KRISTINE FLYNN, LENDA FLOURNOY,
VERNESSIA PARKER and DEBBIE ANN
RAMOS, on behalf of themselves and all
others similarly situated,

       Plaintiffs,

v.
                                  Case No.

JIM DOYLE, Governor of Wisconsin;
MATTHEW FRANK, Secretary, Wisconsin
Department of Corrections (WDOC); JAMES
GREER, Director, WDOC Bureau of Health
Services (BHS); DAVID BURNETT, M.D.,
Medical Director, BHS; KEVIN KALLAS, M.D.,
Mental Health Director, BHS; DONALD
HANDS, Ph.D., Psychology Director, BHS;
BARBARA RIPANI, Dental Director, BHS;
ANA BOATWRIGHT, Warden, Taycheedah
Correctional Institution (TCI); HOLLY MEIER,
R.N., Health Services Unit Manager, TCI;
STEVEN MERESS, M.D., Supervising Physician,
TCI,

       Defendants.

## CLASS ACTION COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

### PRELIMINARY STATEMENT

1.     This is a class action brought by Plaintiffs on behalf of all women confined at

Taycheedah Correctional Institution (TCI) in Fond du Lac, Wisconsin.  The largest women's

prison in Wisconsin, TCI currently houses over 700 prisoners in maximum and medium security

1

settings, including approximately 100 women who are being evaluated for placement within the Wisconsin prison system. Plaintiffs allege that the medical, mental health and dental care provided to prisoners at TCI is grossly deficient, causing them great physical suffering and mental anguish, and constituting cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiffs also allege that Defendants have knowingly and recklessly failed to provide female prisoners at TCI with access to mental health services comparable to the mental health services available to male prisoners through the Wisconsin Resource Center (WRC), in violation of Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.

2.       Plaintiffs seek relief from Defendants' knowing and deliberately indifferent failure to provide necessary care for serious medical, mental health and dental needs. Defendants' actions deny basic human needs, inflict unnecessary pain and suffering, and put Plaintiffs at substantial and ongoing risk of physical injury, illness and premature death.

3.       Plaintiffs bring this action pursuant to 42 U.S.C. § 1983; the Eighth and Fourteenth Amendments to the United States Constitution; Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12132; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Plaintiffs seek declaratory and injunctive relief to remedy the gross deprivation of adequate health care at TCI.

## JURISDICTION

4.       This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(3) because this action seeks to redress the deprivation, under

2

color of state law, of Plaintiffs' civil rights.

5.      This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C.
§§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

6.      This Court has jurisdiction to grant injunctive relief pursuant to Rule 65 of the
Federal Rules of Civil Procedure.

## VENUE

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because
some Defendants reside in this district and because a substantial part of the events and omissions
giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

**I.      Plaintiffs**

8.      All Plaintiffs are women and are currently incarcerated at TCI.  Plaintiffs were
convicted in Wisconsin courts and sentenced under Chapter 973 of the Wisconsin Statutes.

9.      Plaintiffs Flynn, Flournoy and Parker are qualified individuals with disabilities, as
defined in the ADA and the Rehabilitation Act.

10.     Plaintiff **Kristine Flynn** is 48 years old and has been at TCI since 2000.  Flynn
suffers from bipolar mood disorder and social anxiety syndrome.  The Wisconsin Department of
Corrections (WDOC) classifies Flynn as seriously mentally ill (SMI).

11.     During the course of approximately one year at TCI, Flynn was prescribed eight
different psychotropic medications, taking many of them simultaneously, including Valium,
lithium, Seroquel, trazadone, Haldol, Klonopin, Paxil and Depakote.  Flynn had only one blood
draw to test her liver function during this time.

3

12.     In June 2002, TCI psychiatric staff ordered her abruptly taken off all psychotropic medications. Six days later she attempted suicide and was taken to St. Agnes Hospital in Fond du Lac with a broken knee. At St. Agnes, Flynn took someone hostage and assaulted a security guard. She was severely beaten in the incident and suffered a skull fracture. Criminal charges were filed against Flynn, and four years were ultimately added to her sentence. The court-appointed psychiatrist at her trial testified that the interruption in her medications triggered her self-destructive and aggressive behavior. Flynn was not re-medicated for over a month after the St. Agnes incident.

13.     After that incident, Flynn was housed in segregation at TCI for three years, until May 2005. In September 2003, she attempted suicide again. At the time, she was not receiving all her medications because the corrections officers responsible for delivering medications in segregation did not bring them to her.

14.     When Flynn was at her most depressed and suicidal while at TCI, she was not eating or sleeping and was unable to take care of her basic needs. In five years at TCI, Flynn has received no group or individual psychotherapy. In 2005, she requested placement in the Monarch Special Management Unit for prisoners with acute mental health needs, but was turned down. Flynn requested and was denied battered woman counseling. She requested and was denied childhood abuse counseling.

15.     In June 2005, Flynn noticed a small lump in her upper right thigh. Flynn has a history of uterine cancer, a fact that was in her medical file. For the next eight or nine months, Flynn repeatedly filed sick-call requests and told medical staff at TCI that the lump in her thigh was growing and needed to be checked. She got no response to her requests for many months.

4

Eventually, Dr. Steven Meress, the Supervising Physician at TCI, gave her thigh a cursory examination and pronounced the lump "just fatty tissue."

16.     In February 2006, a nurse practitioner at TCI decided to send Flynn out to a specialist to have the lump biopsied or removed.  On March 6, doctors at St. Agnes Hospital in Fond du Lac removed a golf-ball-sized tumor from Flynn's thigh.  The tumor turned out to be benign, but because of its advanced size, doctors were forced to cut into nerves and tendons and to remove a significant amount of muscle tissue in excising it.  If the tumor had been identified and removed sooner, when it was smaller, the procedure would not have been so invasive.

17.     Since the surgery, Flynn has little feeling in her right leg and has difficulty walking.  At night she experiences muscle spasms and shooting pain that keeps her awake. Doctors at St. Agnes have prescribed physical therapy and ongoing pain medication, none of which she has received at TCI.  Medical staff have told Flynn that she will probably have problems with her right leg for the rest of her life.

18.     Flynn has been denied necessary individualized mental health care and inpatient treatment, her medications have been frequently interrupted and improperly managed, and she has not received timely and essential medical referrals and post-surgical care, to the detriment of her physical and mental health.

19.     Plaintiff **Lenda Flournoy** is 54 years old and has been at TCI since 2000.  Before being incarcerated, Flournoy underwent two hip surgeries, ovarian cyst removal, bi-lateral foot surgery and two sinus surgeries.  She suffers from scoliosis, chronic rhinitis and degenerative joint disease.  A Vietnam veteran, Flournoy was receiving complete medical care for all these conditions from the VA Hospital in Milwaukee before entering prison.  Since coming to TCI she

5

has experienced numerous medical and mental health problems stemming from inadequate health care. She suffers from frequent sciatic pain and has difficulty walking, but this disability has never been properly treated or accommodated during her time at TCI.

20.     Flournoy underwent painful reconstructive foot surgery in May 2005 to remove a metal wire left protruding from her right big toe. The surgeon in Madison prescribed Percocet for Flournoy's post-surgical pain, but TCI medical staff gave her no pain medication for eight days after the surgery. The surgeon instructed TCI medical staff to keep Flournoy's foot tightly wrapped and to check regularly for proper toe alignment. Flournoy did not receive the prescribed post-surgical care at TCI, and the bones in her foot healed improperly. In February 2006, she underwent yet another foot surgery to correct the same problem. Once again, TCI medical staff are not providing the after-care prescribed by the doctors in Madison. Flournoy's foot is not taped or checked regularly; she has been given only an air-cast to inflate herself, and has received no medication to manage the persistent pain in her foot. She fears that her bones are healing crookedly again, which will lead to further complications and more surgery.

21.     Because of her foot problems, Flournoy cannot work and needs crutches to walk. She has difficulty performing basic tasks, like showering or cleaning her cell.

22.     Until 2003, Flournoy was taking multiple psychotropic medications for anxiety, depression and schizophrenia. Dr. Julia Reschke at TCI abruptly took Flournoy off all psychotropic medications in 2003. Since then Flournoy rarely sees mental health staff. On one occasion, she filled out a request to see a crisis intervention worker and waited one month to see someone. She has felt driven to harm herself on numerous occasions because that seems to be the only way to actually see a psychiatrist or psychologist.

6

23.     Flournoy's last mammogram was three years ago – only her second breast screening at TCI in over five years, despite her repeated requests for the procedure. Before being incarcerated, her mammograms had revealed some abnormal breast tissue, and she was told to be vigilant about getting her breasts screened every nine to twelve months.

24.     Flournoy has been denied necessary post-surgical, inpatient and chronic care, her medications have been frequently interrupted and improperly managed, she has been forced to wait many months for referrals to see outside physicians, and she has not received essential women's health care services, to the detriment of her physical and mental health.

25.     Plaintiff **Vernessia Parker** is 37 years old and has been incarcerated at TCI since 1994, except for one year when she was transferred and housed out-of-state. Parker suffers from a complex of mental health issues, including bipolar mood disorder with psychotic features and major depression. WDOC classifies Parker as SMI.

26.     Parker has been housed in the Monarch Unit at TCI for almost four years. In 2001, she assaulted a correctional officer and was forced into civil commitment proceedings. Parker was committed to 24 months of intensive mental health treatment and thought she would be sent to the Winnebago Mental Health Institute. Parker never left TCI. Instead she was placed in Monarch, where she has been ever since. In all these years, Parker has had only a handful of one-on-one sessions with psychologists, and then only when she is in crisis. Parker has been severely depressed and suicidal on numerous occasions at TCI. At those times she shuts down, cannot communicate, and is unable to care for herself. In 2004, Parker told Dr. Reschke that she was having suicidal thoughts. Reschke told her to see a crisis intervention worker. Parker

7

requested a visit according to TCI procedures, but she did not see anyone from crisis intervention for over two weeks.

27.     Parker has been placed in segregation for extended periods on several occasions for aggressive behavior exacerbated by her mental health problems.  While in segregation, her medication was disrupted and she did not receive the monthly blood pressure checks that had been ordered for her.

28.     Parker was diagnosed with systemic lupus erythematosus in early 1999 while at TCI.  She was not told of her diagnosis, and soon afterward was transferred to Oklahoma.  She learned that she had lupus only when she returned to TCI in early 2000.  Over the next year she received no treatment for her disease despite numerous medical requests, and her condition worsened; she experienced numbness and fatigue, developed skin lesions, and her hair fell out.  Dr. Meress finally saw Parker in December 2000 and said she should be sent off-site to see a rheumatologist.  The off-site consultation did not happen until the following May.  The rheumatologist at St. Agnes Hospital immediately put her on plaquenil and told her to come back in six months.  Parker was not sent off-site again for about a year.  In the meantime, her medication was disrupted several times, and at one point was discontinued by Dr. Meress.

29.     Parker continues to experience flare-ups of her lupus symptoms and needs closer monitoring by a rheumatologist.  Because of her medical condition, she is unable to work and has difficulty walking and showering.

30.     In November 2005, Parker had her first mammogram at TCI.  Medical staff told Parker that she had two moderate-sized lumps, one in each breast.  Parker was supposed to be sent for an immediate biopsy and an ultrasound.  The off-site referral did not happen for several

8

months, during which time Parker grew stressed and anxious about the possibility of cancer. She was finally sent to St. Agnes Hospital for an ultrasound in March 2006. By that time, however, TCI had lost her original mammogram film, so a new x-ray was taken at the hospital. The new mammogram showed only one very small lump. When Parker returned to TCI, medical staff reported that her x-ray had been mixed up, and the film from her first mammogram, now missing, was not really hers. TCI medical staff could not determine whose mammogram film had actually been lost, or whether that prisoner ever learned she had lumps in her breasts or received follow-up care.

31.     Parker has been denied necessary individualized mental health care and inpatient treatment, her medications have been frequently interrupted and improperly managed, and she has not received adequate follow-up care and timely off-site referrals for her lupus and other medical conditions, to the detriment of her physical and mental health.

32.     Plaintiff **Debbie Ramos** is 43 years old and has been at TCI since 1992. Ramos was diagnosed with endometriosis in 1980. She shared this information on her medical intake form when she entered prison and signed a release so that medical staff could obtain her records. Nonetheless, she did not see a gynecologist at TCI for seven years, until 1999. In the meantime, her vaginal bleeding grew worse every year. When she complained to TCI medical staff, she was told that this was just a consequence of getting older. In April 2000, Ramos was forced to have a hysterectomy. After the procedure, she received essentially no follow-up care and has never seen a gynecologist again. Ramos took estrogen pills for about a year and a half after her surgery, but then stopped. She has never been able to speak with a gynecologist about the benefits of estrogen therapy and its impact on her long-term health.

9

33.     Ramos was diagnosed with asthma in 2002.  She was told she needed albuterol, but she was not given any medication or an inhaler for almost two years.

34.     TCI medical staff have improperly charged Ramos co-payment fees for follow-up medical care related to hemorrhoids and deep muscle bruising.

35.     Until 2003, Ramos was on numerous psychotropic medications, including Klonopin, trazadone and Seroquel.  In July 2003, while in segregation, she was abruptly taken off these medications.  Ramos recalls being told by medical staff: "DOC doesn't want people on these drugs anymore."  Psychiatric staff never returned to see how she was doing after the medications were discontinued.

36.     Ramos has been denied essential gynecological care and mental health care, and her medications have been frequently interrupted or improperly managed, to the detriment of her physical and mental health.

## II.     Defendants

37.     Defendant Jim Doyle is Governor of the State of Wisconsin.  As such, he has the ultimate state authority over the care and treatment of the plaintiff class.  Doyle is obligated under state law to supervise the official conduct of all executive and ministerial officers and to appoint and remove the subordinate defendants named herein.  Doyle has control over the monies allocated to WDOC by virtue of his authority to present to the legislature WDOC's annual budget and to veto or sign legislation appropriating funds for prison medical care.

38.     Defendant Matthew Frank is Secretary of the WDOC.  As such, he is the legal custodian of all prisoners sentenced by the courts of Wisconsin for felony offenses, and is responsible for the safe, secure and humane housing of those prisoners.  Frank is responsible for

Case 2:06-cv-00537-RTR   Filed 05/01/06   Page 10 of 49   Document 1-2

the administration and operation of WDOC, including the provision of medical, dental and mental health care to Wisconsin prisoners.

39.     Defendant James Greer is the Director of the WDOC Bureau of Health Services (BHS).  As such, he is responsible for the administration and provision of medical, dental and mental health care services to individuals in WDOC custody, and for developing and ensuring compliance with policies and procedures related to correctional health services in Wisconsin.

40.      Defendant David Burnett, M.D., is the Medical Director at BHS.  As such, he is responsible for the administration and provision of medical services to individuals in WDOC custody, and for the quality and adequacy of those services.  Burnett supervises and has direct authority over all medical doctors and nurse practitioners who work at TCI.

41.     Defendant Kevin Kallas, M.D., is the Mental Health Director at BHS.  As such, he is responsible for the administration and provision of mental health care services to individuals in WDOC custody, and for the quality and adequacy of those services.  Kallas supervises and has direct authority over all psychiatrists who work at TCI, and provides technical assistance to the TCI warden in supervising the prison's psychological services staff.

42.     Defendant Donald Hands, Ph.D., is the Psychology Director at BHS.  As such, he is responsible for the administration and provision of mental health care services to individuals in WDOC custody, and for the quality and adequacy of those services.  Hands assists in the supervision of all psychologists who work at TCI, and provides technical assistance to the TCI warden in supervising the prison's psychological services staff.

43.     Defendant Barbara Ripani is the Dental Director at BHS.  As such, she is responsible for the administration and provision of dental services to individuals in WDOC

11

custody, and for the quality and adequacy of those services. Ripani supervises and has direct authority over all dentists who work at TCI.

44.     Defendant Ana Boatwright is the Warden at TCI. As such, she is the legal custodian of all prisoners housed at TCI, and is responsible for the safe, secure and humane housing of those prisoners. In addition to the daily administration and functioning of TCI, Defendant Boatwright also oversees the single operational structure of the WDOC female correctional system, reorganized by Secretary Frank in September 2005. Boatwright supervises and has direct authority over the Manager of the TCI Health Services Unit (HSU) and all TCI psychological services staff, including psychologists, crisis intervention workers, social workers and professional counselors.

45.     Defendant Holly Meier, R.N., is the HSU Manager at TCI. As such, she is responsible for the daily administration and functioning of the HSU. Meier supervises and has direct authority over all nursing professionals, dental assistants and dental hygienists who work at TCI.

46.     Defendant Steven Meress, M.D., is the Supervising Physician at TCI and the only medical doctor there. As such, he is responsible for the provision of medical services to individuals incarcerated at TCI, and for the quality and adequacy of those services.

47.     All Defendants are sued in their official capacities. At all relevant times, all Defendants were acting under color of state law; pursuant to their authority as officials, agents, contractors or employees of the State of Wisconsin; and within the scope of their employment as representatives of public entities, as defined in 42 U.S.C. § 12131(1).

## FACTS GIVING RISE TO THE CLAIMS FOR RELIEF

**I.    Wisconsin's Troubled History in Correctional Health Care**

    ***A.    The NCCHC Report***

48.    Medical care in the Wisconsin prison system has been in a state of crisis for years. Numerous reports on correctional health care in Wisconsin since 2000 describe a system plagued by pervasive problems.  In February 2000, a 29-year-old asthmatic prisoner named Michelle Greer collapsed and died gasping for air on the dining room floor at TCI, after her numerous requests for medical attention had gone unheeded.  Galvanized by this unnecessary death, in 2000-2001 the *Milwaukee Journal Sentinel* published a series of articles documenting problems with health services in Wisconsin prisons.

49.    Spurred in part by these articles, the United States Congress authorized the National Institute of Corrections (NIC) to conduct a comprehensive study of WDOC health services.  The National Commission on Correctional Health Care (NCCHC) was contracted to conduct the study and prepare a report for submission to Congress.  The NCCHC audit team made site visits to 14 of the 15 then-existing WDOC adult facilities, including TCI, in the spring of 2002, and a draft report was completed that December ("NCCHC Report").  The NCCHC Report identified numerous problems with correctional health services, including:

- •    the absence of any unified organization and leadership structure for medical or mental health staff, either at the department or prison level

- •    severe understaffing in health services throughout the WDOC system

- •    reliance on untrained corrections officers to distribute virtually all controlled medications

13

- extremely poor mental health services, marked by overuse of psychotropic medications and a lack of coordination between psychiatric and medical staff

- a highly inefficient sick-call process and reluctance to refer prisoners for off-site consultation

- the near total absence of quality improvement activities

- a substantial backlog of requests for routine and emergency dental care

50. On information and belief, defendants Doyle, Frank, Greer, Burnett, Kallas, Hands, Ripani, Boatwright, Meier and Meress were made aware of the NCCHC Report and its findings.

### B. The LAB Audit

51. The NCCHC Report should have come as no surprise to Defendants. In May 2001, over a year before the report was completed, the Wisconsin Legislative Audit Bureau ("LAB") issued an extensive audit of Wisconsin prison health care, also prompted by Greer's untimely death. The 2001 LAB Audit reached many of the same conclusions as the NCCHC Report. For example, the audit report cited the poor organizational and leadership structure of WDOC health services staff, chronic understaffing, and the delivery of controlled medications by corrections officers as particular areas of concern. On information and belief, defendants Doyle, Frank, Greer, Burnett, Kallas, Hands, Ripani, Boatwright, Meier and Meress were made aware of the LAB Audit and its findings.

52. In addition, the 2001 LAB Audit report included WDOC's own self-evaluation of its compliance with NCCHC essential standards for correctional health care, begun in early 2000. BHS concluded that it met only 14 of the NCCHC's 37 essential standards related to the health, safety, and welfare of prisoners. Among other comments, BHS noted that it was questionable whether segregated prisoners had adequate access to health care in Wisconsin prisons.

14

53.     The LAB Audit singled out health services at TCI as particularly deficient in a number of respects, even as compared to other WDOC adult institutions.  The audit summary, for example, noted that there were 132 mentally ill prisoners for every psychological services staff position at TCI; whereas at Jackson Correctional Institution for men in Black River Falls, Wisconsin, the ratio was only 14 mentally ill prisoners per mental health staff position.  The LAB also reported that during a site visit to TCI in October 2000, its auditors found over 100 sick-call request forms dated more than three weeks prior to their visit, while no other WDOC health services unit had a similar backlog of pending requests.

### C.     Other Evidence of Long-Standing Problems at TCI

54.     Even before the 2002 NCCHC Report and the 2001 LAB Audit, the deficiencies identified in the wake of Greer's death had been long-standing problems at TCI and were well known to defendants Doyle, Frank, Greer, Burnett, Kallas, Hands, Ripani, Boatwright, Meier and Meress.  Several months after Greer's death in February 2000, the labor union representing nurses and other health care professionals who work in WDOC facilities called a statewide protest demanding better health care for Wisconsin prisoners.  Union officials declared health care at TCI to be in a "state of crisis."

55.     The WDOC Inmate Complaint Tracking System (ICTS) identifies and tracks prisoner grievances by various subject codes.  An ICTS report compiling prisoner complaint data from 1999 through the first half of 2004 shows that complaints about medical issues constituted approximately 29 percent of all grievances filed by TCI prisoners during this period – by far the largest volume of prisoner complaints filed at TCI on any subject.  By comparison, during the

15

same period, only 14 percent of all complaints filed by prisoners at all WDOC institutions were related to medical care.

56.     Defendants Doyle, Frank, Greer, Burnett, Kallas, Hands, Ripani, Boatwright, Meier and Meress have been aware for many years that shoddy medical care at TCI generates huge numbers of well-founded prisoner complaints. For example, a 2001 consultant's report commissioned by BHS found that among WDOC institutions TCI had the highest rate of health care-related prisoner complaints in 1999 and 2000 that were ultimately affirmed by the grievance process. According to the same report, access to pharmaceuticals was the single largest prisoner concern in health-care-related complaints, and "[t]he medication process at Taycheedah Correctional Institution is the source of the majority of these complaints."

### D.     Defendants' Failure to Act

57.     Despite mounting evidence over many years that the Wisconsin prison health system is understaffed, poorly organized and fails to provide essential medical, mental health and dental care to Wisconsin prisoners, and that TCI in particular is in a critical state, defendants Doyle, Frank, Greer, Burnett, Kallas, Hands, Ripani, Boatwright, Meier and Meress have adopted few of the NCCHC, LAB or other recommendations for addressing these problems. The organizational and reporting structure of WDOC health services staff remains disjointed, and many essential health care positions have not been added. In 2005, the staffing ratios for mental health services staff fell significantly short of national recommendations for prison settings. Specifically, the WDOC psychiatry staff/prisoner ratio was 1:396, compared to the American Psychiatric Association recommendation of 1:150; and the WDOC psychology staff/prisoner ratio

16

was 1:244, compared to the recommendation of 1:150-160, by the American Association of Correctional Psychologists.

58.     In August 2004 the LAB noted, in responding to a legislative request for information about mentally ill prisoners in segregation, that WDOC had not reallocated mental health staff to ensure that prisoners at different institutions receive comparable levels of care, as recommended in the 2001 LAB Audit.  Almost five years after the audit, WDOC is still not in compliance with key NCCHC standards related to mental health care in segregation.

59.     Defendants Doyle, Frank, Greer, Burnett, Kallas, Hands, Ripani, Boatwright, Meier and Meress know that they are exposing prisoners to unreasonable risks of death and serious injury by their failure to correct the deficiencies in the health care system at TCI.

60.     Even though defendants Doyle, Frank, Greer, Burnett, Kallas, Hands, Ripani, Boatwright, Meier and Meress know that TCI lacks a proper system for medical, mental health and dental care, they have failed to take reasonable and effective steps to establish an appropriate system.

61.     Defendants' failure to provide an appropriate system of medical, mental health and dental care at TCI results in needless pain and suffering, the overall deterioration of prisoners' health, and avoidable fatalities.

## II.     The Crisis in Medical Care at TCI

### A.     High Rates of Chronic Disease

62.     Defendants' continued failure to reform correctional health care in Wisconsin has had serious consequences for the women at TCI.  Correctional populations, in general, tend to have high rates of chronic disease, but even among prison populations TCI is exceptional.  TCI

17

consistently has the highest ratio of prisoners in a WDOC institution with at least one chronic illness.  In June 2000, 248 prisoners at TCI, or about 40 percent, had been diagnosed with at least one chronic illness, such as diabetes, hypertension, cardiac disease, seizure disorder or a respiratory condition.  In June 2003, this number had risen to 327 prisoners, or about 49 percent.

### B.    *Dysfunctional Organization of Health Services*

63.     A central criticism of the 2001 LAB Audit and the 2002 NCCHC Report was that WDOC health services staff was poorly organized and poorly led, and lacked coherent and sensible lines of authority.  Little has changed since then.  Since 1998, the WDOC wardens have been responsible for the administration of the health services units in their prisons.  The HSU at TCI is typical: it is headed by Holly Meier, a registered nurse, who reports to Warden Ana Boatwright.  Nursing staff, dental assistants and dental hygienists report to Meier.  Psychological services staff, including crisis intervention workers, report to a supervising psychologist at TCI, who reports to the warden.  In contrast, medical doctors and nurse practitioners, psychiatrists, and dentists report to medical, mental health and dental directors in BHS, who are responsible for WDOC's system-wide provision of health care.

64.     The 2002 NCCHC Report criticized these diverging lines of authority, and the fact that wardens with no medical background were making personnel decisions affecting professional medical and mental health care staff.  The LAB noted in 2001 that because of the organization of health services, WDOC's "management and oversight efforts have not been adequate to monitor basic information about health care delivery, making it difficult to manage resources in an environment of increasing costs."   The NCCHC Report strongly recommended that medical, mental health and dental services at the institution level be reorganized into a unified health

18

services unit headed by a professional health care administrator who reports to BHS, and that all health care staff report along program lines to directors in BHS. An external consultant made the same recommendation in 1995. Like so many others, these recommendations have not been implemented by defendants Doyle, Frank, Greer, Burnett, Kallas, Hands, Ripani, Boatwright, Meier and Meress.

65. As a result of the poor organizational structure of health services at TCI, medical treatment is not appropriately coordinated with mental health evaluation and treatment, leading to poor medication management and the failure to diagnose and treat urgent physical problems.

## C.     *Severe Shortage of Health Care Staff*

66. HSU staffing levels at TCI are wholly inadequate to provide primary health care for over 700 women, while also providing 24-hour on-site medical care. Defendant Meress, the only licensed physician on staff at TCI, works only one partial day each week. Since December 2004, medical staff at TCI also perform medical admissions and evaluations for *all* women prisoners entering the Wisconsin prison system. The extreme shortage of medical personnel results in a lower quality of care and a huge backlog of requests for medical services. The heavy workload forces nurses to handle diagnostic and other tasks that should be performed by doctors. Nurses at TCI are overworked and set up to fail, and the attrition rate is high.

67. In 2002, the NCCHC Report identified severe understaffing as a major problem with correctional health care in Wisconsin. Union officials representing WDOC's nurses and health care professionals have been complaining vocally for years about understaffing and the burdens it places on health care workers. Despite these criticisms, medical staffing levels at TCI have remained virtually unchanged for several years, even as the institutional population and

19

program responsibilities have grown significantly. The FY 2006-07 budget for correctional health care in Wisconsin does not include funding for any additional medical staff at TCI.

68.     On information and belief, the number of medical staff in relation to prisoners with chronic illnesses and serious medical needs is lower at TCI than the same ratio at other WDOC adult institutions. WDOC has no formal guidelines to ensure that prisoners at all institutions receive comparable levels of medical care through equivalent staffing.

69.     As a result of severe understaffing in health care services at TCI, prisoners receive substantially delayed evaluation and treatment for serious medical conditions, or are denied important follow-up care. Necessary examinations and tests are frequently delayed and follow-up on abnormal test results is unreliable.

### D.     Delivery of Controlled Medications by Corrections Staff

70.     Against the recommendations in the 2002 NCCHC Report, the 2001 LAB Audit, and other industry standards, the medication process at TCI continues to rely on corrections staff rather than professional health staff to deliver controlled medications. As the LAB noted again in an August 2004 report, this practice is problematic for several reasons: (1) corrections staff have minimal medical training and are less able to identify dangerous side effects; (2) records of medication delivery are invariably less complete and accurate when maintained by corrections staff; and (3) under the terms of their collective bargaining agreement, corrections staff may not be disciplined for unintentional errors when delivering medications.

71.     And there are many errors. A medication error report log prepared by WDOC's central pharmacy services in February 2005 shows over fifty medication errors by pharmacy, nursing and corrections staff in administering controlled medications to prisoners at TCI in the

year 2004 alone – and these are only the errors that made it into the log. A 2001 medication incident study commissioned by BHS notes that corrections staff – who deliver most of the controlled medications at TCI – are far less likely to identify and report medication errors than nursing staff.

72. Although training for corrections staff has improved since 2004, medication errors and interruptions are still disturbingly common. Prisoners must rely on corrections officers to request a refill when their prescriptions run out – and many times the guards neglect to file the request, causing a delay and forcing the prisoner to file a separate request with HSU. Women in segregation are even more dependent on corrections staff  because they must wait for their medications to be brought to their cells. On information and belief, corrections officers often fail to deliver medications on schedule.

73. WDOC figures indicate that the number of prisoners in Wisconsin prisons has grown more than twice as fast as the number of corrections officers in the last three fiscal years. During this time the ratio of prisoners to officers rose by 23 percent, and the amount of overtime paid to officers rose by 78 percent. Corrections officers working double shifts and supervising greater and greater numbers of prisoners are increasingly likely to make mistakes in medication distribution or to shirk such responsibilities, which fall outside the scope of their profession.

74. Unlike corrections officers in Minnesota, Michigan, Iowa and Illinois, officers in Wisconsin are not required to have a high school diploma or the equivalent. Starting wages for corrections officers in Wisconsin are among the lowest in these states, and are typically lower than wages at county jails in Wisconsin. With low hiring standards, low pay and increasing demands for overtime, turnover in corrections staff remains high throughout WDOC.

21

75.     As a result of Defendants' reliance on corrections staff to deliver controlled medications, prisoners at TCI endure frequent medication errors and interruptions and are inadequately protected in the event of dangerous side effects.  The common disruption of prescription medications poses an unnecessary and unreasonable risk to prisoners' health.

### E.     Extremely High Co-payment Fees

76.     Since 2002, prisoners at TCI pay a $7.50 co-payment fee for each non-emergency request for medical or dental services.  When instituted in 1995, the co-payment fee was $2.50. The 2001 LAB Audit suggested that the fee could be raised to $3.00, to bring it into line with co-payment fees in several comparison states, but noted that increasing the fee even that modest amount "could reduce access to health care for some inmates."  The LAB also noted that the NCCHC generally opposes co-payment systems that restrict prisoners' access to care. Notwithstanding this advice, the co-payment amount was tripled in 2002, from $2.50 to $7.50.

77.     The $7.50 fee that Wisconsin prisoners pay for inmate-initiated medical visits is among the highest co-payment fees in the nation and far outstrips comparison states.  For example: Illinois charges $2.00; Michigan charges $5.00; Minnesota charges $3.00.   Most prisoners are indigent and have minimal or no earnings.  Although there is an indigency exception to the co-payment rule, the high cost nonetheless actively discourages prisoners at TCI from seeking medical care when they need it – particularly as they are likely to be assessed a co-payment fee for virtually any interaction with HSU, including follow-up care that should not trigger a fee.

78.     As a result of the inordinately high co-payment fee at TCI, prisoners are denied reasonable access to routine and follow-up health care.

### F.     Deficient Sick-Call Process and Medical Follow-up

79.     Seriously ill prisoners who are undeterred by the co-payment fees and seek medical attention are still often denied access to care.  Short of a life-threatening emergency, prisoners access medical care by submitting a "blue-slip" to HSU that describes their medical problem.  Nurses triage the slips and refer prisoners to see a nurse, a nurse practitioner or a medical doctor, depending on the issue.  Even prisoners with complex medical issues are often not seen by a clinician qualified to evaluate them for many months.  If they do manage to see a qualified clinician, there is no proper medical follow-up to ensure that they received appropriate treatment.

80.     The case of Tammy Young exemplifies the potentially serious consequences of this kind of delay in treatment and inadequate follow-up.  Young was incarcerated at TCI from April 2001 to October 2005.  In November 2003, Young developed several painful sores on her head that began to bleed and leak pus.  Young repeatedly sought medical attention for her head over a period of eighteen months, as the sores grew progressively worse.  Her scalp became so tender that lying down was painful, and she would wake most mornings with her hair encrusted with blood and pus.  Young was seen by several nurses at TCI, each of whom offered a different explanation for her condition  –  including dry scalp, keloids, seborrhea, and some kind of infection –  though no culture was done.  The nurses gave Young various shampoos and oils, which did nothing to improve her scalp and sometimes made things worse.

81.     Young made numerous requests to see a doctor over a period of many months.  HSU scheduled and then cancelled an appointment with Dr. Meress in February 2004; it was not rescheduled for six months.  When Young finally saw Dr. Meress in August 2004, he gave her a 30-day course of antibiotics but *still* did not culture her open sores.  Her head did not improve and

continued to bleed and leak pus. HSU scheduled no follow-up and she did not see the doctor again for six months. In the meantime, she was continually in pain and became convinced that she was dying. Several officers in her building saw her bleeding scalp and called HSU on her behalf. They were told that she had already been seen by Dr. Meress.

82. On March 9, 2005, Young became lightheaded from pain on her scalp and passed out in a classroom at TCI. She saw Dr. Meress two weeks later, but he ejected her from his office. In August 2005, Young still had pus-filled sores on her head and was receiving no treatment.

83. As far as she knows, in almost two years of seeking medical attention, Young was never specifically tested or treated for MRSA – methicillin-resistant staphylococcus aureus. MRSA is a highly contagious bacteria known to spread rapidly in institutional settings. MRSA causes skin infections and boils and can lead to serious complications such as deep abscesses, pneumonia, endocarditis (infection of the heart), meningitis, bone infection, blood infection and death. Based on her symptoms, the need to test Young and obtain an accurate diagnosis, either confirming or ruling out MRSA, was obvious. Failure to do so left her at grave risk and highly contagious for almost two years.

84. In September 2005, just before she was transferred out of TCI, Young was finally tested and told she had MRSA. She was given three consecutive 7-day courses of the same antibiotic drug, though each week her symptoms did not improve. MRSA is resistant to some types of antibiotics. HSU staff did not reculture Young and never successfully treated her infection before she left TCI.

85. The incidence of MRSA infection at TCI has soared in the past several years, and scores of women are currently infected.

24

### G. Excessive Delay in Referring Prisoners for Outside Medical Consultation

86.     In her efforts to obtain medical treatment for her scalp, Tammy Young also repeatedly asked Dr. Meress and other health care staff to be sent for an off-site medical consultation, even writing several times to HSU Manager Holly Meier with that request. Meress and Meier did not give Young the referral.

87.     TCI health care staff rarely refer prisoners for off-site medical consultation, even when their medical conditions are serious and life-threatening. Defendants' failure to properly diagnose and treat critically ill prisoners through prompt referral to outside specialists has resulted in pain, suffering and increased medical complications for many TCI prisoners, and premature death for some.

88.     Sandra Pankow is 56 years old and has been incarcerated at TCI for almost 20 years. Pankow suffers from severe heart problems, hypertension and spondylitis, a chronic form of inflammatory arthritis. Both her parents have heart problems, and her father underwent a quadruple bypass. For 12 years at TCI, Pankow took medication for hypertension, but her blood pressure reading remained around 180/100 – at stroke risk level. She often experienced numbness in her hands and feet and shortness of breath. Medical staff at TCI knew of Pankow's family history and her symptoms, but they never sent her to a cardiologist. A walking time bomb, Pankow suffered a heart attack in November 2001 and almost died. She received cardiac stents in a community hospital, and was returned to TCI.

89.     By January 2004, Pankow began experiencing the same symptoms as before and informed HSU staff. Over the course of several months, Pankow had several "mini-strokes" and was sent to the emergency room at St. Agnes Hospital multiple times. Each time, the nurses on

duty at TCI would not permit the doctors at St. Agnes to admit Pankow for treatment; so the doctors would stabilize her and send her back to TCI. Finally, on May 7, Pankow suffered another stroke-like episode and the St. Agnes doctors refused to send her back. They performed an angioplasty and replaced her stents.

90.     Pankow remains vulnerable to mini-strokes, or transient ischemic attacks (TIAs), when her blood pressure gets too high. She has experienced so many TIAs while at TCI – the last one in January 2006 – that the terrifying occurrence has become almost routine. She suffers a piercing pain in her brain stem and is immobilized during the attacks, able to communicate only by blinking her eyes. The officers in her building simply give Pankow her emergency medication and watch her. No one bothers to call HSU unless the attack lasts more than 45 minutes. Doctors generally consider TIAs critical harbingers of a more debilitating stroke and urge prompt medical evaluation by a specialist after such an attack. At TCI, a TIA does not even merit a trip to the HSU.

### H.     Lack of Infirmary Care or Long-Term Inpatient Capacity

91.     The HSU facilities at TCI consist of five examination rooms, a physical therapy room, a treatment room, an on-site X-ray room, and a three-chair dental suite. There is no infirmary at TCI. Women who need hospitalization or long-term inpatient care may be sent to the hospital at Dodge Correctional Institution (DCI) in Waupun, a men's prison. However, there are many women at TCI whose care cannot be safely managed in an outpatient setting, but who do not need to be hospitalized. These women need infirmary care, *i.e.*, daily monitoring, medication, therapy and/or physical assistance by skilled health care professionals – something that is simply not available at TCI.

26

92.     Denise Kirmsse is an example of a prisoner who has suffered because of the lack of infirmary care at TCI.  Kirmsse is 49 years old and came to TCI in January 1998.  She began having severe breathing problems and chest pain in December 2001.  She informed HSU, but her complaints were ignored for many months.  Finally, in May 2002, after a trip to the emergency room in Fond du Lac, Kirmsse was sent to the University of Wisconsin Hospital in Madison, where she was diagnosed with restrictive lung disease and chronic obstructive pulmonary disease. Doctors in Madison immediately put her on oxygen 24-hours a day.

93.     From May 2002 to May 2004, Kirmsse was housed at the infirmary at DCI, where she received round-the-clock medical attention and assistance with her oxygen tank.  At DCI, she tried several new medications that improved her lung capacity and relieved much of her discomfort.  In May 2004, Kirmsse was returned to population at TCI, although her diagnosis and underlying condition remained essentially unchanged.  At TCI, she does not have a roommate, nobody checks on her, and she cannot easily summon medical staff.  Kirmsse, who is overweight and mobility-impaired, struggles each day with a heavy portable oxygen tank.  Dr. Meress, who is not a pulmonary specialist, has encouraged Kirmsse to turn off her oxygen as much as possible, although that makes her breathing more labored.  Dr. Meress and Dr. Reschke discontinued the medication that had been helping Kirmsse at DCI, and took her off the drugs she had been taking to manage her bipolar disorder.

94.     By early 2005, Kirmsse's condition had worsened and she began feeling pain and constriction in her chest and lungs similar to her condition before her diagnosis. She became depressed and suicidal.  Kirmsse has complained to defendants Boatwright, Meier and Meress about the medical care she is receiving at TCI, but the care has not improved and Kirmsse has not

27

been returned to DCI. On information and belief, it is cheaper to house Kirmsse at TCI than at the DCI infirmary. Warden Boatwright told Kirmsse: "HSU can only do for you what they can afford."

95.    Because of the cost and difficulty associated with housing women at the DCI hospital, many seriously ill women like Kirmsse are kept at TCI, where they do not receive essential infirmary care.

### I.    Inadequate Dental Care and Women's Health Care

96.    Women at TCI do not have access to adequate gynecological care or specialized women's health care services, such as pap smears, mammograms, and appropriate prenatal, obstetrical and postpartum care.

97.    Pregnant women at TCI who are about to give birth are taken to St. Agnes Hospital in Fond du Lac to deliver. WDOC security policy has always required the women to remain shackled for most of their labor, and to be re-shackled immediately after childbirth.

98.    Prisoners at TCI do not have access to adequate or timely dental care. Only one part-time dentist serves the entire TCI population. Prisoners with painful dental problems sometimes remain on the "urgent wait list" for weeks before they are seen by a dentist. Women in segregation have almost no access to dental care. For example, prisoner Janice Funk waited over a year to see a dentist while in segregation, although she complained of pain. On information and belief, defendants Frank, Greer, Ripani and Meier have been made aware of the backlog in requests for routine and urgent dental care by TCI prisoners, and of the shortage of qualified dental staff at TCI.

28

*J.*      *Increased Demands on Health Care Staff Due to Admissions Process*

99.      In the past 15 months the crisis in medical and mental health care at TCI has deepened due to unprecedented overcrowding at the facility.  In December 2004, defendant Frank moved the admission and evaluation process for all women entering the prison system from DCI to TCI.  Since then the number of women undergoing admission and evaluation at TCI has crept steadily upward, and is now regularly in the range of 80 to 120 prisoners at any given time.  Because of these additional prisoners, TCI's total incarcerated population is now well over its operating capacity.

100.      On top of the swollen prisoner population, the admission process itself places additional demands on medical staff.  New prisoners are supposed to receive a health assessment within 14 days of admission to the prison system.  Prisoners have to be screened for communicable diseases and evaluated for chronic conditions, mental health problems, disabilities and other medical issues that could affect their placement within the WDOC system.  On information and belief, no new medical or mental health staff positions were added at TCI to address the increased burden on health services created by the prison's new admission and evaluation function.

III.      **The Crisis in Mental Health Care at TCI**

*A.*      *High Incidence of Mental Illness*

101.      TCI has the highest ratio of mentally ill prisoners of all the WDOC adult institutions.  Chronic mental illness is defined in § 51.01(3g) of the Wisconsin Statutes as "a mental illness which is severe in degree and persistent in duration, which causes a substantially diminished level of functioning in the primary aspects of daily living and an inability to cope with

29

the ordinary demands of life, which may lead to an inability to maintain stable adjustment and independent functioning without long-term treatment and support and which may be of lifelong duration." WDOC considers prisoners with particular diagnoses (*e.g.*, bipolar mood disorder, major depression) or who meet certain functional criteria (*e.g.*, recurrent suicide attempts, severe impairment of functioning) as seriously mentally ill (SMI). At the end of FY 2005, fully 27 percent of TCI prisoners were classified as SMI. In contrast, only about 8 percent of all WDOC prisoners are classified as SMI.

102. "Clinical monitoring status" is a designation within WDOC for prisoners with mental health needs who must be followed by a psychiatrist or psychologist. According to Defendants' own figures, 459 prisoners at TCI, or about 68 percent, were on clinical monitoring status in June 2004, and the rate of prisoners on psychotropic medications at the time of their arrival at TCI was 55 percent. In contrast, only about 24 percent of all WDOC prisoners are on clinical monitoring status.

103. For years, defendants Doyle, Frank, Greer, Burnett, Kallas, Hands, Boatwright, Meier and Meress have been well aware of the enormous demands on the mental health care system at TCI but have repeatedly failed to allocate sufficient staff and resources to address the needs of prisoners there. As a result, TCI prisoners have been denied even minimally adequate mental health care.

### B. Inadequate and Poorly Qualified Mental Health Care Staff

104. Mental health care staff levels at TCI fall short of levels recommended by the American Psychiatric Association and the American Association of Correctional Psychologists. On information and belief, the number of psychiatrists and psychological services staff at TCI in

Case 2:06-cv-00537-RTR   Filed 05/01/06   Page 30 of 49   Document 1-2

relation to prisoners classified as SMI, or prisoners on clinical monitoring status, is significantly lower than the same ratios at other WDOC adult institutions. Despite these numbers, the FY 2006-07 budget for correctional health care in Wisconsin does not include funding for additional mental health staff at TCI. WDOC has no formal guidelines to ensure that prisoners at all institutions receive comparable levels of mental health care through equivalent staffing.

105. The 2001 LAB Audit noted the imbalance in mental health staffing among WDOC facilities and recommended the reallocation of mental health resources. This staffing disparity was noted again by the LAB in a 2004 follow-up report. In addition, WDOC's Segregation Workgroup, appointed by defendant Frank and chaired by defendant Kallas, acknowledged the mental health care staffing shortage at a number of Wisconsin prisons, including TCI, in its January 2005 report ("Segregation Workgroup Report"). Nonetheless, defendant Doyle's budget recommendations for health care expenditures in FY 2006-07 included 16 new psychologist staff positions in nine WDOC institutions – but not a single new position at TCI.

106. NCCHC standards require chart review by a qualified health care professional immediately upon a prisoner's placement in segregation, and regular (thrice-weekly) rounds by medical and mental health care staff for *all* segregated prisoners. An external consultant hired by WDOC recommended a 24-hour clinical response time after placement in segregation. Disability Rights Wisconsin, the state's independent protection and advocacy group for people with disabilities, has also pushed for a 24-hour response protocol. Nonetheless, WDOC policy continues to require that psychology staff respond within two business days after placement, which can stretch to five days over the weekend. The Segregation Workgroup Report makes clear

31

that insufficient staffing is the primary reason that appropriate standards for clinical response and segregation rounds have not been implemented.

107.    The Segregation Workgroup Report also concludes that current psychological services staff are in many cases wholly unqualified to identify and treat prisoners with mental illness.  Like many WDOC institutions, TCI relies heavily on "crisis intervention workers" to satisfy prisoners' urgent mental health care needs.  Crisis intervention workers engage in difficult and high-risk clinical work, often rotating on-call responsibilities with psychologists; yet WDOC does not require them to have any specific level of education, training or actual clinical experience.

108.    In late 2005, Dr. Reschke, the Chief Psychiatrist at TCI and the medical doctor primarily responsible for monitoring prisoners on psychotropic medications, left TCI or was fired.  Since then, the hundreds of women at TCI on psychotropic drugs, or in need of them, have been without a single full-time psychiatrist.  Plaintiff Vernessia Parker has seen three different temporary or part-time psychiatrists in the last four or five months, each of whom has altered her diagnosis and modified her prescriptions after spending less than ten minutes with her, and without inquiring about other medications she may be taking for her lupus or other conditions.  Parker's current combination of  prescription drugs gives her headaches and makes her sleep all day.

109.    The severe shortage of qualified mental health care staff at TCI and the lack of staffing continuity mean that prisoners on psychotropic medications are not adequately monitored, and many prisoners with moderate to severe mental health needs are rarely seen by qualified and properly informed staff.

## C.        Overprescription of Psychotropic Medications

110.    A salient feature of mental health care at TCI for many years has been the overprescription of psychotropic medications.  The 2002 NCCHC Report noted that virtually all the TCI staff interviewed voiced concerns about the excessive use of psychotropic medications at the facility.  Although the use of such medications at Wisconsin prisons has declined since 2003 due to a WDOC cost-saving initiative, on information and belief many women at TCI still take too many psychotropic drugs, or have been unnecessarily and abruptly taken off medications that were helping them.

111.    On information and belief, TCI still has not implemented a process of case management and utilization review to monitor the appropriateness of the level of medication and mental health services being offered to specific prisoners, as recommended by the 2002 NCCHC Report.

## D.        Failures of the Monarch Special Management Unit

112.    The Monarch Unit opened at TCI in January 2002.  Monarch is a 64-bed unit ostensibly intended to serve the needs of prisoners with mental health issues or other special needs who require more attention from health care and correctional staff than can be provided in general population.  In actuality, the women housed in Monarch get no greater attention from medical and mental health care staff despite their greater needs.  Monarch is the farthest building from the HSU at TCI, and there are no 24-hour medical or psychological services staff assigned to the unit. Although billed as a mental health unit, Monarch has become another punishment and segregation unit for prisoners who present management or disciplinary problems.

33

113.    There are four levels of decreasing privileges at Monarch, denoted by different colors.  Women on Level 1 (no color) are essentially in continuous lockdown, with no out-of-cell privileges – *i.e.*, no recreation, no library, no canteen, no television, no vocational or other classes, no group therapy.  Level 1 prisoners are usually those with the most severe mental health issues, and prisoners on suicide watch.  Monarch prisoners on Levels 2 (red), 3 (yellow), and 4 (green) have limited out-of-cell time (between 2 and 5 hours per day) and access to more groups and other privileges, but cannot work or take classes in general population.  The extreme isolation and idleness imposed on women in Monarch, especially those in the lower levels, intensifies their pre-existing mental health problems and causes many Monarch residents to act disruptively, leading to greater loss of privileges or placement in actual disciplinary segregation.

114.    Although placement in Monarch is supposed to be a medical decision, in many cases the security director at TCI assigns prisoners to Monarch for non-medical reasons.  Conversely, many women in the Segregation Unit suffer from untreated chronic mental health problems.

115.    On information and belief, defendants Doyle, Frank, Greer, Burnett, Kallas, Hands, Boatwright, Meier and Meress are well aware of the connection between segregated settings, such as the Monarch and Segregation Units at TCI, and the increasing cycle of mental illness in prison.  The 2005 Segregation Workgroup Report noted, for example, that "inmates with psychological vulnerabilities can deteriorate if placed in settings that have significant social isolation and inactivity."

34

### E.    Lack of Inpatient Capacity to Treat Mental Illness

116.    TCI has no long-term inpatient capacity for women with severe mental illness who need round-the-clock care and supervision.  Unlike severely mentally ill male prisoners in the Wisconsin system, who may be assigned to the Wisconsin Resource Center for long-term inpatient care, female prisoners who need equivalent treatment must undergo involuntary commitment procedures under § 51.20 of the Wisconsin Statutes, so they can be admitted to the Winnebago Mental Health Institute.  On information and belief, because of the additional work entailed in obtaining a court-ordered involuntary commitment, WDOC officials often decline to pursue this avenue for many women who need hospitalization for mental health issues.  Instead, such women are assigned to the Monarch Unit, which provides inadequate individualized care and medical attention, or they languish in segregation.

117.    Angela Enoch was 18 years old when she killed herself in the Monarch Unit in June 2005.  Enoch had been in a segregation cell at Monarch, under observation, for five days before she died.  She was suicidal and had been pleading for psychiatric help.  A crisis intervention worker visited Enoch, but no one else came to see her during that time.  On a Sunday afternoon, Enoch used the ripped seams from her pillow to strangle herself.  A corrections officer observed her choking, but corrections staff unaccountably waited until there were five officers on the scene before entering Enoch's cell.  By that time, her face was blue; when medical staff arrived shortly after that, they were unable to revive her.

118.    Enoch's suicide – while "in observation" in a special management unit supposedly devoted to prisoners with serious psychiatric and emotional needs – illustrates the grievous inadequacy of mental health care in the Monarch Unit and at TCI.

35

119.     According to a recent WDOC report on suicide prevention in Wisconsin prisons, the suicide rate in segregation units is 10 times the rate in general population units, and the average yearly  suicide rate since 2001 is about twice the national average.

### F.     Gender-Based Disparities in the Provision of Mental Health Care

120.     Since 1990, the number of women in Wisconsin prisons has more than tripled. Even at TCI, the state's only maximum or medium security prison for women, the great majority of female prisoners there are nonviolent offenders.  Most have a history of childhood physical or sexual abuse, or repeated domestic battering.  More than 70 percent have problems with drug or alcohol abuse or dependence.  WDOC's own classification system identifies over 200 women at TCI as seriously mentally ill.  This is a population with unique, pervasive and well-documented mental health problems, and, if anything, a *greater* need for specialized mental health treatment as compared to similar numbers of male prisoners.

121.     Nonetheless, it is an acknowledged fact at WDOC that severely mentally ill women in Wisconsin prisons receive *poorer* mental health care than their male counterparts.  WDOC's February 2006 Status Report on adult correctional health care, produced at the request of the Joint Committee on Finance, concedes that although a much greater percentage of the female prison population has mental health needs, women prisoners do not have access to inpatient mental health care that is "comparable" or even "similar" in quality to the care available to incarcerated men at the Wisconsin Resource Center (WRC).

122.     WRC is a specialized mental health facility administered jointly by the state's Department of Health and Family Services (DHFS) and WDOC.  The facility provides individualized treatment for approximately 350 male prisoners with serious mental health or

36

behavioral problems, and for up to 60 men detained or committed as sexually violent predators pursuant to Chapter 980 of the Wisconsin Statutes. Although a secure facility, WRC is staffed primarily by *treatment personnel* – not correctional officers but patient care technicians, DHFS employees who are hired to provide patient care and trained in dealing with severely mentally ill persons.

123. As noted above, there is no equivalent treatment option for female prisoners who need attentive, individualized long-term mental health or behavioral treatment. In theory, severely mentally ill women at TCI may access inpatient care at the state mental health treatment facility in Winnebago. As a practical matter, WDOC rarely seeks to place women at the Winnebago facility because the judicial commitment process is cumbersome, time-consuming and costly: Wis. Stat. § 51.20 requires the filing of a petition for examination; a probable-cause hearing conforming to due process requirements; a psychiatric examination by two court-appointed physicians; a final hearing or jury trial; and then periodic reevaluation by treatment staff, with written findings to be filed in court. In contrast, prison officials may simply transfer male prisoners who need inpatient mental health care to WRC.

124. In addition, civil commitment entails a second and independent loss of civil liberties that theoretically may extend beyond a prisoner's release date. TCI prisoners desperate for better mental health treatment often willingly undergo civil commitment procedures. Some women may even be driven to self-destructive behaviors because of the perceived need to satisfy judicial commitment standards and to convince reluctant prison officials to undertake the commitment process. Male prisoners in Wisconsin are not required to risk sacrificing future civil liberties or exhibit dangerous behavior in order to receive essential mental health treatment.

37

125.    Most TCI prisoners with acute mental health needs remain at TCI.  These women have far less access to treatment staff on a daily basis than do the men at WRC.  Typically, TCI prisoners may see a psychiatrist for a brief medication check every two to three months, and see psychological services staff on only an emergency basis.  Even women in Monarch rarely see psychiatric staff more often than every four to six weeks, and often must wait weeks to see crisis intervention or psychology staff.  In contrast, men at WRC, including men in the acute psychiatric and high management security units, have daily contact with psychological services staff and have access to psychiatric care on an as-needed basis.  Round-the-clock attention by health care professionals who specialize in psychiatric care is available throughout WRC.  At TCI, suicidal prisoners like Angela Enoch remain isolated, observed only by corrections officers.

126.    WRC's treatment programs are individualized and inter-disciplinary, emphasizing engagement with staff and continued involvement in a variety of productive activities.  At every stage of the treatment process, men at WRC are encouraged to participate in scheduled events, therapeutic services groups, academic and self-improvement classes, and work assignments.  For severely mentally ill persons, the critical importance of this type of structured therapeutic environment is widely accepted in the field of mental health care.  At TCI, and particularly in the Monarch Unit, severely mentally ill women have little access to therapeutic programming, socialization, or out-of-cell activity of any nature.

127.    At WRC, the ultimate goal of each individualized treatment plan is to return the prisoner to general population.  The average stay at WRC is nine months.  At Monarch, there is no organized clinical effort to treat seriously mentally ill women and return them to population.  Plaintiff Vernessia Parker has been at Monarch for almost four years and there is no clear path to

38

leave the special management unit.  Indeed, the descending privilege system at Monarch seems almost calculated to entrap the most seriously disturbed women in the most restrictive and isolating levels, where they have the *least* access to therapeutic activities.

128.    Defendants' failure to provide adequate or gender-equivalent treatment for female prisoners with extremely serious mental health needs adversely affects the mental health treatment afforded to *all* women at TCI.  Because severely mentally ill women cannot be easily transferred to an appropriate inpatient setting and must be maintained in the prison environment, these women require disproportionate amounts of time and attention from treatment staff.  With psychological services staff already stretched thin at TCI, the continued presence of severely mentally ill women in need of specialized inpatient care among the population at TCI exacerbates the staff shortage.  As a consequence, female prisoners with significant but perhaps not severe mental health needs – in other words, most of the women at TCI – have insufficient access to psychiatric and psychological services staff.  On information and belief, based on their more pervasive mental health needs and the heightened demands on the TCI mental health system, women at TCI have access to fewer treatment staff and less mental health programming than men in WDOC custody.

129.    The disparity in treatment for seriously mentally ill women versus men in WDOC adult institutions mirrors a similar disparity at the juvenile correctional level in Wisconsin.  Delinquent boys with serious mental health or behavioral problems can receive specialized treatment and inpatient care at the Mendota Juvenile Treatment Center (MJTC), administered by DHFS.  There is no similar treatment option for delinquent girls with serious mental health or

39

behavioral problems, who are consigned to the mental health unit at the Southern Oaks Girls School (SOGS), operated by juvenile corrections, not DHFS.

130.     Defendants Doyle, Frank, Burnett, Kallas, Hands and Boatwright have been aware for a number of years of gender-based disparities in the quality and availability of mental health care for persons in WDOC custody.  In particular, Disability Rights Wisconsin has raised the issue of gender inequity in WDOC's provision of mental health care in correspondence and meetings with these Defendants over the past several years.  Despite their long-standing knowledge that TCI prisoners do not have access to substantially equivalent mental health care as compared to male prisoners, and of the adverse effect on the health and welfare of women at TCI, defendants Doyle, Frank, Burnett, Kallas, Hands and Boatwright have repeatedly and recklessly failed to take reasonable steps to remedy this inequality.

## IV.     **Exhaustion of Administrative Remedies**

131.     Plaintiffs have exhausted such administrative remedies as are available to them.

## CLASS ACTION ALLEGATIONS

### A.     *Constitutional Claims on Behalf of All TCI Prisoners*

132.     Plaintiffs Flynn, Flournoy, Parker and Ramos bring claims based on the Eighth and Fourteenth Amendments to the United States Constitution on behalf of themselves and all others similarly situated, pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

133.     Plaintiffs seek to represent a class consisting of all prisoners who are now or in the future will be confined at TCI (henceforth, "TCI Class").  As a result of their confinement at TCI, members of the TCI Class including Plaintiffs have been, are, and will be subjected to violations of their constitutional and statutory rights, as described in this Complaint.  Plaintiffs represent a

Case 2:06-cv-00537-RTR   Filed 05/01/06   Page 40 of 49   Document 1-2

class of persons seeking declaratory and injunctive relief to eliminate Defendants' actions, policies and practices that deprive them of those rights.

134.     There are currently over 700 women confined at TCI.  The proposed TCI Class is so numerous, and membership in the class so fluid, that joinder of all members is impracticable.

135.     All TCI Class members are equally subject to the conditions described in this Complaint, and common questions of law and fact exist as to all TCI Class members.  These common questions include, but are not limited to: whether Defendants provide systemically inadequate medical, mental health and dental care to class members; whether Defendants have been deliberately indifferent to the serious medical, mental health and dental needs of class members; whether Defendants have placed class members at unreasonable risk of developing serious medical, mental health and dental problems; whether Defendants have violated class members' rights to be free of cruel and unusual punishment under the Eighth and Fourteenth Amendments; whether Defendants provide mental health care to TCI prisoners that is comparable or substantially equivalent to that provided to WDOC's male prisoners; whether disparities in the provision of mental health care by Defendants arise from an explicit gender-based assignment policy; whether disparities in the provision of mental health care by Defendants are substantially related to the achievement of an important governmental objective; and whether Defendants have violated class members' right to equal protection of the laws under the Fourteenth Amendment.

136.     Plaintiffs' claims are typical of the claims of the TCI Class.  Plaintiffs are prisoners with a range of serious health care needs typical of the TCI Class as a whole.  Plaintiffs and the class they represent have been directly injured by Defendants' unconstitutional and unlawful policies and practices with respect to health care.

41

137. Plaintiffs will fairly and adequately represent the interests of the TCI Class. Plaintiffs have no interests separate from those of the TCI Class, and seek no relief other than the relief sought on behalf of the class. Plaintiffs' counsel are experienced in the protection and enforcement of the constitutional and statutory rights of prisoners.

138. Defendants have acted and refused to act on grounds generally applicable to the TCI Class, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.

**B. ADA/Rehabilitation Act Claims on Behalf of Subclass**

139. Plaintiffs Flynn, Flournoy and Parker (henceforth, "Subclass Plaintiffs") bring ADA and Rehabilitation Act claims on behalf of themselves and all others similarly situated, pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

140. Subclass Plaintiffs seek to represent a class consisting of all individuals with disabilities who are now or in the future will be confined at TCI (henceforth, "ADA Subclass"). As a result of their confinement at TCI, members of the ADA Subclass including Subclass Plaintiffs have been, are, and will be subjected to violations of their constitutional and statutory rights, as described in this Complaint. Plaintiffs represent a class of persons seeking declaratory and injunctive relief to eliminate Defendants' actions, policies and practices that deprive them of those rights.

141. All women incarcerated at TCI meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendants. On information and belief, approximately 30% of the women at TCI suffer from severe mental illnesses or physical impairments that substantially limit one or more major life activity. The

42

proposed ADA Subclass is so numerous, and membership in the subclass so fluid, that joinder of all members is impracticable.

142. All subclass members are equally subject to the conditions described in this Complaint, and common questions of law and fact exist as to all subclass members. These common questions include, but are not limited to: whether Defendants have discriminated against subclass members on the basis of disability; whether Defendants have denied or excluded subclass members from the benefits of services, programs or activities on the basis of disability; whether Defendants have failed to make reasonable modifications to policies, practices and procedures to avoid discriminating against subclass members on the basis of disability; and whether Defendants have violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the ADA, 42 U.S.C. § 12132.

143. Subclass Plaintiffs' claims are typical of the claims of the ADA Subclass. Subclass Plaintiffs are prisoners suffering from serious mental illnesses and/or physical impairments typical of the subclass as a whole. Subclass Plaintiffs and the class they represent have been directly injured by Defendants' unconstitutional and unlawful policies and practices with respect to health care.

144. Subclass Plaintiffs will fairly and adequately represent the interests of the ADA Subclass. Subclass Plaintiffs have no interests separate from those of the subclass, and seek no relief other than the relief sought on behalf of the subclass. Subclass Plaintiffs' counsel are experienced in the protection and enforcement of the constitutional and statutory rights of prisoners.

145.     Defendants have acted and refused to act on grounds generally applicable to the ADA Subclass, thereby making appropriate final injunctive and declaratory relief with respect to the subclass as a whole.

## FIRST CLAIM FOR RELIEF

### (Eighth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983)

146.     Defendants' deliberate indifference to Plaintiffs' serious medical, mental health and dental needs causes avoidable pain, mental suffering, and deterioration of Plaintiffs' health. In some cases, it has resulted in premature death.

147.     Defendants' policies, practices, acts, and omissions evidence and constitute deliberate indifference to the serious health care needs of prisoners and violate the Cruel and Unusual Punishments Clause of the Eighth Amendment, made applicable to the States through the Fourteenth Amendment to the United States Constitution.

148.     Defendants' policies, practices, acts, and omissions place Plaintiffs at unreasonable, continuing and foreseeable risk of developing or exacerbating serious medical, mental health and dental problems.

149.     As a proximate result of Defendants' unconstitutional policies, practices, acts and omissions, Plaintiffs have suffered and will continue to suffer immediate and irreparable injury, including physical, psychological and emotional injury and the risk of death.  Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein.  The injunctive relief sought by Plaintiffs is necessary to prevent continued and further injury.

44

## SECOND CLAIM FOR RELIEF

**(Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983)**

150.     Pursuant to WDOC policy and practice, only female prisoners are housed at TCI and only male prisoners are housed at WRC.

151.     For all relevant purposes, male and female prisoners convicted and sentenced in Wisconsin courts and committed to the legal custody of WDOC are similarly situated with respect to their right to constitutionally adequate mental health care, and to treatment for serious mental illnesses that meets accepted professional standards.

152.     Defendants' policies, practices, acts, and omissions create, sustain and perpetuate a system of mental health care for female prisoners in WDOC custody that is not comparable, substantially equivalent or in parity with the system of mental health care for male prisoners in WDOC custody.  As a consequence of this disparity, female prisoners at TCI do not receive mental health care that is comparable, substantially equivalent or in parity with the mental health care available to WDOC's male prisoners.  This disparity in treatment is a direct result of the differences in mental health treatment afforded to prisoners at TCI and WRC, and the gender-based assignment of prisoners to these institutions under WDOC policy.

153.     The disparity in mental health treatment for male and female prisoners in WDOC custody, as described in this complaint and particularly in paragraphs 120 to 130, is not substantially related to the achievement of an important, or even legitimate, governmental objective.  Similarly, there is no compelling need or exceedingly persuasive justification for this disparity in mental health treatment.

45

154.     Plaintiffs are adversely affected by the Defendants' policies, practices, acts, and omissions in creating, sustaining and perpetuating a disparity in mental health treatment for male and female prisoners, and are placed at unreasonable, continuing and foreseeable risk by this disparity.

155.     Defendants' policies, practices, acts, and omissions evidence a reckless disregard for and deliberate indifference to the health and welfare of Plaintiffs and their constitutional right to adequate mental health care, and constitute a denial of equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution.

156.     As a proximate result of Defendants' unconstitutional policies, practices, acts and omissions, Plaintiffs have suffered and will continue to suffer immediate and irreparable injury, including physical, psychological and emotional injury and the risk of death.  Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein.  The injunctive relief sought by Plaintiffs is necessary to prevent continued and further injury.

### THIRD CLAIM FOR RELIEF

**(Americans With Disabilities Act and Section 504 of the Rehabilitation Act)**

157.     Subclass Plaintiffs are qualified individuals with disabilities as defined in 42 U.S.C. § 12131(2) and § 12102(2), and in 29 U.S.C. § 794(a) and § 705(20).  Subclass Plaintiffs have mental and/or physical impairments that substantially limit one or more major life activity; or they have records of having such impairments; or they are regarded as having such impairments.  Subclass Plaintiffs meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendants.

46

158. The Wisconsin state government, WDOC and TCI are public entities as defined in 42 U.S.C. § 12131(1); and operate programs and activities receiving or distributing Federal financial assistance as described in 29 U.S.C. § 794(a) and (b). All Defendants at all relevant times acted in their official capacities as representatives of at least one of these public entities.

159. Defendants discriminate against Subclass Plaintiffs by excluding them from participation in, or denying them the benefits of, services, programs or activities on the basis of their disabilities, or solely on the basis of their disabilities, in violation of 42 U.S.C. § 12132 and 29 U.S.C. § 794.

160. Defendants discriminate against Subclass Plaintiffs by failing to provide alternative disciplinary sanctions as reasonable modifications so that placement in segregation and other punishments that exacerbate mental or physical impairments are not imposed.

161. Defendants deprive Subclass Plaintiffs of their rights under the ADA and the Rehabilitation Act by (1) failing to administer services, programs and activities in the most integrated setting appropriate to needs of the Subclass Plaintiffs; (2) failing to make reasonable modifications in Defendants' policies, practices and procedures to avoid discriminating against Subclass Plaintiffs on the basis of disability; (3) using eligibility criteria or methods of administration that have the effect of discriminating against Subclass Plaintiffs on the basis of disability; and (4) failing to furnish appropriate aids, services, devices or assistance to afford Subclass Plaintiffs an equal opportunity to participate in and benefit from Defendants' services, programs and activities.

162. As a proximate result of Defendants' unlawful policies, practices, acts and omissions, Subclass Plaintiffs have suffered and will continue to suffer immediate and irreparable

injury, including physical, psychological and emotional injury and the risk of death. Subclass Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein. The injunctive relief sought by Subclass Plaintiffs is necessary to prevent continued and further injury.

## PRAYER FOR RELIEF

163.    WHEREFORE, Plaintiffs respectfully request that the Court:

a.    Issue an order certifying this action to proceed as a class action pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure;

b.    Appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

c.    Issue a judgment declaring that Defendants' policies, practices, acts and omissions described herein are unlawful and violate Plaintiffs' rights under the Constitution and laws of the United States;

d.    Permanently enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from subjecting Plaintiffs to the unconstitutional and unlawful conditions described herein, and issue injunctive relief sufficient to rectify those conditions;

e.    Grant Plaintiffs their reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988 and § 12205, and 29 U.S.C. § 794a(b), and other applicable law; and

f.    Grant such other and further relief as this Court deems just and proper.

Dated this 1st day of May, 2006.

*Attorneys for Plaintiffs*

**s/** Gouri Bhat

Gouri Bhat
David C. Fathi*
National Prison Project of the ACLU Foundation
915 15th Street, N.W., 7th Floor
Washington, D.C.  20005
Telephone: (202) 393-4930
Fax: (202) 393-4931
Email: gbhat@npp-aclu.org
*Practice limited to federal courts and admission
pending in this District*

Laurence J. Dupuis
ACLU of Wisconsin Foundation
207 E. Buffalo Street, Suite 325
Milwaukee, WI  53202
Telephone: (414) 272-4032
Fax: (414) 272-0182

49