# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

KRISTINE FLYNN, *et al.*, on behalf of themselves
and all others similarly situated,

       Plaintiffs,

v.                                   **Case No. 06-C-537-RTR**

JIM DOYLE, *et al.*,

       Defendants.

---

## PLAINTIFFS' BRIEF IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

# Table of Contents

INTRODUCTION ................................................................................................. 1

   I.   THE MEDICATION ORDERING PROCESS. .................................................. 4

      A.  Why the System Fails: The Convoluted Medication Ordering Process. ......... 6

      B.  Common Errors and Consequences.............................................................. 11

          1.  Delays in Processing Medication Orders .............................................. 11

          2.  Errors in Processing Medication Orders .............................................. 20

      C.  Defendants' Knowledge of the Danger. ....................................................... 24

      D.  Defendants' Failure to Reduce the Risk. ...................................................... 26

  II.   MEDICATION DISTRIBUTION BY CORRECTIONAL OFFICERS.............. 28

      A.  Correctional Officers Cannot Safely Administer Medications...................... 29

          1.  A Knowledge Deficit with Potentially Fatal Consequences. ............... 30

          2.  Correctional Officers' Failure to Follow Safe Medication
             Administration Practices. ..................................................................... 37

          3.  Officers' Under-Reporting of Medication Errors................................. 47

      B.  Little Boxes and Big Risks: Dangerous Medication Documentation Practices.
          ........................................................................................................ 48

          1.  Correctional Officers Do Not Properly Document Medication
             Administration. ..................................................................................... 49

          2.  The Consequences of Poor Medication Administration Documentation.
             .......................................................................................... 53

          3.  Medication Documentation: A Nursing Function in Need of Nurses.. 55

      C.  Licensed Practical Nurses: A Readily Identifiable and Necessary Remedy. . 57

LEGAL ARGUMENT.......................................................................................... 60

      A.  Defendants' Medication Ordering and Administration Systems Create an
         Objectively Substantial Risk of Serious Harm to TCI Prisoners. ............... 62

      B.  Defendants Are Subjectively Aware of The Risks But Have Repeatedly Failed
         to Take Reasonable Steps to Abate Them.................................................. 72

  II.   PLAINTIFFS HAVE A RIGHT TO PRELIMINARY INJUNCTIVE RELIEF. . 75

      A.  The Requirements of the PLRA Are Met....................................................... 76

      B.  Plaintiffs Meet the Standard for Issuance of a Preliminary Injunction. ......... 79

CONCLUSION.................................................................................................... 80

i

## INTRODUCTION

Defendants' medication system poses a "clear and present danger to the health and safety" of the more than 700 women prisoners at the Taycheedah Correctional Institution in Fond du Lac, Wisconsin.[1]  By this motion, Plaintiffs and a certified class of all women imprisoned at Taycheedah Correctional Institution ("TCI" or "Taycheedah"), seek urgent, preliminary injunctive relief to protect them from serious, ongoing risks to their health and safety posed by Defendants' dangerously dysfunctional systems of ordering and administering medications to prisoners.  Members of the class have already been harmed by pervasive medication errors and delays.  Defendants, knowing of the harm and risk of harm posed by their current medication system, have failed to take reasonable steps necessary to abate the risk, in violation of the Eighth Amendment's prohibition on cruel and unusual punishments.  Without prompt relief from this Court, the women at Taycheedah will remain at substantial risk of serious injury and death.

## FACTS

The Defendants' system for ordering and administering medications to prisoners at Taycheedah "is in chaos."[2]  This chaos results in unacceptable rates of medication delays, errors, and omissions, which impose a substantial and ongoing risk of serious

---

[1] Declaration of Gabriel B. Eber (hereinafter, "Eber Decl.") ¶ 81, Ex. King-01, Rep't of Dr. Lambert N. King at 9.

[2] Eber Decl. ¶ 11, Ex. 308, Rep't of Dr. Jerry Walden at 2; Defendant Steven Meress, M.D., Taycheedah's responsible physician for most of the duration of this litigation, agrees with this characterization of the pharmacy services provided to Taycheedah prisoners.  Eber Decl. ¶ 29, Ex. 500, Dep. of Dr. Steven Meress at 258 ("The information on the pharmacy at Taycheedah is in chaos, I do agree with that.").

1

harm to prisoners at Taycheedah. As set forth more fully below, a number of prisoners at TCI have suffered prolonged and unnecessary illness, injury, pain, hospitalization and other complications, and all prisoners receiving medications are at significant risk of harm and even death. For years, Defendants have known of this significant risk, and of ways to reduce it, but have failed to take the actions necessary to do so.

Defendants' own expert witnesses have characterized the current medication system at TCI as likely to be unconstitutional. Dr. Robert Greifinger, Defendants' medical expert, told defendant David Burnett, M.D., the medical director of the Wisconsin Department of Corrections ("WDOC"), that "[f]rom a constitutional perspective," the "medication system" is one of "two areas in particular" that creates a "significant" "risk of harm."[3] In his recent deposition, Dr. Burnett agreed that the medication system is an "area of significant risk."[4] Dr. Robert Rawski, defendant's psychiatric expert, testified that he couldn't "envision a scenario" in which defendants continued to have correctional officers distribute psychotropic medications to seriously mentally ill prisoners that would not amount to deliberate indifference to a serious medical need.[5]

Like many prison systems throughout the United States, WDOC has experienced an enormous population increase, with the number of prisoners growing to over 22,000 offenders, "an increase of over 240% since 1990."[6] TCI, likewise, has seen its population grow dramatically, from approximately 590 prisoners in January 2000 to a

---

[3] Eber Decl. ¶ 74, Ex. Burnett-413, e-mail from David Burnett.

[4] Eber Decl. ¶ 30, Ex. 501, Dep. of Dr. David Burnett at 377.

[5] Eber Decl. ¶ 31, Ex. 502, Dep. of Dr. Robert Rawski at 241-43.

[6] Eber Decl. ¶ 17, Ex. 398, Wisconsin DOC, "Adult Correctional Health Care: Status Report & Plans for the Future" (Feb. 1, 2006) (hereinafter, "WDOC Status Report & Plans 2006") at 1.

2

census of approximately 708 inmates in October 2008.[7]  These prisoners have more medical and psychiatric needs than prisoners of earlier generations, in part because of the aging of the prison population.[8]  TCI's medical system has also had to absorb the assessment and evaluation ("A & E") function for all women entering WDOC's female adult institutions, a function previously handled at Dodge Correctional Institution.[9]  Despite this huge expansion in population and medical need, the resources to provide care at TCI have stagnated.  Until this lawsuit was filed, almost no additional resources were provided to TCI to assess and care for the increased population of women at the institution.[10]

WDOC's central pharmacy, too, has experienced enormous increases in demand without commensurate increases in resources.  The pharmacy has seen a 43% increase in the number of prescriptions dispensed, from 526,361 in FY 2004 to 752,674 in FY 2007.[11]  A system designed to handle a smaller, younger and healthier population has been asked to do more, but without the staff necessary to make the existing system function safely[12] or the technology to transform the system to allow the small staff to do

---

[7] Eber Decl. ¶ 32, Ex. 503, WDOC, "Offenders Under Control on October 3, 2008" & Eber Decl. ¶ 33, Ex. 504, "Offenders Under Control on January 7, 2000"; Eber Decl. ¶ 34, Ex. 505, Dep. of Dr. Kevin Kallas at 202, 204-05 (noting rapid population growth).

[8] Eber Decl. ¶ 17, Ex. 398, WDOC Status Report & Plans 2006 at 21-25 (noting increase in proportion of prisoners aged 50 and over from 4.5% to 8.5%; inmates 45 years old and older almost twice as likely as younger inmates to suffer from medical problems).

[9] Eber Decl. ¶ 34, Ex. 505, Kallas Dep. at 38-40 (A&E moved to TCI; no additional resources provided).

[10] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 45-47, 178 (no additional nurse practitioners after intake moved to TCI until after lawsuit; concern that will lose staff without lawsuit); Eber Decl. ¶ 35, Ex. 506, Dep. of Dawn Atkinson at 51-54 (lack of response to staffing needs until lawsuit).

[11] Eber Decl. ¶ 71, Ex. Burnett-400, "Central Pharmacy Recommendations" at DOC-TCI00278423.  Page citations to this document, the "Draft Project Recommendations Department of Corrections Central Pharmacy," are by Bates number, because the original document is a compilation of multiple reports with discontinuous pagination.

[12] *Id*. at DOC-TCI00278381.

3

more with less.  This overtaxed and archaic system places Plaintiffs at a constitutionally unacceptable risk of serious harm.

A vast majority of the errors and delays in the current medication system are attributable to two steps in the process: (1) transmitting the medication order from the medical record to the pharmacy for dispensing and to the housing unit for administration; and (2) the administration of that medication to prisoners by correctional officers with no formal education in health care and no accountability for medication errors.[13]  In fact, the number of medication incidents attributable to these two steps dwarfs the number of incidents attributable to any other step in the process.[14]

I.      THE MEDICATION ORDERING PROCESS.

TCI's convoluted and archaic medication ordering process frequently causes "unconscionable"[15] and "shocking"[16] delays in the delivery of medications to prisoners. Because it relies on multiple manual transcriptions of information, the process is "fraught with errors,"[17] resulting in patients routinely receiving wrong medications, medications that should have been discontinued, wrong dosages of medications, and medications that cause adverse interactions with other medications.

---

[13] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 330-37; Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 106-08.

[14] Eber Decl. ¶ 72, Ex. Burnett-401, Prescriber & Therapeutic Committee minutes for October 19, 2005 and attached medication error graphs at DOC-TCI00276138, DOC-TCI00276142, DOC-TCI00276210; Eber Decl. ¶ 73, Ex. Burnett-402 at DOC-TCI00275996-99.

[15] Eber Decl. ¶ 18, Ex. 399, "Review of Mental Health Services, Taycheedah Correctional Institution" (prepared for the United States Dep't of Justice), at 26-27 (Dec. 27, 2005) (hereinafter, "USDOJ Report").

[16] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 347-48.

[17] Eber Decl. ¶ 36, Ex. 507, Dep. of Dr. Robert Greifinger at 56-57.

4

After the filing of this lawsuit and an investigation of TCI's mental health services by the U.S. Department of Justice under its authority pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, *et seq.*, WDOC formed a Pharmacy Transformation Workgroup ("PTW") to explore deficiencies in the pharmacy system.[18] After soliciting and reviewing studies by several consulting groups, the PTW found that the transmission and receipt of medication orders was "perhaps the most problematic" step in the entire pharmacy process.[19] The Workgroup summarized the problem as follows:

> DOC prescribers hand-write medication orders on paper, which are then faxed to the Central Pharmacy. Refills of orders are handled similarly, with tear off bar codes adhered to a page that is later faxed to the CP. Too much time is wasted in the process of prescribers' handwriting the medication order, HSU [Health Services Unit] staff photocopying the order and then faxing it to the Central Pharmacy. Current faxed orders are frequently difficult to read. There are problems with illegibility of prescribers' handwriting, confusion over the inmate/patient's medication record or incompatibility of complex medications that lead to Pharmacist intervention. This type of intervention slows down the medication order process significantly. . . . Medication errors, which carry with them reverberations of liability far into the future, are also a potential.[20]

Ultimately, the PTW concluded that replacing the current process of faxing handwritten medication orders to WDOC's Central Pharmacy Services ("CPS") with a computerized medication order entry system "should be DOC's first priority in improving pharmaceutical services."[21] Such a system would "eliminate the current time consuming processes of fax receipt and sortation, and manual entry of order information into [WDOC's pharmacy management computer] system," help obviate "further delays

---

[18] Eber Decl. ¶ 71, Ex. Burnett-400 at DOC-TCI00278384.

[19] Eber Decl. ¶ 71, Ex. Burnett-400 at DOC-TCI00278382.

[20] Eber Decl. ¶ 56, Ex. 555, "Central Pharmacy Project Recommendations" at DOC-TCI00318007-08.

[21] Eber Decl. ¶ 71, Ex. Burnett-400 at DOC-TCI00278387.

5

while pharmacists or other CP staff contact institution HSUs to clarify what faxed orders actually say," and "greatly reduce[]" "[m]edication errors" by, among other things, "flagg[ing] for medication contraindications."[22]

Business as usual is unacceptable: "The continued use of paper Doctor's Orders only foster[s] continued errors anywhere along the long line of order processing in the current setting."[23]

## A.  Why the System Fails: The Convoluted Medication Ordering Process.

When a doctor or other health care provider with authority to prescribe medication decides to order a medication for a prisoner, the decision triggers a long chain of steps.[24]  The convoluted process includes many manual steps, regularly resulting in a delay of essential medications – including pain medications, antibiotics, anti-seizure medications, heart and blood pressure drugs, and psychiatric medicine – and, all too often, in the patient taking a medication that is not what the prescriber actually ordered. Defendants' medical expert, Robert Greifinger, M.D., described this procedure as "tediously cumbersome," and as "a very unusual system with a lot of redundant paperwork and layer upon layer of bureaucratic steps to get from the moment the physician orders a medication until the delivery of the first dose.  It is also a medication management system that is fraught with errors and doesn't provide adequate and timely information to the prescribing clinicians."[25]

---

[22] *Id.* at DOC-TCI00278386.

[23] *Id.* at DOC-TCI00278386.

[24] A flow-chart depicting the current system gives an idealized overview of this labyrinthine process.  Eber Decl. ¶ 71, Ex. Burnett-400 at DOC-TCI00278434.

[25] Eber Decl. ¶ 36, Ex. 507, Greifinger Dep. at 56-57.

6

TCI's baroque system has too many steps in which error can and does occur. In general, the chain of events begins when the prescriber handwrites a medication order on a "Physician's Orders" form in the patient's medical chart.[26] The order should, but does not always, contain the date and time of the order, the priority code ("STAT," "Code 1" or "Code 2"), the name of the drug and strength, the dosage, frequency and time of administration, the route of administration, the duration of the order and the prescriber's signature.[27]

At this first step, a prescriber's handwriting may be illegible, requiring either the nurse at TCI or staff at CPS to seek clarification, which causes delay.[28] The prescriber may use an incorrect drug name or ambiguous abbreviation or order a medication or form of a medication not available on the WDOC formulary.[29] Each of these defects in the order may require nursing staff at TCI or staff at CPS to seek clarification from the prescriber, who may or may not be available to respond to queries.

The prescriber then "flags" the order in the patient's medical chart by manually raising a plastic flag on the chart divider in front of the order so that the flag protrudes from the record, and puts the chart on a medical record cart for "processing," if the order is "routine," or hand delivers the chart to a nurse, if the order is "STAT" (meaning the order is to be filled immediately) or "Code 1" (meaning the order is to be filled the same

---

[26] Eber Decl. ¶ 38, Ex. 509, Dep. of Holly Meier, November 8, 2007, (hereinafter, "Meier Pharmacy Dep.") at 12; Eber Decl. ¶ 39, Ex. 510, Dep. of Rhonda Holzman at 27.

[27] Eber Decl. ¶ 82, Ex. Meier-2-02, Taycheedah Procedure No. 5200, "Medications: Processing Physician/Dental Orders" at DOC-TCI00000804.

[28] Eber Decl. ¶ 39, Ex. 510, Holzman Dep. at 31; Eber Decl. ¶ 40, Ex. 511, Dep. of Larry Edwards at 103.

[29] Eber Decl. ¶ 71, Ex. Burnett-400 at DOC-TCI00278411 (identifying problems with prescription writing and processing, including, *inter alia*, "wrong drug, drug name confusion . . . , inconsistent use of abbreviations . . . .", DOC-TCI00278387 (a direct computer ordering system would "forc[e] prescribers to use only the approved drug formulary.")

7

day).[30]  Medication orders are sometimes missed entirely when the prescriber forgets to raise the flag on the chart and may also be missed if the flag inadvertently gets pushed back into the chart.[31]

The nurse then "processes" or "transcribes" the order by checking that the required information is contained in the order, signing off on the order, and taking a carbon copy of the order to the TCI medication room.[32]  Depending on workloads, this step may not occur until the end of the day for routine orders.[33]

If the order is a "Code 2" (routine) order, the medication room nurse will (1) fax the carbon copy of the handwritten order, with various annotations, to CPS; (2) write the prescription information on the prisoner's "medication profile," which is kept in the medication room; and (3) wait for CPS to ship the medication to TCI.[34]  At this step, any errors in the order not previously detected are be passed on to the central pharmacy.[35]  In addition, a bad fax transmission or breakdown in the fax machines can result in further delay.  The former director of the Central Pharmacy testified that CPS gets "faxes of carbons, and they're atrocious to read."[36]

If the order is "STAT" or "Code 1," the nurse transcribing the order or the medication room nurse will try to fill the order from stock kept in the medication room at

---

[30] Eber Decl. ¶ 82, Ex. Meier-2-02, Taycheedah Procedure No. 5200, "Medications: Processing Physician/Dental Orders" at DOC-TCI00000805; Eber Decl. ¶ 39, Ex. 510, Holzman Dep. at 28-29 (flags); Eber Decl. ¶ 38, Ex. 509, Meier Pharmacy Dep. at 23 (priority codes).

[31] Eber Decl. ¶ 38, Ex. 509, Meier Pharmacy Dep. at 21.

[32] Eber Decl. ¶ 38, Ex. 509, Meier Pharmacy Dep. at 18, 21-23.

[33] Eber Decl. ¶ 38, Ex. 509, Meier Pharmacy Dep. at 16-17.

[34] Eber Decl. ¶ 39, Ex. 510, Holzman Dep. at 31-32.

[35] *See, e.g.*, Eber Decl. ¶ 40, Ex. 511, Edwards Dep. at 104 ("[I]t might be the doctor is missing some information.  Maybe he did not put a stop date or an expiration date on that order.")

[36] Eber Decl. ¶ 40, Ex. 511, Edwards Dep. at 103.

8

TCI or, failing that, order the medication from a local pharmacy so that it can be given to the patient quickly in accordance with the prescriber's order.[37] When medication is given to a patient from stock, the information about the medication order is supposed to be faxed to CPS, either at the end of the day or on the next business day, so that the order can be entered into the computer system and replacement stock can be sent to TCI.[38]

Unfortunately, when medication is dispensed from stock, no check on whether a prescribed medication may have adverse interactions with the prisoner's other medications occurs until after the order information is entered into the data system at CPS.[39] Thus, the prisoner can take a contraindicated medication with potential for dangerous interactions before the CPS interaction checking system alerts the provider to the danger.[40] In fact, when a STAT or Code 1 medication order is written on a Friday, when a prescriber is not on-site to respond to questions about an order, or when the pharmacist at CPS does not promptly enter the order, a patient may take a contraindicated drug with potentially dangerous interactions for as long as a *week* before CPS has an opportunity to check for contraindications.[41] Indeed, it is possible for short-course medication orders that are filled from stock, such as antibiotics prescribed for seven days, *never* to be checked for interactions at CPS.[42] As noted by the WDOC's Pharmacy

---

[37] Eber Decl. ¶ 39, Ex. 510, Holzman Dep. at 34; Eber Decl. ¶ 38, Ex. 509, Meier Pharmacy Dep. at 13-14.

[38] Eber Decl. ¶ 39, Ex. 510, Holzman Dep. at 35-36, 61-62; Eber Decl. ¶ 40, Ex. 511, Edwards Dep. at 91-95.

[39] Eber Decl. ¶ 40, Ex. 511, Edwards Dep. at 91, 94; Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 130-31.

[40] Eber Decl. ¶ 39, Ex. 510, Holzman Dep. at 62; Eber Decl. ¶ 40, Ex. 511, Edwards Dep. at 94-95.

[41] Eber Decl. ¶ 40, Ex. 511, Edwards Dep. at 94-95.

[42] Eber Decl. ¶ 38, Ex. 509, Meier Pharmacy Dep. at 27.

9

Transformation Workgroup, this delay in checking for drug interactions carries significant risk. [43]

At CPS, a pharmacist manually enters information from the faxed order form into the pharmacy management software.[44] Errors may occur at this step of the process as well: the pharmacist may misread the order or simply make a data entry error. After data entry, the order is filled from the CPS shelves, packaged, and shipped to the TCI HSU.[45]

Once an order is filled, either from stock or from a delivery from CPS, a nurse brings the medication to a "med cart" in the patient's housing unit.[46] The delivering nurse is supposed to handwrite the orders onto the patient's Medication Administration Record (hereinafter, "MAR"), which constitutes the instructions to the correctional officer who will administer the medication to the prisoner.[47] Again, errors may occur in transcribing information from the order to the MAR.

As TCI psychiatrist Dr. Kathleen Schneider lamented, TCI's medication system is:

> [a] big, cumbersome system, and that whenever pieces have to go from one hand to the next to the next, there – there can be cracks in it. So the order might have been written and then the nurse took it off, and if the nurse didn't get it to the hard card,[48] that would be – there's a spot there. But let's say it gets to the hard card, then it's supposed to go to the pharmacy, there's a crack there, and then the pharmacy has to get it back, crack – you see what I'm saying? . . . So when there – those [delays] have happened, I don't know that we see a consistent one place as much as there's just a lot of – it's a big system. The hope is that we're going to

---

[43] Eber Decl. ¶ 71, Ex. Burnett-400 at DOC-TCI00278386.

[44] Eber Decl. ¶ 40, Ex. 511, Edwards Dep. at 97-98.

[45] *Id.*

[46] Eber Decl. ¶ 38, Ex. 509, Meier Pharmacy Dep. at 60-62.

[47] *Id.* at 24-25, 66.

[48] A "hard card," or "Medication Profile," lists a prisoner's current medications and is kept in the TCI medication room.

move to computerized ordering. I mean, that's what's on the horizon, so that I would write the order, and then it goes to the pharmacy and then the – so we're trying to get at that . . . Originally I think it was supposed to be for – maybe even this year, and I think that's gotten held up.[49]

## B. Common Errors and Consequences.

### 1. Delays in Processing Medication Orders

A recent WDOC Central Pharmacy "TCI Fax Tracking" audit quantified the delay from the time a prescriber writes an order until TCI faxes that order to CPS.[50] Although the audit does not identify the source of the delay, it illustrates the scope of the problem. During a three-month period beginning in February 2008, the average delay between the writing of the medication order until the faxing of the order to Central Pharmacy was 2.73 days, with a maximum of 24 days.[51] Dr. Meress, TCI's physician at the time, testified that the average time from ordering to faxing of the order was "too long," and agreed that delays of 21 and 24 days were "shocking."[52] Although TCI's official policy is that medication orders are to be processed within 24 hours,[53] delays in practice are clearly much greater.

Susan Stone, J.D., M.D., and Joel Dvoskin, Ph.D., reviewed mental health services at Taycheedah for the U.S. Department of Justice in the summer and fall of 2005.[54] These reviewers noted the importance of "[p]rompt response to medication orders

---

[49] Eber Decl. ¶ 37, Ex. 508, Dep. of Dr. Kathleen Scheider-Braus at 153-54.

[50] Eber Decl. ¶ 20, Ex. 439. "TCI – Fax Tracking Feb Thru May 2008" (DOC-TCI00318095-8103.

[51] Eber Decl. ¶ 20, Ex. 439, "TCI – Fax Tracking Feb Thru May 2008" at DOC-TCI00318095-8103.

[52] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 347-48.

[53] Eber Decl. ¶ 38, Ex. 509, Meier Pharmacy Dep. at 20-21; Eber Decl. ¶ 82, Ex. Meier-2-02, Taycheedah Procedure No. 5200, "Medications: Processing Physician/Dental Orders" at DOC-TCI00000803.

[54] Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 3.

11

. . . to prevent worsening of identified psychiatric symptoms."[55]  At Taycheedah,

however, they observed "[s]ignificant delays in providing ordered medications. . . . The

source of these serious delays appears to arise from a number of problems in the process

of filling medication orders."[56]  Nursing shortages contribute to "unconscionable delays,

and somewhat flat omissions, in taking orders off the charts for processing;"[57] an

"unwieldy and unnecessarily complicated" process at Central Pharmacy adds further

delay; and the processing after a shipment of medications arrives at TCI can also add to

the time between ordering and distribution of medications.[58]  These delays "have caused

real harm in that inmates with severe psychiatric symptoms go untreated or under-treated

for unreasonably long periods of time.  This can lead to severe suffering, as well as the

potential for dangerous behavior towards themselves or others."[59]

 Other evidence revealed through discovery further illustrates the scope of these

delays and the serious harm and risk of harm caused by them.  The following represent

examples of such delays.

Patient L.L.[60]

According to Medication Incident Report[61] No. 05-4262, Patient  L.L. was
discharged to TCI from a local hospital on March 4, 2005, with a

---

[55] *Id.* at 26.

[56] *Id.*

[57] "Taking orders off the charts" is the manual process of culling orders for medications, lab work, or other procedures and transmitting the information to pharmacy, scheduler, off-site provider, etc.  *See* Eber Decl. ¶ 30, Burnett Dep. at 311-12.

[58] Eber Decl. ¶ 18, Ex. 3999, USDOJ Rep't at 26-27.

[59] *Id.* at 27.

[60] Patients herein are referred to by their initials to protect their privacy.

[61] Health care staff are supposed to complete Medication Incident Reports when they learn of medication errors. Eber Decl. ¶ 83, Ex. Meier-2-08, WDOC Policy & Procedure 500:16, "Medication Incident Reporting" (DOC-TCI00001368-71); Eber Decl. ¶ 38 Ex. 509, Meier Pharmacy Dep. at 55.

12

diagnosis of, among other things, "MRSA sepsis,"[62] a systemic infection of the bloodstream.[63]  MRSA is a communicable and drug-resistant[64] infection endemic to institutional settings, including prisons.[65]  MRSA sepsis is a life-threatening condition.[66] L.L. also suffered from lupus, an immune disorder, which made the sepsis even more dangerous.[67]  Despite the significant danger of serious complications or death for this "critically ill patient," the prescriber's order for an antibiotic, Clindamycin, to treat the MRSA sepsis, went unfilled for three days.[68]  In addition, an order for pain medication was ignored, and the patient's lupus medication was interrupted, putting her at risk of significant health consequences – including elevated blood pressure and blood sugars – from the abrupt cessation.[69]   All the physicians who reviewed this medication incident agree that it was a "critical mistake" that could have resulted in death.[70]

Delays in initiating antibiotics seem particularly common and particularly troubling.  Recognizing that timely treatment of infections is crucial, especially in an institutional setting where untreated infections can spread quickly, WDOC policy treats all antibiotic orders for active infections as "STAT" orders to be given to patients immediately.[71]  As Dr. Meress testified, the consequences of delays in antibiotics "could be anything from acne, for example, . . . to something more serious, like a urinary tract

---

[62] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 438-48; Eber Decl. ¶ 41, Ex. 512, Dep. of Dr. Jerry Walden at 543-47; Eber Decl. ¶ 76, Ex. Burnett-423, Medication Incident Report No. 05-4262; Eber Decl. ¶ 77, Ex. Burnett-424, Medical Record excerpt.

[63] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 444; Eber Decl. ¶ 41. Ex. 512, Walden Dep. at 545-47.

[64] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 444; Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 262.

[65] Eber Decl. ¶ 41, Walden Dep. at 397-99; Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 261-62 (TCI's Dr. Meress agrees that there is a lot of MRSA at TCI).

[66] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 444.

[67] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 444; Eber Decl. ¶ 11, Ex. 308, Walden Rep't at 15.

[68] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 439; Eber Decl. ¶ 76, Ex. Burnett-423, Medication Incident Report No. 05-4262 (DOC-TCI00029212-13).

[69] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 446-47.

[70] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 438; Eber Decl. ¶ 76, Ex. Burnett-423, Medication Incident Report 05-4262; Eber Decl. ¶ 11, Ex. 308, Walden Rep't at 15.

[71] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 238, 247-48, Eber Decl. ¶ 15, Ex. 394, DOC Policy & Proc. 800:02 ("Medication Orders")  at DOC-TCI00001291; Eber Decl. ¶ 39, Ex. 510, Holzman Dep. at 59.

13

infection that leads to a sepsis."[72]  Despite the potentially serious consequences, antibiotic orders routinely slip through the cracks of TCI's convoluted system.  In one case in early 2008, an antibiotic order went unfilled for 60 days.[73]  Dr. Meress testified that "the order was totally missed, and nobody – nobody discovered it," possibly because of a failure to flag it for processing.[74]

Other examples of antibiotic delays include:

Patient J.J.

In May 2008, an order for the antibiotic Flagyl to treat a bacterial infection for J.J. went unfilled for three days. Although a nurse transcribed the order, at some point the order was not conveyed through the manual system and the medication was "not set up and delivered." The error was detected only when the patient filed a health services request asking about it.  Flagyl is commonly used to treat infections of the female reproductive tract or the colon.  Delayed treatment of bowel infections can lead to hospitalization.[75]

Patient J.L.

In November 2007, an order for the antibiotic tetracycline from two months earlier was found unprocessed.  A two month delay in an antibiotic, especially when the error was only discovered by coincidence, is, at a minimum, "disconcerting."[76]

In addition to the chronic problems of delays in dispensing antibiotics to treat bacterial infections, the current medication ordering system appears to be unable to maintain an uninterrupted supply of anti-retroviral medications for patients with HIV.

---

[72] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 371.

[73] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 369-71; Eber Decl. ¶ 25, Ex. 446, Medication Incident Report No. 08-10071 (DOC-TCI00318126).

[74] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 371.

[75] Declaration of Dr. Jerry S. Walden (hereinafter, "Walden Decl.") ¶ 9; Walden Decl. ¶ 9, Ex. 515, Medication Incident Report No. 0910287 (DOC-TCI00318109).

[76] Walden Decl. ¶ 8; Walden Decl. ¶ 8, Ex. 514, Medication Incident Report No. 089668 (DOC-TCI00297393).

14

For example, in the spring and summer of 2008, Patient M.R., a woman with full-blown AIDS, repeatedly ran out of her antiretroviral drugs and experienced a delay in another antiretroviral added to her medication regimen.[77]  The cause of these medication outages appeared to be CPS's repeated misinterpretation of the medication orders.[78]  This resulted in a "significant" increase in her "viral load" (from 325 on June 5, 2008, to 22,711 on July 24, 2008), "nausea and vomiting, emesis . . . and general malaise," the classic symptoms of "acute viral illness type syndrome," and increased risk of potentially fatal opportunistic infections.[79]  Dr. Meress testified that TCI had ongoing problems with delays and outages of HIV medications, which he attributed to "everything we've been talking about today from that [TCI Fax] audit sheet, how items get from the order to the patient and all the steps it takes to get there."[80]

WDOC policy treats medication orders to control intermediate to severe pain as "STAT" orders to be delivered to the patient immediately.[81]  In practice, however, such orders often take days to fill, resulting in unnecessarily prolonged pain.[82]  Examples include:

> Patient J.L.
>
> In September 2008, an order for morphine to control the pain of this terminal cancer patient was not initiated for seven days,[83] a delay Dr.

---

[77] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 365-69; Eber Decl. ¶ 24, Ex. 445, e-mails relating to Patient M.R. (DOC-TCI00316933-35,  DOC-TCI00320320, DOC-TCI00320541).

[78] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 366.

[79] *Id*. at 367-68, 363-64.

[80] *Id.* at 368-69.

[81] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 247-48; Eber Decl. ¶ 15,  Ex. 394, DOC Policy & Proc. 800:02 ("Medication Orders") at DOC-TCI00001291; Eber Decl. ¶ 39, Ex. 510, Holzman Dep. at 59.

[82] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 447 (agrees it is "fair to say" patient "suffered unnecessary pain as a result of not getting her pain meds for three days"); Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 97 (consequence of not receiving ordered Vicodin is "uncontrolled pain").

[83] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 354-57; Eber Decl. ¶ 22, Ex. 442, e-mails relating to Patient

Meress, her treating physician, described as "unacceptable": "This patient has terminal cancer pain and going four hours is unacceptable, much less one week."[84] Dr. Meress and Susan Koon, a nurse supervisor at DOC, questioned where the system broke down and expressed frustration that patient care remained below standard at TCI.[85]

Patient S.N.

On October 22, 2007, a physician ordered oxycodone to control a prisoner's "chronic right shoulder pain." Her shoulder had been injured in an automobile accident. Although the nurse transcribed the order, it was not filled until October 31, 2007, indicating a breakdown in the medication ordering process. Patient S.N. submitted at least two health service requests while waiting for her pain medication. She suffered needlessly for more than a week.[86]

Patient D.D.

On December 3, 2007, a nurse discovered that a "code 1" order dated November 29 for the muscle relaxant cyclobenzaprine was never filled. The cause of the error appears to be another breakdown in the "convoluted paper-based system" of ordering medications. Patient D.D. has a history of head injury, chronic back pain and muscle spasms from an automobile accident. Once again, the delay harmed the patient, leaving her in unnecessary pain for several days.[87]

Seizure medications, too, are frequently delayed, as illustrated below:

Patient S.F.

On September 27, 2007, a nurse practitioner ordered Dilantin "STAT" to control Patient S.F.'s seizure disorder. However, because the chart was not flagged as stat, the order was not processed immediately and the first dose was missed. The same patient suffered delays in receiving refills on at least two other occasions in early 2008. In one instance, the error again appeared attributable to a problem with flagging or recognizing a flag.

---

J.L. (DOC-TCI00321205-06).

[84] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 356.

[85] *Id.* at 357.

[86] Walden Decl. ¶ 10; Walden Decl. ¶ 10, Ex. 516, Medication Incident Report No. 086588 (DOC-TCI00297389); Ex. 569, Medical Records excerpt.

[87] Walden Decl. ¶ 11; Walden Decl. ¶ 11, Ex. 517, Medication Incident Report No. 089763 (DOC-TCI00297408); Walden Decl. ¶ 11, Ex. 573, Medical Records of D.D.

16

S.F. suffered a seizure as a result of the error. Repeated seizures can cause lasting neurological damage or injuries from falls.[88]


Patient K.O.

The abrupt discontinuation caused by a delay in refills of clonazepam, an anti-anxiety drug sometimes used in the management of seizure disorders, contributed to a preventable seizure that required treatment.[89]

Breakdowns in the medication ordering system lead to frequent delays in critical

psychiatric medications as well, as the following cases illustrate:


Patient S.M.

In April 2007, an error in dispensing medications from stock resulted in S.M. not receiving four doses of oral Prolixin, a "powerful antipsychotic medication."[90] This error resulted in significant patient harm: "escalating" acute psychosis, which required placement in an observation cell and an emergency injection of intramuscular Prolixin to stabilize the patient.[91]


Patient T.P.

In May 2008, a psychiatrist discovered that her April order for Vitamin E, to be taken with the patient's antipsychotic medication, had not been entered into CPS's computer. Some psychiatrists use Vitamin E to treat tardive dyskinesia, a common side effect of antipsychotic medications. Deficiencies in the vitamin can also affect mood. According to the prescriber, the delay in Vitamin E resulted in T.P. stopping her antipsychotic medications, which harmed her. A lapse in antipsychotic medication for this length of time can lead to a relapse of psychotic symptoms that interfere with daily living or even to hospitalization for a

---

[88] Walden Decl. ¶ 12; Walden Decl. ¶ 12, Ex. 518, Medication Incident Report No. 08-6501 (DOC-TCI00297379), Ex. 519, Inmate Complaint Reports.

[89] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 68-71; Eber Decl. ¶ 12, Ex. 366. Medication Incident Report No. 02-2916 (DOC-TCI00276910).

[90] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 350-51; Eber Decl. ¶ 21, Ex. 440, Medication Incident Report No. 6182 (DOC-TCI00138185-88).

[91] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 351-52.

breakdown.[92]

Patient M.W.

In January 2008, a "loose order sheet" resulted in a seven-day delay in an
order to increase the dosage of M.W.'s antidepressant. M.W.'s psychiatric
problems were sufficiently serious that she was housed in the Monarch
Unit, which provides more intense programming for the severely mentally
ill. A delay of this sort leaves a patient suffering unnecessary symptoms
and may actually worsen the depression and exacerbate feelings of
hopelessness caused by taking a sub-therapeutic dose that the patient
expects to have some positive effect.[93]

The failures of the ordering system result in delays of other important medicines

prescribed to the women at Taycheedah, as the following examples show.

Patient P.H.

On April 23, 2008, laboratory results showed a low thyroid hormone level
for P.H., which led a nurse to review medication orders in the chart. The
chart revealed a code 1 order for Synthroid (levothyroxine) on April 9,
2008, which was apparently not processed as a code 1 order, resulting in a
significant delay in the P.H.'s thyroid treatment. Synthroid requires careful
dosing to avoid over- and under-treatment. The patient's thyroid level on
April 23 suggests she may have been under-treated even before April 9.
Poor control of thyroid levels can adversely affect cardiovascular function,
bone metabolism, gastrointestinal functioning, glucose and fat
metabolism, and emotional stability.[94]

Patient S.H.

On November 15, 2007, ferrous gluconate was ordered to treat S.H.'s
anemia, but the order was not filled until November 27, 2007. S.H. had
heavy menstrual periods, which may account for her anemia. A nursing
evaluation on November 22 noted that S.H. was "cold, weak, light headed
[and] tired." These are common symptoms of significant anemia, which

---

[92] Walden Decl. ¶ 15; Walden Decl. ¶ 15, Ex. 520, Medication Incident Report No. 0910285 (DOC-
TCI00318107).

[93] Walden Decl. ¶ 17; Walden Decl. ¶ 17, Ex. 521, Medication Incident Report No. 08-9861 (DOC-
TCI00318140).

[94] Walden Decl. ¶ 16; Walden Decl. ¶ 16, Ex. 522, Medication Incident Report No. 08-10075 (DOC-
TCI00318122).

18

can also result in fainting and injury.[95]


Patient J.L.

On April 3, 2008, a provider prescribed Zofran to cancer patient J.L. to control the nausea and vomiting caused by her chemotherapy drugs. However, J.L. did not receive the Zofran until April 29, 2008.[96] As a result of this delay, the patient suffered nausea that likely would otherwise have been controlled by the Zofran.[97]

Delays in receiving ordered medications, including refills, are chronic and ongoing. From December 2007 through February 2008, a correctional officer in the Harris unit, which houses many of the older and sicker prisoners at TCI, repeatedly filed incident reports about multiple prisoners running out of medications that had been reordered at least a week before.[98] Dr. Meress, who was not made aware of these refill delays at the time, testified at his deposition that outages of several of the medications identified in the incident reports gave him particular concern: stoppage of one patient's temazepam could result in seizures; abrupt cessation of another's metoprolol could result in cardiac arrhythmias and even sudden death; and a stoppage of a third patient's quetiapine could also cause arrhythmias.[99]

---

[95] Walden Decl. ¶ 14; Walden Decl. ¶ 14, Ex. 523, Medication Incident Report No. 089679 (DOC-TCI00297404); Walden Decl. ¶ 14, Ex. 524, Health Service Request dated November 22, 2007 (DOC-TCI00325125).

[96] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 359-61; Eber Decl. ¶ 23, Ex. 443, Medication Incident Report No. 08-10073 (DOC-TCI00318124).

[97] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 360-61.

[98] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 288-292; Eber Decl. ¶ 19, Ex. 435, Incident Report No. 984174 (DOC-TCI00298176-77), Incident Report No. 1139264 (DOC-TCI00298002-03), Incident Report No. 984190 (DOC-TCI00297956), and Incident Report No. 1139247 (DOC-TCI00297793).

[99] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 292-95.

19

2.      Errors in Processing Medication Orders

In addition to the processing *delays* illustrated above, TCI's convoluted, paper-based system also results in outright *errors* in the medications prisoners receive. CPS frequently fails to send the proper quantity of an ordered drug, which can result in patients running out of necessary medications prematurely.[100] Astoundingly, the medication room nurse at TCI admitted that CPS sends fewer pills than ordered "50 percent of the time."[101] As another, particularly dangerous, example, the existing system predictably fails to check for drug interactions, which can result in a prisoner receiving contraindicated medications.[102]

The ordering system has resulted in patients receiving excessive doses of their medications:

Patient C.C.

In January 2008, a provider ordered oxycodone, a powerful painkiller with abuse potential, to control C.C.'s pain from end-stage liver disease.[103] However, C.C. received 45 milligrams, rather than the 15 milligrams ordered, (*i.e.*, "three times the dose"), which Dr. Meress testified can lead to "excessive sedation" and falls.[104] Dr. Meress attributed this error to CPS, because the pill dosage at the unit was not what was ordered, suggesting that either the fax was unclear or the pharmacist manually entered the dosage incorrectly.[105]

---

[100] Eber Decl. ¶ 39, Ex. 510, Holzman Dep. at 41-47.

[101] Eber Decl. ¶ 39, Ex. 510, Holzman Dep. at 42. Between ten and twenty percent of the time, the medication nurse must submit three requests to CPS before receiving the correct quantity of pills. *Id.* at 46-47.

[102] *See, e.g.*, Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 130 (knows of instances of patients at TCI taking contraindicated drugs).

[103] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 387-390; Eber Decl. ¶ 28, Ex. 452, Medication Incident Report No. 08-9865 (DOC-TCI-00318136).

[104] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 388-89.

[105] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 389-90.

20

Breakdowns in the ordering system can also result in patients receiving lower

doses than required to treat their conditions:

Patient A.F.

On July 31, 2007, Dr. Meress discovered that a May 25, 2007 order to
increase A.F.'s dose of metoprolol, a blood pressure medication, was
never initiated.[106] Dr. Meress detected the error only when he noted an
elevated blood pressure reading recorded in A.F's chart.[107] The
consequences of receiving a low dose of blood pressure medication
include "increased risk of significant hypertension," which may lead to
"[a]nything from headache to chest pain to a variety of symptoms, all the
way to an acute neurologic event, including stroke or death."[108]

Stop dates on orders for short courses of medication are sometimes missed,

resulting in prisoners taking medications for longer than appropriate. For example:

Patient N.G.

On November 28, 2007, a nurse practitioner ordered a one-week course of
Ditropan (oxybutynin) to control N.G.'s urinary incontinence.[109]
However, N.G. received 120 pills and continued to take them for two
months, until January 29, 2008, when the prescriber discovered the
error.[110] The potential consequences of this error included painful urinary
retention and xerostomia.[111]

The medication ordering system also results in prisoners receiving the

wrong medication to treat an illness or injury:

Patient H.S.

---

[106] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 371-73; Eber Decl. ¶ 26, Ex. 447, Medication Incident Report
No. 6370 (DOC-TCI00297321).

[107] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 372.

[108] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 372-73.

[109] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 136-37; Eber Decl. ¶ 10, Ex. 304, Medication Incident
Report No. 08-9866 (DOC-TCI00297427).

[110] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 137-38.

[111] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 137.

21

In August 2007, a nurse practitioner ordered Keflex, an antibiotic, for H.S., but the pharmacy sent ciprofloxacin, a different antibiotic. Ciproflaxin is contraindicated for patients taking certain psychiatric medications, including Geodon. It can lead to heart arrhythmias, which can be fatal. H.S. was taking Geodon and took two doses of the contraindicated ciprofloxacin.[112]

When one of the many manual steps in the medication ordering process goes

awry, patients can even receive medications to treat disorders they do not have:

Patient J.A.

In November 2007, a thyroid medication, thyroxine, was manually written on a medication administration record for J.A., who did not have a thyroid disorder.[113] As a result, the prisoner "received a huge dose of Thyroxine, which is used for [hypo]thyroidism, for five days when she didn't even have the medical condition."[114] Such an error can cause cardiac arrhythmias.[115] Although this patient did not suffer heart complications, she did get "very sick" and had to be "closely monitored for about three weeks after."[116]

Patient L.C.

In another incident, L.C. was given Metformin, a medicine that lowers blood sugar.[117] However, Patient L.C. did not have diabetes, and no order for Metformin appeared in her medical record.[118] It appears that a nurse erroneously transcribed the order for this medication from the order sheet onto the patient's medication administration record.[119] Giving Metformin to a person who does not have diabetes could "lower their blood sugar to a

---

[112] Walden Decl. ¶ 18; Walden Decl. ¶ 18, Ex. 525, Medication Incident Report No. 6416 (DOC-TCI00297368); Walden Decl. ¶ 18, Ex. 526, Medical Record Excerpt for Patient H.S. (DOC-TCI00173443).

[113] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 133-36; Eber Decl. ¶ 9, Ex. 303, Medication Incident Report No. 08-9859 (DOC-TCI00297420).

[114] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 134.

[115] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 135.

[116] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 136.

[117] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 81-83; Eber Decl. ¶ 13, Ex. 370, Medication Incident Report No.  04-3626 (DOC-TCI00277328-32).

[118] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 81-82.

[119] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 82-83.

dangerous level," "which could cause the person to "go into a coma and they could potentially die."[120]

Another common error involves the failure to "hold," or temporarily stop, a medication:

Patient J.G.

In March 2007, a provider discovered that J.G. had an elevated phenytoin (Dilantin) level.[121] The nurse practitioner ordered that the phenytoin, a seizure medication, be put on hold.[122] However, the hold order was not implemented, so the prisoner continued to take the medication. She became "toxic," meaning that she could "go into a stupor or coma state."[123]

Orders for changes in medications are also frequently erroneously transmitted or

implemented because of break downs in the system:

Patient S.B.

In May 2008, an order to increase Lamictal, a seizure medication sometimes also prescribed for psychiatric patients, was never carried out, because the system "broke down." This failure to increase Lamictal was an important error, because, at the same time, another seizure medication was being tapered, so S.B.'s seizure disorder was likely under-medicated. The prisoner ended up being hospitalized, possibly due to the medication error.[124]

---

[120] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 83. In a similar incident, a patient who did not have diabetes received insulin. (Id. at 88-90; Eber Decl. ¶ 14, Ex. 371, Medication Incident Report No. 05-3865 (DOC-TCI00277378-81)).

[121] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 121-26; Eber Decl. ¶ 8, Ex. 301, Medication Incident Report No. 5998 (DOC-TCI00029160-73).

[122] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 122.

[123] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 122-23.

[124] Walden Decl. ¶ 19; Walden Decl. ¶ 19, Ex. 527, Medication Incident Report No. 0910288 (DOC-TCI00318110).

23

## C.     Defendants' Knowledge of the Danger.

Defendants have long known of the extensive delays and errors caused by WDOC's rickety medication ordering process.  A 2002 report by the National Commission on Correctional Health Care (NCCHC) noted the delays inherent in WDOC's manual medication ordering system.[125]  At least as early as summer 2005, the previous pharmacy director, Larry Edwards, produced quarterly medication error graphs, which were presented to the Pharmacy & Therapeutics Committee, of which Defendants David Burnett, Kevin Kallas and Steven Meress were members.[126] These graphs identified the number of medication errors, broken down by the "process step" at which the error occurred.[127]  Dr. Burnett testified that he understood these graphs to show that the greatest number of medication errors occurred in the "transcription" and "administration" process steps, that transcription errors are those that involve "taking off orders or transcribing them" incorrectly at the HSU or problems with "interpretation or legibility" at Central Pharmacy, and that a direct prescriber ordering system should make such transcription errors "plummet."[128]

---

[125] Eber Decl. ¶ 68, Ex. 568, National Commission on Correctional Health Care, "A Comprehensive Assessment of Medical Care in the Wisconsin State Prison System" (Draft) (hereinafter, "NCCHC 2002 Rep't") at 74-75, 210-11.

[126] Eber Decl. ¶ 72, Ex. Burnett-401, Prescriber & Therapeutic Committee minutes for October 19, 2005 and attached medication error graphs (DOC-TCI00276087, DOC-TCI00276135-42, DOC-TCI00276208-10); Eber Decl. ¶ 72, Ex. Burnett-402, Prescriber & Therapeutic Committee minutes for July 26, 2006 and attached medication error graphs (DOC-TCI00275990-6009).

[127] Eber Decl. ¶ 72, Ex. Burnett-401 at DOC-TCI00276138, DOC-TCI00276142, DOC-TCI00276210; Eber Decl. ¶ 73, Ex. Burnett-402 at DOC-TCI00275996-99.

[128] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 332-33.

Similarly, a "Pharmacy Turnaround Audit" by Mr. Edwards as far back as late 2005 revealed not only delays in the processing of medications at CPS, but also routine delays of several days between the writing and faxing of orders from TCI.[129]

Stone and Dvoskin's report for U.S. D.O.J. in late 2005 alerted Defendants that delays and errors in the medication processing system at TCI caused harm and posed substantial risks to TCI prisoners taking psychiatric medications.[130] Consultants to the PTW quickly identified changes to the pharmacy ordering process as a priority.[131]

Moreover, Defendants' own clinicians complained to Defendants and others at WDOC about serious delays and errors resulting from the medication ordering process. Nurse Practitioner Dawn Atkinson testified that she thought "the greatest problem with medication errors at TCI . . . was that one nurse took off the order, another one had to write it on the med sheet, and it went to the med nurse."[132] She raised these concerns with Dr. Burnett at her annual performance evaluation, probably by 2006.[133] She even suggested alternative approaches that appeared to work at other WDOC institutions.[134] NP Atkinson's frustration with medication problems was a major factor in her leaving a job she had once considered her "calling."[135]

---

[129] Eber Decl. ¶ 42, Ex. 528, "Pharmacy Turnaround Audit" at DOC-TCI00278597-98.

[130] Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 26-27.

[131] *See, e.g.*, Eber Decl. ¶ 71, Ex. Burnett-400 at DOC-TCI00278407, DOC-TCI00278411, DOC-TCI00278415 (TMG "Central Pharmacy Facilitation Project Findings" March 2007).

[132] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 138.

[133] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 138.

[134] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 139-140.

[135] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 148, 153-55, 162-64.

25

Similarly, TCI psychiatrist Kathleen Schneider informed Defendant Kevin Kallas of her concerns over the "many" medication errors she encountered.[136] Despite a reduction in certain "dangerous" errors (in which officers gave patients the wrong medications) after nurses began to distribute medications on the Monarch Unit, Dr. Schneider described to Dr. Kallas a frequency of medication errors – particularly outages of medications – that remained at a "nonacceptable level" in early 2008 and expressed her "baffle[ment] . . . that this system cannot get buttoned down."[137] Dr. Kallas testified that "I am aware that the Bureau of Health Services administration and the Health Service Unit managers at Taycheedah are aware that there are ongoing issues with medication orders."[138]

Defendant Steven Meress, too, has long been aware that the medication process at TCI (and within WDOC generally) creates unacceptable delay and errors.[139] Dr. Meress recalled Lori Alsum, a former assistant manager of the TCI HSU, bringing problems with the medication system to the Defendants' attention in 2005 or 2006.[140]

**D.      Defendants' Failure to Reduce the Risk.**

The medication ordering system requires an immediate overhaul because prisoners remain at an unacceptable risk of serious harm. Defendants know that implementation of a computerized prescriber order entry (CPOE) system should cause

---

[136] Eber Decl. ¶ 78, Ex. Kallas-250, e-mail from Schneider to Kallas; Eber Decl. ¶ 34, Ex. 505, Kallas Dep. at 334-37.

[137] Eber Decl. ¶ 34, Ex. 505, Kallas Dep. at 335-36.

[138] Eber Decl. ¶ 34, Ex. 505, Kallas Dep. at 337.

[139] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 114-115, 124-26.

[140] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 131-32.

26

delays and errors that result from the current paper ordering system to "plummet."[141] WDOC expects implementation of a CPOE system to be relatively inexpensive and to save money in the long run.[142]

Despite the known advantages, Defendants have not taken meaningful steps toward implementation of a CPOE system at TCI, at least in part because it has not been made a high enough priority for the WDOC's Bureau of Technology Management.[143] Moreover, Defendants currently plan to phase in the CPOE system by first having providers at *all* WDOC institutions begin using CPOE for refills and reorders, before *any* institution would start using CPOE for new orders. Thus, TCI would be left relying on the present, error-prone manual system for new medications for an indefinite period of time.[144] This will leave members of the plaintiff class at an unacceptable and ongoing risk of harm for the foreseeable future, particularly because TCI has even more problems in the absence of CPOE than other Wisconsin correctional facilities.[145] Defendants also have failed to adopt procedures that appear to have allowed some other WDOC institutions to experience fewer medication problems, even without CPOE.[146]

CPOE may not be a cure-all[147] or even the only means of reducing the dangerous delays and errors bedeviling TCI's current medication ordering system, but that archaic

---

[141] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 244-45, 332-33.

[142] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 245-46.

[143] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 326-28.

[144] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 329-30.

[145] Eber Decl. ¶ 73, Ex. Burnett-402 at DOC-TCI00276008-09 (graph depicting smaller number of medication errors at most other WDOC institutions).

[146] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 138-40 (describing better medication process at Kettle Moraine Correctional Institution).

[147] For example, medication orders from off-site providers are frequently delayed under the current system. Such orders would need to be promptly and accurately entered into the CPOE by available TCI staff at the time the patient returns from the off-site medical visit. Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 373-77

27

and convoluted system must change and change quickly. The substantial risk of serious harm facing the women at TCI under the current system is intolerable. Because Defendants have been unable or unwilling to act expeditiously to abate the risk, this Court must order them to do so.

## II.     MEDICATION DISTRIBUTION BY CORRECTIONAL OFFICERS.

Few issues in prison litigation elicit near unanimity of opinion. The danger of having correctional officers administer medications to prisoners is one of those issues. The overwhelming majority of the parties' medical, psychiatric, and nursing experts agree that current medication administration practices at Taycheedah place prisoners at significant risk. As Dr. Lambert King, one of Plaintiffs' experts, observed, "[a]ny community-based health facility that relied on its security staff to deliver and document administration of prescription medications would not be accredited or permitted to continue to treat patients."[148] The record is unequivocally clear: Defendants have known about these dangers for several years but have done little to remedy this "atavistic and dangerous departure from acceptable standards of patient care."[149]

Currently, officers administer medications to prisoners in five out of TCI's seven housing units. In August 2006, TCI initiated a "pilot program" whereby Licensed Practical Nurses (LPNs), supervised by a Registered Nurse (RN), administer medications to prisoners in the Segregation and the Monarch Mental Health units.[150] In the

---

(relating incident in which medications ordered by hospital for patient with chronic renal failure, hypertension and chest pain were not promptly processed on her return and noting it was not clear whether nursing staff would have access to CPOE to immediately initiate off-site orders); Eber Decl. ¶ 27, Ex. 448.

[148] Eber Decl. ¶ 81, Ex. King-01, King Rep't at 9.

[149] *Id.*

[150] Eber Decl. ¶ 43, Ex. 529, Wisconsin Women's Correctional System Annual Report 2007 at 17 (DOC-

Case 2:06-cv-00537-RTR   Filed 01/23/09   Page 30 of 83   Document 124

remaining housing units, however, officers bear sole responsibility for simultaneously maintaining order, determining which medications to give to which prisoners, and managing a cart full of blister-packed pills and paperwork.

Officers routinely administer wrong doses to the wrong prisoners at the wrong times and improperly memorialize the transaction on a document that will ultimately become part of the prisoner's permanent medical record. It is a dangerous practice that must be stopped immediately. The danger arises in two primary areas: (1) the actual administration of the medication to the prisoner; and (2) the documentation of the dose on the prisoner's Medication Administration Record (MAR).

## A.      Correctional Officers Cannot Safely Administer Medications.

The administration of medication to patients is a nursing function that should be reserved for trained nursing staff.[151] One would not expect hospital security staff, no matter how professional, to distribute pills to hospital patients. The reasons are myriad. WDOC's own 2006 self-assessment provides a succinct statement of the problem:

> Risk management is an ongoing concern of the Department with the current practice of correctional officers distributing controlled medications throughout the correctional system. Officers do not have the clinical training to recognize the various medications by name, their uses, potential and actual side effects, and whether or not the medications are effective and being properly taken (such medications include psychotropics, narcotics, and other classifications of drugs).[152]

Dr. Jeffrey Metzner, who was hired as a consultant pursuant to a settlement agreement between the United States Department of Justice and WDOC, believes that officers

---

TCI00301138); Eber Decl. ¶ 38, Ex. 509, Meier Pharmacy at 70.

[151] Declaration of Madeleine LaMarre (hereinafter, "LaMarre Decl.") ¶¶ 8, 15; Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 13; Eber Decl. ¶ 7, Ex. 202, Rep't of Dr. Robert Greifinger at 8.

[152] Eber Decl. ¶ 17, Ex. 398, WDOC Status Report & Plans 2006 at 30.

29

should not be distributing medications and that the practice can impair the effectiveness of medical treatment.[153]  Even named defendant Dr. Steven Meress, the senior TCI physician, agrees: "I just feel that a skilled medical professional should be distributing medications."[154]

       1.       A Knowledge Deficit with Potentially Fatal Consequences.

              *a.*       *Officers Lack Knowledge of Therapeutic Effects, Side Effects, and Dosing.*

Knowledge of the intended therapeutic use, side effects profile, and proper dosing of a given medication is critical to ensuring patient safety.[155]  Correctional officers lack sufficient training and knowledge to understand why a medication is prescribed and the side effects of that medication.[156]  As one Sergeant freely acknowledged,  "[i]f an inmate asks me what this med's for, I tell them they need to write the person who prescribed it and ask them what it's for, because I do not know what their medication is for."[157]  Officers do not understand proper dosing and are unable to determine if the quantity of pills they dispense represents a toxic dose.[158]  Similarly, officers receive no training in

---

[153] Eber Decl. ¶ 44, Ex. 530, BHS Strategic Plan (excerpt).

[154] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 323.

[155] LaMarre Decl. ¶ 8.

[156] Eber Decl. ¶ 45, Ex. 531, Dep. of Madeleine LaMarre at 236, 246; Eber Decl. ¶ 46, Ex. 532, Dep. of Sgt. Denise Camp at 68-69; Eber Decl. ¶ 47, Ex. 533, Dep. of Lt. April Albertson at 22, 24 (no training or knowledge of therapeutic effects, contraindications, toxicity, or medication interactions); Eber Decl. ¶ 48, Ex. 534, Dep. of Officer Wendy Peterson at 31-32 (no training provided and little or no knowledge of side effects, toxicity, therapeutic effects or contraindications of medications);  Eber Decl. ¶ 68, Ex. 568, NCCHC 2002 Rep't at 138; Eber Decl. ¶ 49, Ex. 535, Legislative Audit Bureau, "Prison Health Care: An Evaluation" (hereinafter, "LAB Report") at 46; Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 13.

[157] Eber Decl. ¶ 50, Ex. 536, Dep. of Sgt. Elizabeth Vandestreek at 53.

[158] Eber Decl. ¶ 48, Ex. 534, Peterson Dep. at 31-32; Eber Decl. ¶ 50, Ex. 536, Vandestreek Dep. at 55; Eber Decl. ¶ 46, Ex. 532, Camp Dep. at 50-51 (no training on how to recognized which doses are toxic); Ex. 531, LaMarre Dep. at 246 (officers cannot recognize "proper dosage ranges").  *See also* Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 389-90 (Officers unlikely to recognize dosing error involving narcotic pain

30

and do not understand tapered dosing.[159]  Due to their knowledge deficit, officers are

unable to answer basic patient questions about medications.  As another Sergeant

observed, "[officers] might be asked by the inmates what are the side effects.  We don't

know that stuff.  And they'll ask me, and I'll laugh, 'I can't even pronounce it, how

would I know a side effect?'"[160]

Two of the highest-ranking medical officers in the WDOC system – both named

as defendants in this action – agree that officers are underequipped to address

medication-related problems or side effects.[161]  Defendants' psychiatry and psychology

experts echo Plaintiffs' psychiatry expert in concluding that officers lack the knowledge

to provide basic medication counseling functions such as inquiring after a patient's

progress or addressing the concerns of "ambivalent" patients.[162]  Similarly, officers are

unable to clinically observe and assess side effects and reactions.[163]  Nor can officers

determine whether observed symptoms are due to medication side effects or an

independent illness.[164]

The consequences of this knowledge deficit can be life-threatening.  United States

Department of Justice investigators Drs. Susan Stone and Joel Dvoskin give the example

---

killer).

[159] Eber Decl. ¶ 50, Ex. 536, Vandestreek Dep. at 66; Eber Decl. ¶ 46, Ex. 532, Camp Dep. at 51 (no training on tapered dosing).

[160] Eber Decl. ¶ 46, Ex. 532, Camp Dep. at 68-69.

[161] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 295-96; Eber Decl. ¶ 34, Ex. 505, Kallas Dep. at 324.

[162] Eber Decl. ¶ 6, Ex. 165, Rep't of Dr. Robert Rawski at 18; Eber Decl. ¶ 51, Ex. 537, Dep. of Dr. Thomas Powell at 242-43 (security staff cannot address medication concerns); Eber Decl. ¶ 5, Ex. 129, Rep't of Dr. Kenneth Robbins at 5; Eber Decl. ¶ 52, Ex. 538, Dep. of Dr. Kenneth Robbins at 125, 127-28.

[163] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 295-96; Eber Decl. ¶ 51, Ex. 537, Powell Dep. at 242-43; Eber Decl. ¶ 5, Ex. 129, Robbins Rep't at 5; Eber Decl. ¶ 52, Ex. 538, Robbins Dep. at 125.  *See also* Eber Decl. ¶ 53, Ex. 539, Kallas e-mail (DOC-TCI00049526-27) (ability of nurses to triage urgent health issues during a medication pass is an example of the value of having increased nursing presence on the units during med administration.)

[164] Eber Decl. ¶ 87, Ex. Ottolini-252, Rep't of Madeleine L. LaMarre at 17.

of an "oculogyric crisis," a side effect of some initial doses of antipsychotic medications

that can cause a patient's eyes to roll back in her head, paralyze her airway, and result in

suffocation. They similarly note that patients who abruptly discontinue long-term

treatment with tranquilizer medications may suffer seizures and potentially fatal

withdrawals.[165] Many patients at TCI take these medications, making the officers'

overall ignorance of side effects particularly dangerous.

The following examples illustrate the risks and consequences of delegating the

administration of medications to officers who lack even a basic understanding of the

medications they dispense:

Patient J.J.

On May 30, 2006, a correctional officer noticed that Patient J.J.'s MAR
had two separate entries for Geodon, an antipsychotic medication. The
first entry specified a dose of 80mg twice per day; the second entry
specified 40mg twice per day. Upon consultation with a nurse, the officer
learned that the 2x80mg order should have been discontinued when the
2x40mg order was started on May 24, 2006. Regrettably, this did not
happen. From May 24 to May 30, the patient received *both* orders,
equaling a total daily dose of 240mg. The maximum daily dose for this
medication is 160mg.[166] This error was life-threatening.[167] This six-day
overdose put the patient at increased risk of side effects such as
bradycardia (slowed heart rate), life-threatening arrhythmia, respiratory
disorders, drops in orthostatic blood pressure (which can cause falls), and
extrapyramidal side effects such as spasms and tics. A trained nurse
would not have taken six days to realize that 240 mg is a potentially toxic
dose. Compounding the risk is the fact that J.J. was also taking Haldol,
another antipsychotic medication that requires careful monitoring when
co-administered with Geodon.[168]

Patient K.F.

---

[165] Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 13.

[166] Walden Decl. ¶ 23, Ex. Meier-2-11 (DOC-TCI00023485-90).

[167] Eber Decl. ¶ 81, Ex. King-01, King Rep't at 10.

[168] Walden Decl. ¶ 23, Ex. Meier-2-11, Incident Report No. 1123238 (DOC-TCI00023485-90).

In one recent Incident Report, a nurse expressed her frustration with an officer's knowledge deficit and the resulting clinical consequences. On April 15, 2008, Patient K.F. arrived at the Health Services Unit (HSU) with exacerbated extrapyramidal symptoms (EPS). These symptoms typically include involuntary muscle spasms and jerking movements, uncontrolled muscle contractions, and vocal tics. EPS are common but serious side effects of many antipsychotic medications and are frequently kept in check by co-administering the medication benztropine (Cogentin). According to the report, K.F. recognized that she needed a dose and requested one from an officer. The officer said he could not locate the medication and took no further action to locate the medication or seek medical advice. The nurse wrote that these symptoms can "sometimes lead to severe problems and even death." The officer's failure to understand the importance of the benztropine and the consequences of ignoring K.F.'s serious medical needs caused "adverse and extremely uncomfortable symptoms."[169] As this example clearly demonstrates, nurses are able to recognize side effects such as EPS and to understand the importance of seeking prompt medical treatment to prevent their escalation. Correctional Officers are unable to do so.

Patient D.N.

According to an Incident Report dated June 24, 2006, a correctional officer brought Patient D.N. to be medically evaluated for complaints of "burning stomach pain." While a nurse performed an assessment, the officer observed that D.N. had not received her Protonix for three days. The nurse explained that Protonix is a stomach medication that had been prescribed by an off-site surgeon.[170] D.N.'s medical record indicates that she had been hospitalized that month for a perforated gastric ulcer with a fistula.[171] Protonix (pantoprazole) is a proton pump inhibitor used to treat gastrointestinal diseases and to prevent further gastric erosion of gastrointestinal tract tissue. The nurse thus recognized that the medication outage was connected to D.N.'s symptoms. A prolonged outage of Protonix could have caused additional damage to D.N.'s gastrointestinal tract, resulting in a need for rehospitalization or possibly surgical treatment. The provider who completed the resulting Medication Incident Report emphatically noted that "These types of errors must be stopped."[172]

Patient M.L.

---

[169] Walden Decl. ¶ 20, Ex. 540, Incident Report No. 1029455 (DOC-TCI00315971-72).

[170] Walden Decl. ¶ 21, Ex. 541, Incident Report No. 1124027 (DOC-TCI00023912-16).

[171] Walden Decl. ¶ 21, Ex. 542, Medical Records of D.N. (DOC-TCI00333851).

[172] Walden Decl. ¶ 21, Ex. 541, Medication Incident Report No. 07-5302 (DOC-TCI00028825-27).

33

On July 25, 2006, a correctional officer noted that Patient M.L. had been out of three of her four medications since July 21.[173] According to the MAR attached to the Incident Report, one of these medications was thiothixene, which is used to treat psychosis. The correctional officer's delay of four days before noticing and/or taking action to obtain this medication put M.L. at risk of harm. Thiothixene, in particular, must not be discontinued abruptly. A nurse would have had the knowledge and skills to recognize the danger and take appropriate action. Correctional officers are unfamiliar with the therapeutic uses of medications. Thus, officers are unable to recognize the consequences of misadministration or unintended discontinuation.

While some medication-related reference materials are made available to officers,[174] such information is no substitute for medical training.[175] Even additional training for officers would fail to alleviate the risks they pose by administering medications. Within the past nine months, WDOC conducted in-service training for TCI correctional officers involved in medication administration. The BHS Medical Director believes the training probably lasted approximately half a day.[176] Training presentations such as those given to correctional officers ask attendees to rapidly absorb important but highly technical pharmacological and toxicological principles, including: (1) akathisia, dystonia, and tardive dyskinesia are reportable neurological adverse reactions to antipsychotic medications; (2) side effects and adverse reactions implicating the autonomic nervous system include dizziness, urinary hesitancy, and blurred vision; (3) Baclofen and cyclobenzaprine have side effects and adverse reactions that affect the somatic nervous system; (4) the antiviral medication amantadine may cause dizziness, lightheadedness, and insomnia but the antiviral medication ritonavir is more likely to

---

[173] Walden Decl. ¶ 22, Ex. 570, Incident Report No. 1124405 (DOC-TCI00024222-24).

[174] Eber Decl. ¶ 50, Ex. 536, Vandestreek Dep. at 52-53.

[175] Eber Decl. ¶ 87, Ex. Ottolini-252, LaMarre Rep't at 17.

[176] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 280-81.

Case 2:06-cv-00537-RTR   Filed 01/23/09   Page 36 of 83   Document 124

cause nausea, weakness, and diarrhea; and (5) the therapeutic effects of methylphenidate and similar medications vary depending on the patient's psychiatric diagnosis.[177] Presenting such advanced information to non-medical personnel is of limited benefit. Even Dr. Burnett, the BHS Medical Director and a named defendant, envisions a full semester of health care training in addition to a hundred hours of specialized medication-related training as the minimum level of education desirable for personnel responsible for administering medications.[178] Providing officers with additional training of dubious value will do little to improve patient safety. [179]

### b. *Officers Lack Knowledge of Medication Interactions.*

Officers routinely administer potentially dangerous psychotropic drugs, potent prescription pain killers, benzodiazepine tranquilizers, anticonvulsants, and other medications with the capacity to cause great harm or even death if given incorrectly. Dosing schedules are frequently complex and a significant proportion of prisoners take more than one – and often up to seven or eight – different medications during the four daily medication passes. Many of these medications interact with one another. Even when the correct dose of the correct medication is administered to the correct prisoner, synergistic interactions can place patients at risk of serious adverse consequences.

Correctional officers openly admit that they lack the knowledge and training to recognize such dangerous interactions. As one Sergeant remarked, "I don't know how

---

[177] Eber Decl. ¶ 54, Ex. 543, Medication Training PowerPoint excerpt.

[178] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 298.

[179] Eber Decl. ¶ 81, Ex. King-01, King Rep't at 9; Eber Decl. ¶ 45, Ex. 531, LaMarre Dep. at 236; Eber Decl. ¶ 52, Ex. 538, Robbins Dep. at 127-28.

35

one medication reacts with the other medication. You know, if there's some that would react wrong, I wouldn't know and I'd be giving it to the inmate. If it's on their sheet, I'd give it to them."[180] Another Sergeant testified that "I can't pronounce most of them. I don't know anything about a med."[181] Officers receive little, if any, training on medication interactions and contraindications.[182] One Lieutenant e-mailed her superiors directly with the observation that officers lack the training and knowledge to distribute and document medications.[183]

Nurses, in contrast, are trained to identify drug interactions and take appropriate measures.[184] Accordingly, nurses can provide a final safety net for TCI's unsafe and problem-ridden medication management system.[185] For example, there is little chance that a correctional officer would recognize that taking the commonly-prescribed antibiotic Bactrim together with the commonly prescribed anticoagulant Coumadin could have fatal consequences.[186] A nurse, however, could spot the potential problem and verify the order with the prescriber. As one officer recognized, "[t]he nurses can look at all the meds one inmate takes and if they clash with each other, she would know that. I wouldn't know that."[187] In the unlikely event that an officer were aware of the potential interaction described above, he or she would be unlikely to recognize the two

---

[180] Eber Decl. ¶ 50, Ex. 536, Vandestreek Dep. at 47-48.

[181] Eber Decl. ¶ 46, Ex. 532, Camp Dep. 90, 93.

[182] Eber Decl. ¶ 47, Ex. 533, Albertson Dep. at 22-25; Eber Decl. ¶ 48, Ex. 534, Peterson Dep. at 32; Eber Decl. ¶ 46, Ex. 532, Camp Dep. at 50-51.

[183] Eber Decl. ¶ 70, Ex. Albertson-02, e-mail from April Albertson (DOC-TCI00047665-66).

[184] LaMarre Decl. ¶ 15; Eber Decl. ¶ 45, Ex. 531, LaMarre Dep. at 246.

[185] *Id.*

[186] Walden Decl. ¶ 35.

[187] Eber Decl. ¶ 46, Ex. 532, Camp Dep. at 93.

36

medications by their generic names (trimethoprim-sulfamethoxazole and warfarin, respectively), which is how they may appear on the prisoner's medication sheet.[188]  As Defendants' own psychiatric expert observed, "[o]ne would not expect correctional officers to detect errors in administration of medication." [189]

> 2.  Correctional Officers' Failure to Follow Safe Medication Administration Practices.

> a.  *Priority of Security Tasks.*

Nurses who distribute medications have no security-related responsibilities to distract them from the task of ensuring that medications are administered safely.[190] Officers, in contrast, must balance their responsibility to maintain security with the performance of a medical task for which they are ill-prepared.[191]  Unanticipated events, distractions, and the constant demands of ensuring order are liable to break the concentration of officers who are already under-trained and ill-equipped to distribute medications.  As one officer observed in an email to her superiors, "Officers are not taking the appropriate amount of time to distribute medication, and causing excessive human error."[192]  Officers are busy with other responsibilities and may rush through medication passes.[193]  Ultimately, "[t]he alert, critically thinking, questioning person is

---

[188] Eber Decl. ¶ 50, Ex. 536, Vandestreek Dep. at 52 (experienced officer never having been trained to recognize generic drug names); Eber Decl. ¶ 46, Ex. 532, Camp Dep. at 93 (nurses recognize both brand and generic names and are thus better suited for medication administration).

[189] Eber Decl. ¶ 6, Ex. 165, Rawski Rep't at 18.

[190] Eber Decl. ¶ 45, Ex. 531, LaMarre Dep. at 236-37 (administering medications is not a priority of correctional officers; they have other priorities).

[191] Eber Decl. ¶ 47, Ex. 533, Albertson Dep. at 88-91; Eber Decl. ¶ 86, Ex. Ottolini-251, Rep't of Patricia A. Ottolini at 7.

[192] Eber Decl. ¶ 70, Ex. Albertson-02, e-mail from April Albertson (DOC-TCI00047665-66).

[193] Eber Decl. ¶ 47, Ex. 533, Albertson Dep. at 84-85.

the only reliable defense against medication errors."[194] Officers are unable to fulfill this function. Only medical staff can provide that "reliable defense."

The incidents below illustrate the risks and consequences of requiring officers to simultaneously serve as providers of both security and health care:

Patient J.L.

On December 27, 2006, an officer gave Patient J.L. a 200mg dose of doxepin not prescribed for her.[195] J.L. had just had surgery on her feet and came to the front of the "pill line" so she could get her medications and go back to bed. As a result of her arrival at the front of the line, the officer inadvertently gave her the wrong medication.[196] The officer also administered the patient's regular dose of diphenhydramine (Benadryl).[197] The patient's medical records indicate that she was also taking Prozac, an antidepressant, during the period in which this incident occurred.[198] This error placed the patient at risk of severe, possibly fatal outcomes.[199]

First, this J.L.'s MAR and medication profile indicate that she is allergic to amitriptyline, another antidepressant with similar pharmacological properties as the doxepin she mistakenly received.[200] The patient's receipt of doxepin, a medication similar to one to which she is allergic, increased the likelihood of experiencing an allergic reaction.[201] A correctional officer lacks the knowledge and training to realize that both doxepin and amitriptyline are both tricyclic antidepressants,[202] and to understand the attendant risks of administering doxepin to a patient allergic to amitriptyline.

Further, according to a pharmacy interaction-checking database, co-administering doxepin and Prozac together is a dangerous practice that

---

[194] Eber Decl. ¶ 55, Ex. 544, Amy M. Karch, Lipincott's Guide to Preventing Medical Errors 325 (2003).

[195] Walden Decl. ¶ 49, Ex. 385, Medication Incident Report No. 07-5823.

[196] Eber Decl. ¶ 50, Ex. 536, Vandestreek Dep. at 63-64

[197] Walden Decl. ¶ 49, Ex. 385.

[198] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 101; Walden Decl. ¶ 34, Ex 545, Medication Profile (DOC-TCI00284895).

[199] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 104-05 (patient placed at "some risk" that would be increased by the co-administration of a tricyclic antidepressant); Eber Decl. ¶ 11, Ex. 308, Walden Rep't at 12.

[200] Walden Decl. ¶ 49, Ex. 385 (DOC-TCI00284895-904).

[201] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 100-01.

[202] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 101.

38

should be avoided due to potentially fatal consequences.[203]  Similarly, taking doxepin with diphenhydramine causes increased sedation and can lead to anticholinergic intoxication syndrome, which can trigger psychosis, delirium, and seizures.[204]  Indeed, the following evening, Patient J.L. turned purple and had the first seizure (or seizure-like episode) of her life.[205]

Patient S.M.

Similarly, while an officer was speaking to multiple prisoners at once, he accidentally administered six times the dose prescribed of the antipsychotic medication Seroquel to Patient S.M.[206]  It was only after S.M. swallowed the pill that the officer yelled, "'stop!' I gave you the wrong dose."[207] Although the Medication Incident Report states that no significant medical problems ensued, the officer's error put the patient at risk of dizziness, somnolence, heart arrhythmia, neuroleptic malignant syndrome, and adverse interactions with other medications.  Nurses are trained to resist distractions when passing medications.[208]

The State of Wisconsin recognizes the problems inherent in asking security staff to administer medications to prisoners.  The contract between the State and the Wisconsin State Employees Union (WSEU), which represents correctional officers, clearly acknowledges that "the knowledge for the performance of this job duty is outside the scope of their profession."[209]  As a result, the contract shields officers from being

---

[203] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 103; Walden Decl. ¶ 49, Ex. 385, Multum doxepin-fluoxetine interaction printout.

[204] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 103-04; Walden Decl. ¶ 49, Ex. 385, Multum doxepin-diphenhydramine interaction printout.

[205] Eber Decl. ¶ 50, Ex. 536, Vandestreek Dep. at 64-65; Eber Decl. ¶ 11, Ex. 308, Walden Rep't at 12; Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 115.

[206] Walden Decl. ¶ 24, Ex. 571, Medication Incident Report No. 05-4284 (DOC-00028329).

[207] Walden Decl. ¶ 24, Ex. 571, Incident Report No. 982658 (DOC-TCI00028330-31).

[208] Walden Decl. ¶ 24.

[209] Eber Decl. ¶ 87, Ex. Vandestreek-01, "Agreement between the State of Wisconsin and AFSCME Council 24 Wisconsin State Employees Union AFL-CIO" (hereinafter, "WSEU Contract"), at 201; Eber Decl. ¶ 46, Ex. 532, Camp Dep. at 89-92.

39

disciplined for unintentional medication-related errors. Under their contract, officers cannot be held accountable for errors such as those described in this motion.[210]

### b. Risk to Patients.

The near unanimity of the lay and expert opinions condemning officer-administered medications is notable. United States Department of Justice investigators Drs. Stone and Dvoskin proclaimed that continuing to allow officers to distribute medications "raises a significant risk to inmates at TCI…."[211] Correctional medicine expert Dr. Lambert King argues that the practice "constitutes a clear and present danger to the health and safety of inmates at TCI."[212] Defendants' correctional psychiatry expert Dr. Robert Rawski is unequivocal: "My opinion about that is clear, that [medications] shouldn't be administered by correctional officers…."[213] Dr. Rawski further holds that "medication administration by correctional officers violates NCCHC standards of care." [214] Dr. Rawski's counterpart, Plaintiffs' psychiatry expert Dr. Kenneth Robbins, writes that permitting officers to administer medications is "not a safe practice."[215] Plaintiffs' correctional nursing expert, Madeleine LaMarre, visited TCI and observed the failure of officers to follow standard nursing procedures for safe medication administration:

> In a mental health unit and segregation, I observed nurses administering medications and found that the nurses met standard nursing practices with respect to medication administration. In general population housing units, I also observed

---

[210] In contrast, LPNs and RNs may be disciplined by the Wisconsin Board of Nursing for failing to carry out an appropriate medical order, executing an order that the nurse knew or should have known would present a likelihood of harm, incompetence, and other acts of negligence and misconduct. Wis. Stat. §441.07; Wis. Admin Code N. §§7.03-7.04.

[211] Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 13.

[212] Eber Decl. ¶ 81, Ex. King-01, King Rep't at 9.

[213] Eber Decl. ¶ 31, Ex. 502, Rawski Dep. at 241.

[214] Eber Decl. ¶ 6, Ex. 165, Rawski Rep't at 18.

[215] Eber Decl. ¶ 5, Ex. 129, Robbins Rep't at 5.

correctional officers administering medications and noted that they did not follow standard nursing procedures for administering medications. This is not unexpected as correctional officers do not have the requisite education and training to safely administer medications. [216]

TCI physician and named defendant Dr. Steven Meress testified that "[i]t's pretty much a standard that medical people should be passing out medications."[217] Ms. LaMarre, who has monitored conditions at over 40 prisons, jails, and juvenile detention facilities throughout the country, is unaware of any other correctional institution that uses officers to administer medications.[218] Plaintiff's medical expert Dr. Jerry Walden notes that at a women's facility and intake center, medication errors are of particular concern to pregnant patients, for whom many medications are contraindicated.[219] And WDOC Medical Director and named defendant Dr. David Burnett testified that LPNs or those with similar levels of training should be the personnel employed to administer medications.[220]

The forcefulness and uniformity of these opinions is hardly surprising given the long history of medication-related incidents attributable to officer error. Below is a selection of additional errors due to officer carelessness, refusal or inability to follow established safety protocols, lack of training, or other long-recognized deficiencies for which discipline can never be imposed. These errors caused real, observable harm and illustrate the substantial and foreseeable risk of serious harm from this practice:

Patient T.F.

---

[216] LaMarre Decl. ¶ 10.

[217] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 116.

[218] LaMarre Decl. ¶ 10.

[219] Walden Decl. ¶ 37.

[220] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 299-300, 305.

41

On December 23, 2006, an officer mistakenly administered a quadruple dose of the muscle relaxant cyclobenzaprine to Patient T.F.[221]  The health care staff who responded called Poison Control.  In addition to the quadrupled cyclobenzaprine dose, the MAR appended to the Medication Incident Report indicates that officers also gave T.F her regular doses of the antihistamine medication cyproheptadine and Paxil, a SSRI antidepressant.[222]   Both cyproheptadine and cyclobenzaprine produce anticholinergic side effects, which include tachycardia (increased heart rate), sedation, slowing of gastrointestinal processes, confusion, and blurred vision.[223]  Combining these medications, particularly when one or both medications is at an abnormally high dose, can lead to anticholinergic intoxication syndrome (symptoms of which include hallucinations, psychosis, fever, and seizures).[224]  Combining the quadrupled dose of cyclobenzaprine and the patient's regular dose of Paxil put T.F. at risk of central nervous system depression and respiratory depression.

Patient S.N.

On May 20, 2008, an officer gave Patient S.N. two psychotropic medications not prescribed for her:  Imipramine, a tricyclic antidepressant, and Xanax (alprazolam), a benzodiazepine anti-anxiety medication with sedative effects.[225]  S.N.'s medical records indicate that she had current orders for and/or was currently taking: amitriptyline, a tricyclic antidepressant; Abilify, a medication to treat psychosis; Valium, another benzodiazepine; Remeron, a tetracyclic antidepressant; Celexa, a SSRI antidepressant; and Klonopin, another benzodiazepine anti-anxiety agent.[226]  Even without the accidental administration of the Xanax and imipramine, S.N. was already prescribed a potent combination of psychotropic medications with significant interactions and side effects. That evening, TCI health staff contacted an on-call physician, who ordered that the S.N.'s dose of Klonopin be held in the morning.[227]

---

[221] According to the Medication Incident Report, the patient's cyclobenzaprine should have been discontinued altogether by December 22, 2006. Thus, receiving *any* dose of the medication represents an error independent of the quadrupled dose.  However, it is difficult to determine whether the source of this error is related to officer conduct.  Walden Decl. ¶ 25, Ex. 546, Medication Incident Report No. 07-5820 (DOC-TCI00027641-47).

[222] Walden Decl. ¶ 25, Ex. 546, Medication Incident Report No. 07-5820 (DOC-TCI-00027641-47), Incident Report No. 1062250 (DOC-TCI00027648-49).

[223] Walden Decl. ¶ 25; Eber Decl. ¶ 11, Ex. 308, Walden Rep't at 13.

[224] Walden Decl. ¶ 24; Eber Decl. ¶ 41, Ex. 512, Walden Dep. at 345-47.

[225] Walden Decl. ¶ 29; Walden Decl. ¶ 29, Ex. 551, Incident Report No. 1198434 (DOC-TCI00315699-700).

[226] Walden Decl. ¶ 29; Walden Decl. ¶ 29, Ex. 552, Emergency Room Records at DOC-TCI00335013.

[227] Walden Decl. ¶ 29; Walden Decl. ¶ 29, Ex. 552, Physicians Orders at DOC-TCI00334871.

42

The following day, S.N. fell down stairs. She had trouble maintaining consciousness, had pupillary abnormalities, did not know what day it was, and began dry heaving.[228] TCI sent her the emergency room, where she was diagnosed with shoulder, head, and back injuries.[229] On May 22, 2008, a Nurse Practitioner noted that "upon further investigation of events of yesterday, [Patient S.N.] received extra dose of Xanax and became dizzy and presumably fell down the stairs."[230] The Nurse Practitioner's explanation makes sense given the nature of the medications involved in this error. The officer's error resulted in significant harm to S.N.

Patient T.P.

On February 6, 2008, an officer gave Patient T.P. a 400 mg dose of Phenytoin ER by mistake.[231] Phenytoin ER is an anti-seizure medication, and T.P. is a complex seizure patient. The officer stated that he gave the medication to T.P. but when he subsequently "went to verify the med sheet, [he] noticed that the medication had been highlighted in yellow and crossed off." TCI policy states that a yellowed-out medication order on a MAR means "discontinued."[232] That same policy requires officers to review the medication sheet *before even picking up the medication package* containing the pills. This policy is intended to reduce the likelihood that the wrong medication is given to the wrong patient; it is a standard safety procedure. In this case, it appears that the officer looked at the medication sheet *after* he had already administered the pills to T.P. At that point, it was too late. Nurses are trained not to take such shortcuts. Given that T.P. is a complex seizure patient already on three other seizure medications and an antipsychotic medication, mistakenly administering Phenytoin would have put her at risk of sedation and falls.[233]

Patients J.D.1 and J.D.2

Correctional officers mistakenly administered four doses of Tylenol-3 to patient Ja█████ D███ (J.D.1) instead of patient Jo███ D███ (J.D.2) over the course of two consecutive days. Both patients have the same last name, which is a common surname. Tylenol-3 is a strong narcotic painkiller containing the opioid codeine. It is a Schedule III federally-controlled substance. Apparently, the medication sheet and controlled

---

[228] Walden Decl. ¶ 29; Walden Decl. ¶ 29, Ex. 552, Progress Notes at DOC-TCI00334865-69.

[229] Walden Decl. ¶ 29; Walden Decl. ¶ 29, Ex. 552, Emergency Room Records at DOC-TCI00335016.

[230] Walden Decl. ¶ 29; Walden Decl. ¶ 29, Ex. 552, Progress Notes at DOC-TCI00334866.

[231] Walden Decl. ¶ 26; Walden Decl. ¶ 26, Ex. 547, Incident Report No. 1232851 (DOC-TCI00297815-17).

[232] Walden Decl. ¶ 26; Walden Decl. ¶ 26, Ex. 548, TCI Procedure No. 2025 (DOC-TCI00000431-37).

[233] Walden Decl. ¶ 26.

substance inventory tracking sheet listed only the last name common to the two patients, but no first name. It appears that the officers administered the narcotic doses to Patient J.D.1 because she had the last name D███ without checking to see if the medication was actually intended for her. This violates BHS policy and is a breach of the standard of care. That the medication was administered to the wrong patient on four separate occasions before the error was discovered is particularly disturbing, as is the corollary that the Patient J.D.2., for whom the pain medication was prescribed to treat dental pain, went without it. Carelessly administering dangerous medications such as narcotics places prisoners at significant risks of serious harm. Tylenol-3 has side effects such as sedation and constipation and may be problematic in patients with a history of substance abuse. The officer's carelessness and failure to follow procedures placed two patients at needless risk of pain and other harms.[234]

Patient P.H.

Patient P.H. has coronary artery disease and cardiomyopathy (deterioration of the heart muscle).[235] On April 9, 2008, an officer picked up a blister pack of spironolactone 12.5mg doses in preparation for administering a single dose to P.H. The blister pack he picked up was empty, so he retrieved another blister pack containing spirolactone and administered a pill from that pack. After P.H. had taken the pill, the officer looked at the new blister pack and realized that it contained 50mg pills. Apparently, the 50mg pills had been dispensed under an old, discontinued medication order. The officer violated TCI's medication administration policy by failing to verify Patient P.H's dose before giving pills. Nurses are specifically trained on how to avoid such errors. Spironolactone is a "potassium-sparing" diuretic often used in patients with congestive heart failure. Giving incorrect doses of spironolactone has the potential to cause dangerously high blood potassium levels, which can cause abnormal heart rhythms.[236] Administering an elevated dose of spironolactone may also cause kidney dysfunction and congestive heart failure, which can be fatal.[237]

Patient C.M.

---

[234] Walden Decl. ¶ 27; Walden Decl. ¶ 27, Ex. 549, Medication Incident Report No. 05-4316 (DOC-TCI00028337-39), Medication Incident Report No. 05-4317 (DOC-TCI00028340-43), Incident Report (DOC-TCI00028344-45).

[235] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 380-81.

[236] Walden Decl. ¶ 28; Walden Decl. ¶ 28, Ex. 550, Incident Report (DOC-TCI00297492-95); Walden Decl. ¶ 28, Ex. 450, Medication Incident Report No. 08-10099 (DOC-TCI00318118); Walden Decl. ¶ 26, Ex. 548, TCI Procedure No. 2025 (DOC-TCI00000431-37).

[237] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 382-83.

Medication Incident Report No. 05-4318 states that an officer mistakenly gave Patient C.M. a medication not prescribed for her. The medication was chlorpromazine, commonly known as Thorazine. Thorazine is a powerful antipsychotic medication now used infrequently due to its potential for serious side effects. Accidentally administering a dose of Thorazine to the wrong patient puts her at a risk of harm, including serious side effects such as neuroleptic malignant syndrome and interactions with other medications.[238]

Patient D.B.

On March 22, 2007, officers in the Abrahamson housing unit accidentally administered double doses of two separate psychotropic medications to Patient D.B. The officers mistakenly gave twice the prescribed amount of Xanax (alprazolam) and twice the prescribed amount of Celexa (citalopram), an antidepressant. In addition, the officers administered the patient's regular dose of Seroquel (quetiapine), an antipsychotic medication.[239] When combined, these medications may synergistically increase depression of respiration and central nervous system functioning.[240] These adverse effects may have been increased even further due to the accidental doubling of doses.[241] The resultant sedation and dizziness could last between 24 and 36 hours.[242] Approximately 26 hours after being given the two double doses, D.B. fell outside and required hospitalization. Plaintiffs' medical expert believes the increased sedation probably led to her instability and resulting injury.[243] WDOC's medical expert (and named defendant, Dr. David Burnett) agrees that even if the drug interactions did not directly cause this particular fall and injury, they may have had the potential to do so and that the error put D.B. at risk of harm.[244]

Patient K.W.

---

[238] Walden Decl. ¶ 30; Walden Decl. ¶ 30, Ex. 572 at DOC-TCI00028346.

[239] Walden Decl. ¶ 32; Walden Decl. ¶ 32, Ex. Burnett-417 (DOC-TCI00281409-11; DOC-TCI00281810-11).

[240] Walden Decl. ¶ 29; Walden Decl. ¶ 32, Ex. Burnett-419.

[241] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 421; Ex. 512, Walden Dep. at 303-04.

[242] Eber Decl. ¶ 41, Ex. 512, Walden Dep. at 304.

[243] Eber Decl. ¶ 11, Ex. 308, Walden Rep't at 13.

[244] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 421-22.

Case 2:06-cv-00537-RTR   Filed 01/23/09   Page 47 of 83   Document 124

On April 16, 2006, officers administered four wrong medications to Patient K.W.[245] These medications included Klonopin (clonazepam), an anti-anxiety drug; Benadryl (diphenhydramine), an antihistamine often used for its sedative effects; ziprasidone (Geodon), an antipsychotic drug; and oxybutynin (Ditropan), a medication used to treat urinary urgency or incontinence. Although her MAR indicates that officers withheld the patient's regular morning dose of hydroxyzine at the direction of health services staff, later that day she received hydroxyzine (Vistaril), an antipsychotic medication; warfarin (Coumadin), an anticoagulant; promethazine (Phenergan), a drug used to treat motion sickness, and Prozac (fluoxetine), an antidepressant.[246] Even without the medication errors, K.W. was taking a heavy regimen of medications. The addition of the mistakenly-given medications created a serious risk of multiple interactions and additive effects. Promethazine and ziprasidone are contra-indicated and co-administering them can result in a dangerous and deadly interaction. The officer's error also placed K.W. at risk for multiple anticholinergic effects such as blurred vision, intestinal blockage, and fever.[247]

Patient B.J.L.

On January 14, 2008, a correctional officer gave Patient B.J.L. 5mg of trifluoperazine (Stelazine) that had been prescribed for another prisoner. The report indicates that the patient regularly takes 0.5mg of Klonopin (clonazepam), an anti-anxiety medication. The officer stated that each medication is kept in a "baggy" and that he "grabbed the wrong baggy of pills." A Medication Incident Report completed on January 28, 2008, notes that the patient's vital signs were checked and no Parkinsonian-like symptoms were observed.[248] Trifluoperazine is a potent tranquilizer and antipsychotic medication that causes numerous side effects. It also interacts with B.J.L.'s Klonopin, creating a risk of central nervous system depression. It can cause extrapyramidal symptoms like spasms and tics, as well as lowering blood pressure. B.J.L. was further put at risk of neuroleptic malignancy syndrome, which can occur after only one dose of the drug. It is an error considerably less likely to happen with a trained medical professional such as a LPN.[249]

---

[245] Walden Decl. ¶ 31; Walden Decl. ¶ 31, Ex. 553, Medication Incident Report 06-5095 (DOC-TCI00029073).

[246] Walden Decl. ¶ 31; Walden Decl. ¶ 31, Ex. 554, Progress Notes at DOC-TCI00166694-96.

[247] Walden Decl. ¶ 31.

[248] Walden Decl. ¶ 33; Walden Decl. ¶ 33, Ex. 556, Incident Report No. 1062109 (DOC-TCI00297962-63), Medication Incident Report No. 08-9860 (DOC-TCI00318141).

[249] Walden Decl. ¶ 33.

3.   Officers' Under-Reporting of Medication Errors.

The timely, accurate reporting of medication-related errors is a bedrock principle of patient safety.  Error reporting identifies system failures, prevents repeats of the error, and alerts practitioners to potentially life-threatening consequences.[250]  Indeed, without proper reporting, the medication errors discussed above would never have come to light.  Had these errors gone unreported, practitioners would not have known that Patient C.M.'s vital signs required monitoring, that poison control should be contacted for Patient T.F., or that a dose of Patient S.N's clonazepam should be withheld to avoid further adverse reactions.

Experts for the parties echo these findings.  Quite simply, compared to nurses, officers are not only more likely to make medication errors, but are also less able to recognize them when they occur.[251]  Undetected errors cannot be reported and, most significantly, cannot be remedied.[252]  This places patients at an additional measure of risk.  The person standing between pill and patient is the final line of defense against medication errors.  By refusing to employ qualified nursing personnel to administer

---

[250] Eber Decl. ¶ 57, Ex. 557, Smetzer, Cohen & Milazzo, *The Role of Risk Management in Medication Error Prevention, in* Medication Errors 19.1, 19.2 (Michael R. Cohen ed. 1999).

[251] Eber Decl. ¶ 45, Ex. 531, LaMarre Dep. at 241 (officers lack the knowledge to detect pharmacy errors); Eber Decl. ¶ 6, Ex. 165, Rawski Rep't at 18; Eber Decl. ¶ 5, Ex. 129, Robbins Rep't at 5-6.

[252] Some officers report medication errors – *if* they can detect them.  In the late 1990s, BHS commissioned several studies of medication errors at its facilities.  A July 2000 report found that that "facilities with nurse administered medication processes reported 6.6 times as many administration incidents as facilities where non-nursing personnel perform this function." Eber Decl. ¶ 58, Ex. 558, *Medication Incident Study FY1999 Final Report* at 2 (FLYNN001567-1607).  *See also* Eber Decl. ¶ 49, Ex. 535, LAB Rep't at 46.  The reporting differential was even greater in a similar draft report prepared in December 2001. Eber Decl. ¶ 85, Ex. Meier-2-12, *Medication Incident Study FY2000 and 2001 Draft 3* at 11.  As the report noted, a higher rate of medication incident reports "indicates that there is better reporting NOT necessarily more incidents."  *Id.* at 4 (emphasis in original).  The consultant who prepared the report concludes that "correctional officers/youth counselors identify, correct, and report fewer medication errors than nursing staff," *id.* at 1, and asserted that "[i]t is assumed that the safety of the inmates is greater with respect to medications where errors are identified and reported with greater frequency." *Id.* at 11.

medication errors, Defendants have not only eliminated that layer of defense against errors but have also increased the underlying likelihood that errors will occur.

## B. Little Boxes and Big Risks: Dangerous Medication Documentation Practices.

Unfortunately, the dangers posed by correctional officer involvement in the medication process do not end when the patient swallows her pills. In institutional medicine, administration of all doses of medication must be promptly and properly documented in writing. Medication documentation by correctional officers at TCI is notoriously poor and has been so for years. WDOC has known of the problem and its associated risks but has done nothing to safeguard a population of prisoners that, collectively, takes thousands of medication doses several times each day. Defendants' expert, Dr. Greifinger, related that the medication delivery system, including poor documentation by correctional staff, represented an "area of significant risk" and "risk of harm" that raised Constitutional concerns.[253] Medication documentation is a medical task simply too important to delegate to untrained or undertrained security staff.

Under WDOC policy, each dose of medication administered to a patient must be recorded on a Medication Administration Record (hereinafter, "MAR") using a set of established abbreviations and protocols.[254] The MAR is a monthly grid with hundreds of small squares, each representing a dose of medication to be administered. Medication names and their dosing instructions are listed in the left-most column. The numbers one through thirty-one are listed in the uppermost row, indicating the days of the month. During each medication pass, officers must enter their initials into the appropriate dose

---

[253] Eber Decl. ¶ 75, Ex. Burnett-413, Burnett e-mail (DOC-TCI00320044); Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 374-77.

[254] Eber Decl. ¶ 61, Ex. 561, WDOC Policy & Procedure 800:11.

48

box if they administer the medication as ordered. If the officer is unable to administer the medication due to patient absence, refusal, or other circumstances, he or she must enter one of several codes into the dose box.[255] Under no circumstances should the personnel administering medications leave a dosage box blank.[256] An example of a WDOC MAR is attached to the Eber Declaration as Exhibit 559.

> 1. Correctional Officers Do Not Properly Document Medication Administration.

In June 2008, Defendants' medical expert, Dr. Robert Greifinger, testified that "[a]lmost every medication administration record was unacceptable."[257] Specifically, he observed that "...where correctional officers are responsible for filling [the MARs] out, they were variable and inconsistent from unit to unit and usually unacceptable in terms of the quality and reliability of the documentation." [258]

On an almost annual basis, both independent and internal audits confirm the shoddy quality of officer-completed medication documentation. Officers consistently fail to document doses at all. Blank dose boxes are never acceptable,[259] but even a cursory review of MARs reveals that such blanks occur regularly. Evidence abounds that officers fail to document doses, or document doses in a manner that raises suspicion as to the accuracy of the documentation. In its 2002 draft report evaluating medical care in Wisconsin prisons, The National Commission on Correctional Health Care (NCCHC) noted multiple problems with officer-completed MARs. On some MARs, the auditors

---

[255] *Id.*

[256] Eber Decl. ¶ 38, Ex. 509, Meier Pharmacy Dep. at 77.

[257] Eber Decl. ¶ 36, Ex. 507, Greifinger Dep. at 66.

[258] Eber Decl. ¶ 36, Ex. 507, Greifinger Dep. at 58.

[259] Eber Decl. ¶ 38, Ex. 509, Meier Pharmacy Dep. at 77.

49

noted that "it looks like the same person on a given day had filled out all of the medication administration [record], even though this covered more than one shift." The auditors noted significant inconsistencies in the manner in which doses were documented by officers. The report concluded that "[t]he current medication administration system clearly creates liability for the officers and for the WDOC."[260] In December 2005, a team of investigators from the United States Department of Justice followed several correctional officers as they administered medications. The investigators reported that "[d]espite the fact that they knew they were being monitored, we noted several errors in documentation, including failures to note that an inmate had received a dose, failure to document a refusal to take a dose, etc."[261] The investigators further recognized that "[n]urses receive extensive and specific training about the importance and requirements of MARs.[262] Correctional officers do not receive such training."[263]

In an audit conducted in May 2006, former HSU Manager Holly Meier found that correctional officers failed to document 12.3% of doses.[264] A series of similar audits conducted in 2008 found that, in some months, housing units in which officers administer

---

[260] Eber Decl. ¶ 68, Ex. 568, NCCHC 2002 Rep't at 138-39. Evidence also demonstrates that officers fail to complete other medication-related documents, as well. *See, e.g.,* Eber Decl. ¶ 49, Ex. 535, LAB Rep't at 45. Over five years after the publication of the LAB report, a diligent TCI Lieutenant informed her superiors that officers continued to fail to sign medication tracking sheets. Eber Decl. ¶ 70, Ex. Albertson-02, Albertson e-mail; Eber Decl. ¶ 47, Ex 533, Albertson Dep. at 82-83.

[261] Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 14.

[262] Although "Medication Administration Record" or "MAR" is a term used consistently throughout institutional medicine, during deposition, two sergeants admitted to being unfamiliar with the term. Eber Decl. ¶ 46, Ex. 532, Camp Dep. at 49-50; Eber Decl. ¶ 50, Ex. 536, Vandestreek Dep. at 62-63. Both sergeants referred to the documents as "med sheets," which should not be confused with "medication hard cards," another document used in the TCI medication management system, Eber Decl. ¶ 39, Ex. 510, Holzman Dep. at 51, or with "med cards," which are the actual blister packages of medication. Eber Decl. ¶ 46, Ex. 532, Camp Dep. at 63.

[263] Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 14.

[264] Eber Decl. ¶ 84, Ex. Meier-2-10, Medication Audits (DOC-TCI00036940-43); Eber Decl. ¶ 38, Ex. 509, Meier Pharmacy Dep. at 76-78.

50

medications fail to document 15% or more of all possible doses.[265]  In June 2008, officers

in one housing unit failed to document nearly *thirty-one percent* of all doses.[266]  During

that same time period, BHS's internal auditor found that certain officers failed to

document *any* doses for the entire shift.[267]  Defendants' medical expert, Dr. Greifinger,

was particularly concerned about the poor quality of officer documentation when he

observed that MARs completed by correctional officers in two units had "a significant

number of blanks" and "so-called refusals."[268]  He echoed this observation in a

conversation with Dr. David Burnett, the WDOC Medical Director.[269]  Further, in a June

2008 email to recipients including WDOC Mental Health Director Dr. Kevin Kallas and

WDOC Medical Director Dr. David Burnett, WDOC auditor Patricia Voermans wrote

that "[t]he number of undocumented signatures on the medication records makes it

impossible to determine compliance."[270]

When officers *do* document medication administration, the results are often

substandard and dangerously ambiguous.  During her visit to TCI in November 2007,

Plaintiff's nursing expert Madeleine LaMarre reported observing inconsistent MAR

documentation.[271]  While observing medication distribution in one unit, she watched as an

officer documented the administration of a medication before giving the medication to

the patient.[272]  In 2006, NCCHC auditors returned to Wisconsin prisons and found little

---

[265] Eber Decl. ¶ 62, Ex. 562, Voermans Medication Documentation Audits.

[266] Eber Decl. ¶ 62, Ex. 562, Voermans Medication Documentation Audits.

[267] Eber Decl. ¶ 63, Ex. 563, Voermans Memo (DOC-TCI00317970)

[268] Eber Decl. ¶ 7, Ex. 202, Greifinger Rep't at 8.

[269] Eber Decl. ¶ 75, Ex. Burnett-413, Burnett e-mail (DOC-TCI00320044).

[270] Eber Decl. ¶ 74, Ex. Burnett-404, Voermans e-mail and charts (DOC-TCI00317987-92).

[271] Eber Decl. ¶ 87, Ex. Ottolini-252, LaMarre Rep't at 20.

[272] *Id*. at 17.

improvement in medication documentation.  They reported that "[i]n one facility, consultants observed a CO administer a medication to an inmate and then record an 'R within a circle' on the medication administration record (MAR).  When asked what that represented, the CO reported this meant the inmate *received* the medication.  Later on, in the same institution, another CO reported an 'R within a circle' on an MAR meant that the inmate *refused* the medication."[273] Despite NCCHC's unequivocal admonition and WDOC's knowledge of the problem, these dangerous ambiguities continue to plague TCI MARs well into 2008.[274]

Similarly, in an April 2006 email, a TCI Nursing Supervisor reported that some officers insisted on documenting doses with only one initial, violating WDOC policy and creating dangerously ambiguous MARs.[275]  For example, an officer whose first initial was "R" would document doses with the same letter reserved to indicate that a patient had refused her medication.  And an officer whose first initial was "W" would mark a dose as given with the same letter reserved for indicating medications that had been withheld.  The officers further proposed using red ink to complete MARs.  The BHS director responded that both the use of single initials and red ink is "not acceptable" and that "NCCHC will not accept this type of charting."[276] As recently as this past summer, correctional officers continued to document doses with single initials on TCI MARs.[277]

---

[273] Eber Decl. ¶ 16, Ex. 397, National Commission on Correctional Health Care, "Pre-Accreditation Technical Assistance: Wisconsin Dep't of Corrections" (2006)*,* at 11 (emphasis added).

[274] *E.g.,* Eber Decl. ¶ 69, Ex. 574, Medication Administration Record (DOC-TCI00319628).

[275] Eber Decl. ¶ 64, Ex. 564, Greer/Alsum e-mail (DOC-TCI00036596-97).

[276] Eber Decl. ¶ 64, Ex. 564, Greer/Alsum e-mail (DOC-TCI00036596-97).

[277] *E.g.*, Eber Decl. ¶ 65, Ex. 565, DOC-TCI00325088.  At deposition, one officer testified that she marked an "O" to indicate that no medication was available to administer.  Eber Decl. ¶ 48, Ex. 534, Peterson Dep. at 48.  This practice leads to significant confusion as to whether the "O" represents "out of medication" or a dose administered by someone whose name begins with "O."  *See* Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at

Perhaps most telling is a comment made by Defendant Dr. Kallas in a peer mortality review of a TCI patient. Dr. Kallas believed the patient died of an overdose of psychotropic medication. Accordingly, the patient's medication intake in the days prior to her death was a salient issue. Dr. Kallas noted that the decedent may have refused her medications since doses were not documented in her MAR. However, he also recognized the reality that "this may also have been due to officers not recording an administered dose."[278]

2.     The Consequences of Poor Medication Administration Documentation.

Accurate documentation of medication administration is a critical component of any safe institutional medication management system. Like administration of the dose itself, medication documentation is a nursing function.[279] Without a written record of the disposition of every dose of medication, pharmacotherapy unravels. Medication Administration Records are a critical component of a patient's medical chart and the importance of their proper completion flows from the medical axiom that without documentation, there is no way to demonstrate that care was given.[280] Correct documentation of doses is vital to determining patient compliance with medication regimens, assessing clinical effectiveness, assessing the need to modify treatment plans, and preventing accidental overdoses and similar errors.[281]

---

122.

[278] Eber Decl. ¶ 66, Ex. 566, Peer Mortality Review of V.W., at DOC-TCI00328545-48.

[279] Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 13.

[280] Eber Decl. ¶ 41, Ex. 512, Walden Dep. at 72-73.

[281] Eber Decl. ¶ 36, Ex. 507, Greifinger Dep. at 59-60, 62-63; Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 123 (unclear MARs make it difficult to determine the frequency with which patients receive their medications); Eber Decl. ¶ 49, Ex. 535, LAB Rep't at 45; Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 13, 15; Eber Decl. ¶ 74, Ex. Burnett-404, Voermans e-mail at DOC-TCI00317987; Eber Decl. ¶ 60, Ex. 560, "TCI

Although the act of recording doses on a chart may seem ministerial, the failure to do so puts patients at risk of harm, including death.[282]  For example, health care providers rely on MARs to determine whether a patient's persistent symptoms are the result of non-compliance or the consequence of an improper dose that needs adjustment.[283]  In the case of a hypothetical seizure patient, proper documentation of medication administration is a prerequisite to determining the proper clinical intervention.[284]  If a patient continues to have seizures notwithstanding the fact that her MAR indicates that she has taken all of her medication doses, then a provider may justifiably raise the dose to seek a better therapeutic response.  If, in fact, the patient refused to take her medication but the doses were nevertheless documented as taken, then the provider's decision to raise the dosage may very well lead to a toxic overdose.  Conversely, if staff administers a dose but leaves the dosage box on the MAR blank and the patient has a seizure, the responding physician may be inclined to administer another pill, resulting in a possible overdose.[285]  Defendants' medical expert testified that such hypothetical poor documentation would place the seizure patient at a risk of harm.[286]  Similar dangers are posed by ambiguous or messy documentation.  Indeed, in an October 2008 deposition, WDOC Medical Director Dr. David Burnett reviewed the MAR of one patient and identified four possible

---

HSU Summary June 2008" at DOC-TCI00317013; Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 338 (undocumented doses on MARs make it impossible to determine patient compliance).

[282] Eber Decl. ¶ 36, Ex. 507, Greifinger Dep. at 59-63; Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 14-15.

[283] *See* Eber Decl. ¶ 49, Ex. 535, LAB Rep't at 45.

[284] Eber Decl. ¶ 36, Ex. 507, Greifinger Dep. at 62.

[285] Eber Decl. ¶ 36, Ex. 507, Greifinger Dep. at 63.

[286] Eber Decl. ¶ 36, Ex. 507, Greifinger Dep. at 62.

54

interpretations for a single ambiguous notation on a MAR.[287]  The risks posed by poor

medication documentation should be well known to Defendants.[288]

### 3.    Medication Documentation: A Nursing Function in Need of Nurses.

Patient safety requires that trained medical personnel replace the correctional

officers currently responsible for medication administration documentation.  Both expert

testimony and empirical studies support the necessity of this change.

As early as 2001, the Legislative Audit Bureau (LAB) identified the use of

officers rather than health care staff to administer medications as a cause of

documentation errors.[289]  More than six years later, Defendants' medical expert, Dr.

Greifinger, bolstered the Bureau's conclusion.  During his visits to TCI, Dr. Greifinger

---

[287] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 122.

[288] In addition to posing a risk clinically, because MARs serve as written proof of the delivery of health care, sloppy medication documentation can have significant legal consequences. The Wisconsin Department of Health and Family Services sets forth specific requirements for the MARs kept in treatment centers.  *See* Wis. Admin. Code HFS § 52.46(4) (specific requirements for MARs used in residential care centers for children and youth); Wis. Admin. Code HFS § 52.45(4)(e) (requiring MAR to be maintained as part of patient health records); Wis. Admin. Code HFS § 36.18(3)(f)(8) (specific requirements for MARs used in comprehensive community services for persons with mental and substance-use disorders).  MARs routinely appear as evidence that care was or was not rendered.  *See, e.g.*, *Frentzel v. Moore*, No. 06-214, 2008 WL 2373119, at *2 (E.D. Mo. June 6, 2008)  (MARs cited as evidence that patient received medication during confinement); *Pardue v. Norris*, No. 06-184, 2008 WL 2001817, at *4-5 (E.D. Ark. May 6, 2008) (MARs introduced at post-conviction hearing to show incompetency to enter a guilty plea); *Pittman v. County of Union*, No. 06-1617, 2008 WL 906235, at *2, *4 (D.N.J. April 1, 2008) (in wrongful death action, MARs used to show prisoner received medications as ordered);  *Lindell v. Daley*, No. 02-459, 2003 WL 23277280, at *7 (W.D. Wis. Nov. 21, 2003) (court relies on MARs in deliberate indifference claim brought by a Wisconsin prisoner).  In one Delaware action brought by a prisoner under 42 U.S.C. § 1983, the court expressed its frustration with poorly documented MARs, many of which shared the same faults as those routinely seen at TCI:

> The MARs present numerous interpretive difficulties: many of the markings on the charts are illegible; the exact meaning of initialing is unclear-presumably, initialing indicates that a medication was dispensed; initials are potentially indistinguishable from other abbreviations, which may have been used to indicate that a medication was not dispensed or was unavailable;

*Cardone v. Dep't of Corr.*, No. 3370-VCN, 2008 WL 2447440, at *5 n.67 (Del. Ch. June 4, 2008). Ultimately, the court refused to give the flawed MARs "any conclusive interpretation."  *Id.* at *10.

[289] Eber Decl. ¶ 49, Ex. 535, LAB Rep't at 45.

55

compared MARs completed by officers with those completed by nursing staff. The latter he found to be "very well documented" and "quite good."[290]  In contrast, he found the officers' MARs to be "usually unacceptable in terms of the quality and reliability of the documentation."[291]  In his Rule 26 expert report, Dr. Greifinger states succinctly the remedy for this quality gap: nurses should distribute medications.[292]

In a 2006 audit comparing MAR documentation between nurses and officers, TCI found that nurses documented 10% more doses than officers.[293]  Former Health Services Unit manager Holly Meier explained the discrepancy as being a result of the considerable differential in standards to which nurse and officers are held.  Nurses, Ms. Meier testified, are held to a higher standard because they have their licenses on the line.  Correctional officers, however, have less to lose if they fail to properly document the doses they administer.[294]  More recent audits show that the Monarch and Segregation Units, in which nurses administer medications, are not subject to the same fluctuations in documentation compliance rates as the Dorms, Adams, and MC Units, in which officer administer medications.[295]  However, even a few hours or a day's worth of training is insufficient to impart the proper methods of medication administration documentation and the significant medical-legal importance of doing so.  By continuing to delegate

---

[290] Eber Decl. ¶ 36, Ex. 507, Greifinger Dep. at 57-59.  *See also* Eber Decl. ¶ 7, Ex. 202, Greifinger Rep't at 8.

[291] Eber Decl. ¶ 36, Ex. 507, Greifinger Dep. at 58.

[292] Eber Decl. ¶ 7, Ex. 202, Greifinger Rep't at 8.

[293] Eber Decl. ¶ 38, Ex. 509, Meier Pharmacy Dep. at 80-81; Eber Decl. ¶ 84, Ex. Meier-2-10, Medication Audits, at DOC-TCI00036940-43.

[294] Eber Decl. ¶ 38, Ex. 509, Meier Pharmacy Dep. at 81.

[295] Eber Decl. ¶ 64, Ex. 562, Voermans Medication Documentation Audits.

medication documentation to prison guards, Defendants continue to turn their backs on a substantial risk of serious harm to the prisoners in their care.

## C.     Licensed Practical Nurses: A Readily Identifiable and Necessary Remedy.

Only the substitution of licensed health care personnel, such as nurses, for correctional officers will remedy the dangers outlined above.[296]  Nearly eight years have passed since the Legislative Audit Bureau identified serious risks associated with officer-administered medications.[297]  Defendants have long recognized the dangers posed by Correctional Officer distribution of medications but have failed to end the practice.[298]  Year after year, Defendants' recalcitrance places TCI patients at serious risk.  In 2002, NCCHC auditors concluded that the current system is a source of liability for the Department and that "[n]urses should be responsible for passing out medications to inmates...."[299]  In December 2005, the United States Department of Justice issued a stinging indictment of officer-controlled medication administration, noting that it poses "significant risk to inmates at TCI."[300]  A 2006 self-evaluation revisited the longstanding problems, catalogued the concerned parties who opposed the continued use of officers, and recognized that using health care staff to deliver medications would "improve risk management."[301]  Yet the litany of expert reports, independent audits, and an ever-growing list of harmed prisoners have been insufficient to motivate Defendants to act. Defendants even ignored the concerns of TCI's senior physician, Dr. Steven Meress, who

---

[296] LaMarre Decl. ¶ 15; Walden Decl. ¶ 36.

[297] Eber Decl. ¶ 49, Ex. 535, LAB Rep't at 45-46

[298] Eber Decl. ¶ 81, Ex. King-01, King Rep't at 9.

[299] Eber Decl. ¶ 68, Ex. 568, NCCHC 2002 Rep't at 138, 211.

[300] Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 13.

[301] Eber Decl. ¶ 17, Ex. 398, WDOC Status Report & Plans 2006 at 30, 35.

57

consistently voiced his opposition to the practice to WDOC officials over the course of several years.[302]

This longstanding knowledge of the dangers combined with a long history of obstinacy demonstrates a collective, system-wide indifference to the serious medical needs of TCI prisoners.[303] Defendants' own psychiatry expert agrees. A system that is aware of such dangers but chooses to balk at taking remedial action is deliberately indifferent.[304]

In 2006, WDOC proclaimed that "[t]he Department is committed to developing a long-term, viable alternative to the practice of correctional officers distributing medications."[305] Regrettably, the Department's actions have yet to match its rhetoric. An internal budget issue paper recalls a decade of bureaucratic indifference by various WDOC officials and the Governor himself. In every biennial budget cycle since 1997, requests were made to replace correctional officers with health care staff for the purpose of medication distribution. Each one of those requests was denied or otherwise unfulfilled.[306] Telling is the justification for refusing to include the staffing request in WDOC's final budget request: "[a]lthough high error rates by officers had been noted by HS, no documentation could be provided, and it was believed that additional training could address error rate issues."[307]

---

[302] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 123-24.

[303] Eber Decl. ¶ 45, Ex. 531, LaMarre Dep. at 154-55.

[304] Eber Decl. ¶ 31, Ex. 502, Rawski Dep. at 242-44.

[305] Eber Decl. ¶ 17, Ex. 398, WDOC Status Report & Plans 2006 at 35.

[306] Eber Decl ¶ 80, Ex. Kallas-252, "Medication Administration Issue Paper" and cover e-mail (DOC-TCI00050668-78); Eber Decl. ¶ 34, Ex. 505, Kallas Dep. at 369-70.

[307] Eber Decl. ¶ 80, Ex. Kallas-252, "Medication Administration Issue Paper," at DOC-TCI00050669-70.

58

Should this Court grant this Motion for Preliminary Injunction, Defendants will have ample opportunity to comply with the Order in a manner that recognizes the value of cost-effectiveness, flexibility, and the circumstances attendant to correctional settings. WDOC already employs LPNs[308] to administer all or some medications at the Milwaukee Secure Detention Facility (MSDF), Green Bay Correctional Institution (GBCI), the John Burke Correctional Center, and in the Segregation and Monarch Mental Health Units at TCI.[309] In some institutions, narcotics are distributed by nursing staff in an attempt to limit diversion of medications for illicit purposes.[310] WDOC may choose to use either LPNs or RNs to administer medications at TCI.[311] The nurses hired to distribute medications could, should Defendants choose, perform other nursing functions in

---

[308] Wisconsin's Board of Nursing recognizes several different nursing credentials. Licensed Practical Nurses (LPNs) hold the lowest level of credential recognized by the Board. LPNs must be 18 years old, completed at least two years of high school or high school equivalency, graduate from a one-year training program, and pass an examination. Wis. Stat. §441.10; Eber Decl. ¶ 67, Ex. 567, Dep. of Holly Meier, November 6, 2008 (hereinafter, "Meier Staffing Dep.") at 56. Registered Nurses (RNs) must have a high school diploma or equivalent, complete a minimum of two years of training, and pass an examination. Wis. Stat. § 441.04; Eber Decl. ¶ 67, Ex. 567, Meier Staffing Dep. at 55-56. Advanced Practice Nurses (APNs) and Advanced Practice Nurse Prescribers (APNPs) must hold masters-level degrees, and the latter have the authority to prescribe medications. Wis. Stat. § 441.16; Wis. Admin. Code N. §8.02. In institutional settings, depending on the level of care required, medications may be administered by LPNs or RNs. Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 304.

[309] Eber Decl. ¶ 17, Ex. 398, WDOC Status Report & Plans 2006 at 30; Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 306.

[310] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 306-07.

[311] In the 2007-2009 budget request, WDOC abandoned its request for LPNs and sought to justify using Certified Nursing Assistants (CNAs) to distribute medications. Under the proposal, WDOC would hire CNAs with at least 2 years prior experience and an additional 100 hours of medication-related training. Eber Decl. ¶ 79, Ex. Kallas-251, "2007-09 Biennial Requests Issue Paper" at DOC-TCI00050730. CNAs are typically employed in nursing homes to change linens, transfer patients in and out of bed, provide hygiene services, and to help patients get dressed. Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 324; LaMarre Decl. ¶ 14. Ostensibly, the CNAs would be required to complete the 75-hour Nursing Assistant training described in Wis. Admin. Code HFS § 129.07. This training culminates in a 25-question written or oral exam and a practical exam that includes topics such as oral hygiene, shampooing, range of motion exercises, and how to take a patient's temperature and measure his pulse rate. Wis. Admin. Code HFS § 129.08. The use of CNAs to administer medications is unacceptable. LaMarre Decl. ¶ 15. *See also* Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 298-300 (if CNA certification required only two weeks of training, then they would lack sufficient training to safely administer medications).

between medication passes.[312] WDOC may decide to hire nurses from one of several nursing agencies with whom the Department already does business, as was done when the pilot program was initiated at TCI.[313] Alternatively, WDOC has the option of hiring less-expensive and more accountable limited term employees (LTEs).[314]

Regardless of how Defendants choose to implement the proposed Order, the ongoing, unabated use of correctional officers to administer medications continues to place TCI prisoners at substantial risk of serious harm. Defendants have demonstrated a longstanding inability or refusal to act. As set forth below, only this Court's intervention can adequately protect the class from additional danger and suffering.

## LEGAL ARGUMENT

With this motion, Plaintiffs seek preliminary injunctive relief to protect them from the serious, ongoing risks to their health posed by a chaotic medication ordering and administration system. A preliminary injunction is a particularly appropriate vehicle for the relief sought given the urgency created by the ongoing dangers at which Plaintiffs and the class are placed. *See Donovan v. Robbins*, 752 F.2d 1170, 1173 (7th Cir. 1984) (noting the emergent character of a preliminary injunction). As set forth below, Plaintiffs are entitled to a preliminary injunction, because the evidence demonstrates that: (1) they have some likelihood of success on the merits; (2) they have no adequate remedy at law; and (3) they will suffer irreparable harm if the injunction is not granted.[315] Plaintiffs need

---

[312] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 301.

[313] Eber Decl. ¶ 67, Ex. 567, Meier Staffing Dep. at 21, 27.

[314] Eber Decl. ¶ 67, Ex. 567, Meier Staffing Dep. at 27, 71-73.

[315] *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 803 (7th Cir. 2002); *see also Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001); *Builder's World*, 482 F. Supp. 2d at 1070-71 (E.D. Wis.

60

only show "that [their] chances of prevailing are better than negligible." *Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.*, 482 F. Supp. 2d 1065, 1071 (E.D. Wis. 2007). Additionally, the requisite likelihood of success decreases as the irreparable harm to the movant increases. *Id.* Thus, if a plaintiff makes a particularly strong showing of irreparable harm, her showing of a likelihood of success need not be as compelling.

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS THAT TCI'S SYSTEMS OF MEDICATION ORDERING AND ADMINISTRATION VIOLATE THE EIGHTH AMENDMENT.

Prison officials have an affirmative obligation under the Eighth Amendment to provide prisoners with the necessities of life, including medical care. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *Helling v. McKinney,* 509 U.S. 25, 31-32 (1993); *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *see also Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999) (when a state "so restrains an individual's liberty that it renders him unable to care for himself," government must provide basic human needs such as medical care) (quoting *Helling*, 509 U.S. at 834). As the Seventh Circuit has consistently held, the Eighth Amendment "imposes a duty upon states to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002).

The facts of this case present a classic example of an Eighth Amendment violation under *Estelle, Farmer*, and their progeny. In *Farmer*, the Supreme Court held that "[a] prison official's '*deliberate indifference*' to *a substantial risk of serious harm* to an inmate violates the Eighth Amendment." 511 U.S. at 828 (emphasis added). In order to prevail in an Eighth Amendment challenge to inadequate medical care, a prisoner must

---

2007); *Manpower, Inc. v. Mason*, 405 F. Supp. 2d 959, 969 (E.D. Wis. 2005).

61

show both that the risk of harm to the prisoner is objectively "serious" and that the defendant was subjectively "deliberately indifferent" to the risk of harm. *Farmer*, 511 U.S. at 834 (noting the objective and subjective components of standard for "deliberate indifference" claims); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005); *Vance v. Peters*, 97 F.3d 987, 991-92 (7th Cir. 1996) (explaining subjective and objective components in Eighth Amendment medical claim). However, a prisoner "does not have to await the consummation of a threatened injury" or "await a tragic event" to obtain injunctive relief. *Farmer*, 511 U.S. at 845 (citations and internal quotation marks omitted). Moreover, a successful plaintiff "need not show that a prison official acted or failed to act *believing* that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his *knowledge of a substantial risk* of serious harm." *Id.* at 842 (emphasis added).

The Defendants in this case have, for years, been subjectively aware of the substantial risks of serious harm to the health and safety of TCI class members posed by the systems of medication ordering and administration, but have failed to act to prevent such harm. The facts set forth above establish that the risk of serious harm to TCI prisoners (the "objective" element) is significant and ongoing, resulting in both present and future dangers. The facts further establish Defendants' actual knowledge of the risk and failure to take the urgent action necessary to abate it (the "subjective" element).

A.  **Defendants' Medication Ordering and Administration Systems Create an Objectively Substantial Risk of Serious Harm to TCI Prisoners.**

For the purpose of Eighth Amendment analysis, a risk is sufficiently serious when "it is one that society considers so grave that it violates contemporary standards of

decency to expose anyone unwillingly to that risk." *Helling*, 509 U.S. at 36. It is a risk that "today's society chooses not to tolerate." *Id.*; *see also Christopher v. Buss*, 384 F.3d 879, 882 (7th Cir. 2004) (summarizing "excessive risk cases"). The substantial risk need not pose an immediate, present threat to health and safety; threats to future wellbeing are equally actionable. *Helling*, 509 U.S. at 33-34.

In the context of correctional health care claims, prisoners may satisfy the objective element by demonstrating that they have a "serious medical condition," or by proving either: (1) "'proving that there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care;'" or (2) "'repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff'" evincing an excessive risk of serious harm. *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (quoting *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir. 1980)). A pattern of such acts "presumptively indicates that prison administrators have, through their programs and procedures, created an environment in which negligence is unacceptably likely." *Robert E. v. Lane*, 530 F. Supp. 930, 940 (N.D. Ill. 1981). The pattern of negligent acts can become so pronounced that it poses a degree of risk that meets *Farmer*'s objective element. *Sellers v. Henman*, 41 F.3d 1100, 1102-03 (7th Cir. 1994).

As illustrated by the evidence submitted with this motion, members of the plaintiff class have suffered, currently suffer or are likely to suffer from serious medical conditions. The Seventh Circuit has adopted multiple verbal formulations for defining a "serious medical condition." A condition is objectively serious if "a reasonable doctor or patient would find [it] important and worthy of comment or treatment…[or if it]

63

significantly affects an individual's daily activities…[or if it causes] chronic and substantial pain." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (citation and internal quotation marks omitted). Similarly, a medical need is serious if failing to treat it "could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id.* (citation omitted). The seriousness of a condition may also be evidenced by the fact that it was "diagnosed by a physician as mandating treatment or… is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Laaman v. Helgemoc,* 437 F. Supp. 269, 311 (D.N.H. 1977)). By these definitions, then, all of class members described in this motion have an objectively serious medical need, since they were diagnosed with an illness or injury that necessitated medical attention – prescription medication – to treat it. *See Casey v. Cooper,* 97 F.3d 914, 917 (7th Cir. 1996) (considering fact that doctor prescribed pain medication for prisoner in determining whether pain was sufficiently serious).

As noted, sometimes entire components of health care systems are so deficient that they pose a substantial risk of serious harm to the entire prisoner population. Proof of systemic deficiencies in staffing, facilities, or procedures and protocols may be sufficient to demonstrate a substantial risk of serious harm, such that "the inmate population is effectively denied access to adequate medical care." *Wellman*, 715 F.2d at 272.[316]

As *Wellman* and similar cases demonstrate, faulty systems predictably cause needless suffering. For example, a medical record keeping system that fails to function can create "an objectively intolerable risk of serious injury." *Ginest v. Bd. of County*

---

[316] *See also Cleveland-Pierce v. Brutsche*, 881 F.2d 427, 430-31 (7th Cir. 1989) (distinguishing between individual and systemic deliberate indifference cases); *Bass v. Lewis*, 769 F.2d 1173. 1186 (7th Cir. 1985) (systemic deficiencies may effectively deny prisoners access to medical care in violation of the Eighth Amendment); *Robert E.*, 530 F.Supp. at 939 (recognizing a "structural suit" that "challenges the very 'bureaucratic dynamics at work… and not simply a collection of past, discrete, *Estelle*-like incidents.").

*Commissioners of Carbon County*, 333 F. Supp. 2d 1190, 1207 (D. Wyo. 2004).

Accordingly, courts will assign Eighth Amendment liability for unsafe medication systems, as well as deficiencies in staffing, medical record keeping, sick call policies, inadequate suicide prevention protocols, failure to supervise and train staff, failure to provide timely acute and emergency care, under-qualified medical personnel, lack of medical supplies, improper triage systems, insufficient resources to transport prisoners to offsite medical visits, lack of a chief medical officer, poor organization of health care services, and a host of other systemic conditions that create substantial risks of serious harm to patient health and safety. *Hoptowit v. Ray*, 682 F.2d 1237, 1252-54 (9th Cir. 1982) (staffing, organization of health care system, access to care, medication distribution system, medical records, facilities); *Lightfoot v. Walker*, 486 F. Supp. 504, 509 (S.D. Ill. 1980) (intake screening, medication distributed by unqualified persons, lack of a chief medical officer).[317]

In this case, TCI's convoluted and error prone medication ordering process and its reliance on correctional officers to administer medications to prisoners are precisely the kind of objectively dangerous systems that give rise to Eighth Amendment liability.

---

[317] *See, also, e.g.*, *Holmes v. Sheahan,* 930 F.2d 1196, 1200 (7th Cir. 1991) (failure to adequately train staff); *Bass v. Wallenstein,* 769 F.2d 1173, 1186 (7th Cir. 1985) (deficiencies in sick call procedures); *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir. 1980) (lack of physician coverage, improper use of non-physician staff, lack of transport to offsite care, under-qualified mental health care staff); *Todaro v. Ward*, 565 F.2d 48, 52 (2d. Cir. 1977) (procedures to request care, triage of complaints, follow-up on orders, observation of infirmary patients); *United States v. Terrell County,* 457 F. Supp. 2d 1359, 1362-64 (M.D. Ga. 2006) (inadequate staffing, record-keeping, delayed emergency care, suicide prevention, etc.); *Ginest,* 333 F. Supp. 2d at 1198 (medical record keeping, inadequate sick call policies, insufficient suicide prevention procedures, failure to train and supervise staff, timeliness of care); *Morales Feliciano v. Rosello Gonzalez,* 13 F. Supp. 2d 151, 206-11 (D.P.R. 1998) (poor organization of health care services, inadequate facilities and equipment, sick call procedures, intake screenings, etc.) *Madrid v. Gomez*, 889 F. Supp. 1146, 1256-59 (N.D. Cal. 1995) (inadequate staffing, training and supervision, record-keeping, intake screening, access to acute care, lack of quality control systems); *Robert E.*, 530 F. Supp. at 939-40 (absence of meaningful mental health services).

1.    **TCI's Medication Ordering System Places Prisoners at a Substantial Risk of Serious Harm.**

TCI's convoluted medication ordering system illustrates the "agony engendered by haphazard and ill-conceived procedures" that characterize unconstitutional correctional health care systems. *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977). A system that fails to "carry out medical orders by neglecting to provide prescribed medications" will support a finding of deliberate indifference, *Morales Feliciano v. Rosello Gonzalez*, 13 F. Supp. 2d 151, 209 (D.P.R. 1998), as will delays and outages in delivery of prescribed medications. *Aswegan v. Bruhl*, 965 F.2d 676, 677-78 (8th Cir. 1992); *see also Graves v. Arpaio*, No. 77-0479, 2008 WL 4699770, at *32 (D. Ariz. Oct. 22, 2008) ("providing detainees' prescription medications without interruption is essential to constitutionally adequate medical care"); *Washington v. Dugger,* 860 F.2d 1018, 1021 (11th Cir. 1988) (reversing summary judgment against prisoner who alleged medication outages); *King v. Frank*, 328 F. Supp. 2d 940, 948 (W.D. Wis. 2004) (allegation of denied medication and later treatment for symptoms caused by missed dose states independent Eighth Amendment claim).

Defendants' own medical expert, Dr. Greifinger, told defendant David Burnett that "[f]rom a constitutional perspective," the medication system poses a "significant risk."[318] Dr. Greifinger characterized TCI's medication-related procedures as "tediously cumbersome" and "a very unusual system with a lot of redundant paperwork and layer upon layer of bureaucratic steps to get from the moment the physician orders a medication until the delivery of the first dose… [it] is fraught with errors…."[319]

---

[318] Eber Decl. ¶ 75, Ex. Burnett-413, Burnett e-mail; Eber Dec. ¶ 30, Ex. 501, Burnett Dep. 374-377.

[319] Eber Decl. ¶ 36, Ex. 507, Greifinger Dep. at 56-57

The Defendants' medication ordering system places prisoners at a substantial risk of serious harm. New and refill medication orders are frequently overlooked or delayed for days or weeks. (*See* Facts, Section I.B.1. "Delays in Processing Medication Orders," *supra* at 11-19). Errors in any one of the needlessly complex steps in the ordering process may result in the wrong medication being issued, wrong doses being dispensed, or patients taking medications that are contraindicated for them. (*See* Facts, Section I.B.2. "Errors in Processing Medication Orders," *supra* at 19-23).

Untreated pain without additional physical manifestations can be a serious medical need that satisfies the objective component of a deliberate indifference claim. *See, e.g.*, *Cooper*, 97 F.3d at 916-17; *see also Gutierrez,* 111 F.3d at 1371 (recognizing deliberate indifference claims involving failure to treat "pain and suffering which no one suggests would serve any penological purpose") (citation omitted). The record shows that TCI's medication ordering system has chronic breakdowns resulting in delayed pain medications and consequently prolonged pain from, among other ailments, terminal cancer[320] and shoulder separation.[321] (*See also* Facts, Section I.B.2., *supra* at 15-16).

An infection, which threatens not only the health of the infected prisoner but also those to whom the infection may spread, also may constitute a serious medical need. *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) ("A delay in providing antibiotics will necessarily delay the curing of the infection or possibly lead to its spread"). Despite a DOC policy directing that all medications to treat active infections be initiated immediately, delays in and outright omissions of such medications are common at TCI.

---

[320] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 354-57; Eber Decl. ¶ 22, Ex. 442, e-mail relating to Patient J.L.

[321] Walden Decl. ¶ 9, Ex. 516, Medication Incident Report No. 086588.

67

For example, a TCI prisoner with blood-borne MRSA, a bacterial infection that is potentially fatal if not treated promptly, did not receive a prescribed antibiotic for three days, in what the DOC's medical director acknowledged was a "critical mistake."[322] Similarly, delays in refills of antiretroviral drugs for prisoners with HIV or even full-blown AIDS appear to be alarmingly common, leading to an increased risk of viral syndrome and even death from opportunistic infections.[323] (*See also* Facts, Section I.B.1., *supra* at 12-15).

Psychiatric or psychological conditions, too, "may present a 'serious medical need'" for treatment "under the *Estelle* formulation." *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987). The "unconscionable delays" in these medications at TCI "have caused real harm in that inmates with severe psychiatric symptoms go untreated or under-treated for unreasonably long periods of time."[324] In one of many examples, a patient did not receive four prescribed doses of oral Prolixin, a "powerful antipsychotic medication," resulting in "escalating" acute psychosis, placement in an observation cell and an emergency injection to stabilize her.[325] (*See also* Facts, Section I.B.1., *supra* at 17-18).

As the Seventh Circuit recognized in another Eighth Amendment correctional health care case, courts "need not check [their] common sense at the door." *Gil*, 381 F.3d

---

[322] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 438-448; Eber Decl. ¶ 41, Ex. 512, Walden Dep. at 543-547; Eber Decl. ¶ 76, Ex. Burnett-423, Medication Incident Report No. 05-4262; Eber Decl. ¶ 77, Ex. Burnett-424, medical record excerpts relating to Patient L.L.

[323] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 363-69; Eber Decl. ¶ 24, Ex. 445, e-mails relating to Patient M.R.

[324] Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 26-27.

[325] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 350-52; Eber Decl. ¶ 21, Ex. 440, Medication Incident Report No. 6182.

68

at 662. The pervasive risks of needless pain and suffering caused by the medication ordering system at TCI are obvious.

### 2. Medication Administration by Correctional Officers Places TCI Prisoners at a Substantial Risk of Serious Harm.

The use of Correctional Officers to administer medications is precisely the kind of systemic deficiency that places prisoners at a substantial risk of serious – often lethal – harm. Four times per day, Defendants place thousands of pills in the hands of unqualified officers with the knowledge that a dangerously high proportion of those pills will be given to the wrong patient in the wrong dose at the wrong time. Many of the errors will place unsuspecting prisoners at risk for life-threatening medication interactions, overdoses, allergic reactions, and other forms of pain and suffering. As the Seventh Circuit observed, "[u]nwitting ingestion of prescription drugs that are not medically indicated is not a risk inherent in prison life, nor one that the general population would willingly accept." *Bowers v. Milwaukee County Jail Med. Staff*, No. 02-1259, 52 Fed. Appx. 295, 298 (7th Cir. Oct. 25, 2002) (citing *Helling*, 509 U.S. at 36).

TCI's current system of medication administration poses an objectively serious risk to health and safety more than sufficient to support a finding of deliberate indifference. *Hoptowit*, 682 F.2d at 1252-53 (the use of under-qualified personnel to distribute medication will support a finding of deliberate indifference); *Lightfoot*, 486 F. Supp. at 517 (failure to properly administer medications can create "haphazard system of distribution" supporting a finding of deliberate indifference).

As the record amply demonstrates, correctional officers lack medical training and cannot reasonably be trained to understand the purpose or therapeutic effects of a medication or the significance of an outage, overdose, or failure to follow a prescribed

69

dosing schedule.[326]  For example, patients K.F. and D.N. suffered preventable pain because correctional officers failed to recognize the importance of their medications, and M.L was put at risk when officers failed to realize the seriousness of being without her antipsychotic medications.[327]  (*See also* Facts, Section II.A.1.a., *supra* at 32-33).

Prisoners are similarly put at substantial risk by officers' lack of sufficient knowledge of side effects, contraindications, and toxicity.[328]  In one instance, patient J.J. received a toxic dose of the antipsychotic medication for *six* days.[329]  As one officer noted, "We don't know that stuff.  And they'll ask me, and I'll laugh, 'I can't even pronounce it, how would I know a side effect?'"[330]  (*See also* Facts, Sections II.A.1.a. & b., *supra* at 30-32, 35-36).

Because their first priority is to maintain order and ensure security, housing unit officers cannot devote the attention and care necessary to distribute hundreds of doses to hundreds of prisoners each shift.[331]  To make matters worse, officers have little incentive to take care: they are contractually immune from discipline for negligent medication

---

[326] *See, e.g.*, Eber Decl. ¶ 81, Ex. King-01, King Rep't at 9 ("The reality is that, even if correctional officers received more training in medication side effects, their continued participation in medication dispensing and documentation constitutes a clear and present danger to the health and safety of inmates at TCI."); Eber Decl. ¶ 45, Ex. 531, LaMarre Dep. at 236.

[327] Walden Decl. ¶¶ 20-22.

[328] *See, e.g.,* Eber Decl. ¶ 68, Ex. 568, NCCHC 2002 Rep't at 138; Eber Decl. ¶ 50, Ex. 536, Vandestreek Dep. at 53; Eber Decl. ¶ 45, Ex. 531, LaMarre Dep. at 236, 246; Eber Decl. ¶ 46, Ex. 532, Camp Dep. 50-51; Eber Decl. ¶ 47, Ex. 533, Albertson Dep. at 22, 24; Eber Decl. ¶ 48, Ex. 534, Peterson Dep. 31:21-32:16; Eber Decl. ¶ 49, Ex. 535, LAB Report at 46;  Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 13; Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 389-90.

[329] Walden Decl. ¶ 23.

[330] Eber Decl. ¶ 46, Ex. 532, Camp Dep. at 68-69.

[331] *See* Eber Decl. ¶ 45, Ex. 531, LaMarre Dep. at 236-37; Eber Decl. ¶ 47, Ex. 533, Albertson Dep. 88-91; Eber Decl. ¶ 86, Ex. Ottolini-251, Ottolini Rep't at 7.  Nor are officers capable of recognizing errors when they occur. Eber Decl. ¶ 6, Ex. 165, Rawski Rep't at 18; Eber Decl. ¶ 45, Ex. 531, LaMarre Dep. at 241; Eber Decl. ¶ 5, Ex. 129, Robbins Rep't at 5-6.

70

errors.[332] The inevitable errors that ensue cause real, observable pain and suffering as well as substantial risks of pain and suffering in the future.  For example, officer errors placed patient T.F. at risk for anticholinergic intoxication syndrome (symptoms of which include hallucinations, psychosis, and fever) and heart patient P.H. at risk of serious renal and cardiac complications.[333]  (*See also* Facts, Section II.A.2., *supra* at 40-46).

When errors do occur, the evidence suggests that officers are less likely than medical personnel to file reports.[334]  Even when guards correctly administer a medication as prescribed, there is an unacceptable likelihood that the officer will improperly document the dose on the patient's Medication Administration Record, or not document the dose at all, placing patients at additional grave risks.[335] (*See also* Facts, Section II.B.1., *supra* at 49-53, and Section II.B.2, *supra* at 53 -56).

The high degree of risk posed by the use of security staff to administer medications was apparent to a range of experts who looked at TCI's system.  Dr. Lambert King, for example, concluded that the practice "constitutes a clear and present danger to the health and safety of inmates at TCI."[336]  Even Defendants' medical expert, Dr. Greifinger, bemoaned the poor quality of medication documentation by officers and

---

[332] Eber Decl. ¶ 88, Ex. Vandestreek-01, WSEU Contract, at 201; Eber Decl. ¶ 46, Ex. 532, Camp Dep. at 89-92.

[333] Walden Decl. ¶¶ 25, 28; Eber Decl. ¶ 29, Ex. 500, Meress Dep. 380-83.

[334] Eber Decl. ¶ 58, Ex. 558, *Medication Incident Study FY1999 Final Report* at 2.  *See also* Eber Decl. ¶ 49, Ex. 535, LAB Rep't at 46; Eber Decl. ¶ 85, Ex. Meier-2-12, *Medication Incident Study FY2000 and 2001 Draft 3* at 11.

[335] *See, e.g.,* Eber Decl. ¶ 36, Ex. 507, Greifinger Dep. at 58; Eber Decl. ¶ 68, Ex. 568, NCCHC 2002 Rep't at 138-39; Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 14; Eber Decl. ¶ 7, Ex. 202, Greifinger Rep't at 8; Eber Decl. ¶ 38, Ex. 509, Meier Pharmacy Dep. at 80-81; Eber Decl. ¶ 84, Ex. Meier-2-10, Medication Audits.

[336] Eber Decl. ¶ 81, Ex. King-01, King Rep't at 9; *see also* Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 13 (medication distribution by officers "raises a significant risk to inmates at TCI…").

explained how shoddy documentation can place patients at risk of overdoses or other adverse health outcomes.[337] (*See also* Facts, Section II.B., *supra* at 49, 53-54).

The numerous medication errors made by corrections officers, and the cumulative risk those errors reflect, prove that there is an objectively substantial risk of serious harm inherent in the continued use of corrections officers to distribute prescription medications.

**B.     Defendants Are Subjectively Aware of The Risks But Have Repeatedly Failed to Take Reasonable Steps to Abate Them.**

Defendants have long known of the risks posed by the medication ordering and administration systems, thus satisfying the subjective element of deliberate indifference. *Farmer*, 511 U.S. at 842 (plaintiffs may satisfy subjective element of deliberate indifference claim by showing prison "official acted or failed to act despite his knowledge of a substantial risk of serious harm."). Eighth Amendment plaintiffs can prove subjective deliberate indifference indirectly, through circumstantial evidence or by showing that the risk of harm was so obvious that the defendants must have known of it. *See Mayoral v. Sheahan*, 245 F.3d 934, 938-39 (7th Cir. 2001) (describing methods of proving knowledge for *Farmer* analysis). However, in this case, such indirect proof is unnecessary. Defendants have *actual* knowledge of the substantial risks of serious harm inherent in both the medication ordering system and their insistence on using correctional officers to administer medications.

---

[337] Eber Decl. ¶ 36, Ex. 507, Greifinger Dep. 59-63.

Case 2:06-cv-00537-RTR   Filed 01/23/09   Page 74 of 83   Document 124

1.     **Defendants Know the Medication Ordering System Poses Substantial Risks.**

Defendants have long known of the extensive delays and errors caused by DOC's malfunctioning medication ordering process.[338] Indeed, they have freely admitted as much.[339]

Defendants Dr. David Burnett, Dr. Kevin Kallas and Dr. Steven Meress, as members of the Pharmacy and Therapeutics Committee, received graphs showing numerous medication errors caused by the manual process of taking medication orders from the chart and transmitting them to pharmacy or to the housing units.[340] Similarly, pharmacy "Turnaround Audits" revealed routine delays of several days in the processing of medications at CPS as well as between the writing and faxing of orders from TCI.[341] Reports by the USDOJ and DOC consultants alerted Defendants that delays and errors in the medication processing system at TCI caused harm and posed substantial risks to TCI prisoners taking psychiatric medications.[342]

Moreover, Defendants' own clinicians repeatedly complained to Defendants about serious delays and errors resulting from the medication ordering process.[343]

---

[338] As early as 2002, a report by the National Commission on Correctional Health Care (NCCHC) identified serious problems with WDOC's manual medication ordering system.  Eber Decl. ¶ 68, Ex. 568, NCCHC 2002 Report at 74-75, 210-11.

[339] Eber Decl. ¶ 34, Ex. 505, Kallas Dep. at 334-37; Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 114-115, 124-26, 131-32.

[340] Eber Decl. ¶ 72, Ex. Burnett-401, Prescriber & Therapeutic Committee minutes for October 19, 2005 and attached medication error graphs; Eber Decl. ¶ 73, Ex. Burnett-402, Prescriber & Therapeutic Committee minutes for July 26, 2006 and attached medication error graphs; Eber Decl. ¶ 30, Ex. 501, Burnett Dep.  at 332-33.

[341] Eber Decl. ¶ 20, Ex. 439; Eber Decl. ¶ 42, Ex. 528, "Pharmacy Turnaround Audit" at DOC-TCI00278597-98.

[342] Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 26-27; Eber Decl. ¶ 71, Ex. Burnett-400 at DOC-TCI00278407, 8411, 8415 (TMG "Central Pharmacy Facilitation Project Findings" March 2007).

[343] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 138; Eber Decl. ¶ 78, Ex. Kallas-250, e-mail from Schneider

73

Despite this actual knowledge of the risk of harm, Defendants have failed to take reasonable steps that they know would reduce the risk. For example, Defendants know that implementation of a computerized prescriber order entry (CPOE) system should cause delays and errors to "plummet."[344] DOC expects implementation of a CPOE system to be relatively inexpensive and to save the DOC money in the long run.[345] Despite the known advantages, Defendants have failed to take meaningful steps toward implementation at TCI, at least in part because DOC has not made CPOE a high enough priority.[346] To the extent that CPOE may be implemented at TCI in the future, it is likely at first to be used only for refills and only at some unspecified, possibly distant, time will new orders be included.[347] Similarly, Defendants have failed to adopt measures that appear to have allowed some other DOC institutions to experience substantially fewer medication problems, even without CPOE.[348]

### 2. Defendants Know Using Correctional Officers to Distribute Medications Poses Substantial Risks.

Defendants' knowledge of the risks of harm posed by the continued use of correctional officers to distribute medication is best evidenced by the fact that two of the named defendants believe the practice falls short of the standard of care in correctional

---

to Kallas; Eber Decl. ¶ 34, Ex. 505, Kallas Dep. at 334-37.

[344] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 244-45, 332-33.

[345] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 245-46.

[346] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 326-328.

[347] Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 329-30.

[348] Eber Decl. ¶ 35, Ex. 506, Atkinson Dep. at 138-40 (describing better medication process at Kettle Moraine Correctional Institution); Eber Decl. ¶ 73, Ex. Burnett-402, Prescriber & Therapeutic Committee minutes for October 19, 2005 and attached medication error graphs (graph depicting smaller number of medication errors at most other DOC institutions).

74

medicine.[349]  Further, various internal and external reports as well as the findings of their own expert witnesses remind Defendants on an almost annual basis that their stubborn refusal to switch to using trained medical personnel places prisoners in grave danger.[350] Moreover, the fact that the union representing correctional officers negotiated a contract term immunizing officers from liability for negligence in distributing medications put the Defendants on notice of the risk of using officers.[351]


## II.     PLAINTIFFS HAVE A RIGHT TO PRELIMINARY INJUNCTIVE RELIEF.

Plaintiffs seek a preliminary injunction requiring Defendants to prepare and implement a plan (i) to ensure that all controlled medications at TCI be distributed by trained medical personnel with credentials equal to or greater than those of LPNs; and to prepare and implement a plan (ii) to ensure that Defendants timely, accurately, and reliably process medication orders and dispense and administer prescribed medications, complying with Wisconsin Department of Corrections Policy and Procedure 800:02 Corrections Policy and Procedure 800:02 as modified by the terms of the proposed Order. Plaintiffs ask that a preliminary plan be due seven days after the date that the Court issues its injunction; that a final plan be due thirty-seven days after the date that the Court issues

---

[349] Eber Decl. ¶ 29, Ex. 500, Meress Dep. at 123-24, 323; Eber Decl. ¶ 30, Ex. 501, Burnett Dep. at 305 ("I think that licensed practical nurses is the level of health professional that you should have delivering medications there, I would agree with that, or at least someone trained along a similar level.").

[350] *See, e.g.,* Eber Decl. ¶ 17, Ex. 398, WDOC Status Report & Plans 2006 at 30; Eber Decl. ¶ 7, Ex. 202, Greifinger Rep't at 8; Eber Decl. ¶ 18, Ex. 399, USDOJ Rep't at 13; Eber Decl. ¶ 31, Ex. 502, Rawski Dep. at 241; Eber Decl. ¶ 6, Ex. 165, Rawski Rep't at 18; Eber Decl. ¶ 49, Ex. 535, LAB Rep't at 45-46; Eber Decl. ¶ 68, Ex. 568, NCCHC 2002 Rep't at 138, 211.

[351] *See* Eber Decl. ¶ 88, Ex. Vandestreek-01, WSEU Contract.

its injunction; and that Defendants comply with the terms of the order by instituting the plans within sixty days.

## A.     The Requirements of the PLRA Are Met.

For the reasons set forth below, the requested relief is consistent with the requirements of the Prison Litigation Reform Act of 1995, 18 U.S.C. § 3626(a)(2) ("PLRA").  Moreover, Plaintiffs have established a right to injunctive relief.

The relevant provisions of the PLRA require the following with regard to preliminary injunctions:

> **Preliminary injunctive relief.**–In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means to correct that harm.  The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief.

18 U.S.C. § 3626(a)(2).[352]

All courts to address the issue have held that, with regard to litigated decrees, the PLRA does not change the standards for issuance of an injunction.  *Armstrong v. Davis*, 275 F.3d 849, 872 (9th Cir. 2001); *Smith v. Arkansas Dep't of Corr.*, 103 F.3d 637, 647 (8th Cir. 1996) ("The Act merely codifies existing law and does not change the standards of whether to grant an injunction."); *Williams v. Edwards*, 87 F.3d 126, 133 n.21 (5th Cir. 1996) (same).   This principle specifically applies to preliminary injunctions.  *Jones'El v.*

---

[352] 18 U.S.C. § 3626(a)(1)(B) involves injunctive relief that violates state law.  Essentially, that provision provides that relief that violates state law can be imposed only if such a remedy is the sole relief that will correct the violation of federal law.

76

*Berge*, 164 F. Supp. 2d 1096, 1116 (W.D. Wis. 2001). Further, the ninety-day time limitation imposed on the length of preliminary injunctions imposed by the PLRA does not affect the ability of a court to enter a series of preliminary injunctions, as long as relief is specifically re-entered at the appropriate times. *Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001).

The general remedy requested by Plaintiffs is an order that Defendants prepare plans, so the proposed order intrinsically provides guarantees that it meets the PLRA requirements that such relief be narrowly drawn and no broader than necessary. Thus in *Armstrong*, the court of appeals rejected the defendants' argument that an order was insufficiently narrowly tailored or overly intrusive when the order allowed the defendants to develop the policies and practices that would eliminate conditions that violate the rights of disabled prisoners, even though the resulting injunction included a number of quite detailed provisions. 275 F.3d at 872-73; *cf. Cason v. Secksinger,* 231 F.3d 777, 785 n.8 (11th Cir. 2000) (a court may accept a defendant's concession that PLRA's requirements for factual findings are met).

For the same reasons that were persuasive in *Armstrong* and *Cason*, the order proposed by Plaintiffs will result in relief that is no broader than necessary to correct the violation and that is minimally intrusive. The order requires Defendants to focus on critical constitutional violations and take concrete steps to address them. By requiring that the plans be developed by Defendants, but that Defendants obtain court approval for those plans, the proposed order is carefully designed not to infringe on Defendants' discretion unnecessarily:

> By her injunction, the thorough and extremely patient district judge did
> not attempt to "micro manage" the Board's activities, but rather to set

clear objectives for it to attempt to attain, and, in most circumstances, general methods whereby it would attain them.

*Armstrong* at 873.

Similarly, Plaintiffs' proposal that the requested injunction require that medications be distributed by properly trained medical personnel is the narrowest relief that is likely to address the constitutional violation. *See Armstrong* at 873 (affirming district court PLRA findings regarding necessity of injunction requiring hiring staff and providing additional training to other staff); *cf. Morales Feliciano v. Rullan,* 378 F.3d 42, 55 (1st Cir. 2004) (remedy requiring that prison health care system be privatized was appropriate under PLRA in light of specific record showing constitutional failures).

Further, Plaintiffs' proposed remedy, to the extent that it requires modifications to Defendants' current medication prescription practices, is also narrowly tailored and no more intrusive than necessary. The proposal deviates from Defendants' current policy as little as possible, consistent with the need to cure the constitutional violation shown by the record in this case. By establishing general standards for Defendants' staff to follow, the proposed remedy actually avoids micro-management by the Court. *See Benjamin v. Fraser,* 343 F.3d 35, 53-54 (2d Cir. 2003) (rejecting jail defendants' argument that the district court should have examined every window in jail to determine whether each needed to be fixed to assure constitutional conditions; a comprehensive repair program under the circumstances was in fact less intrusive than an individual review of each window in the jail).

Finally, the proposed order, by serving to promote constitutional levels of health care, will promote the public safety by removing a source of prisoner unrest. In *Johnson v. California*, 543 U.S. 499 (2005), the Supreme Court noted, in connection with a

78

challenge to prison racial segregation, that racial segregation may exacerbate hostility and violence among prisoners. *Id.* at 507-508. Fixing the medication system here will actually promote safety, by removing a source of unrest.

**B.      Plaintiffs Meet the Standard for Issuance of a Preliminary Injunction.**

As set forth above, a party seeking a preliminary injunction must demonstrate (1) that it has some likelihood of success on the merits, (2) that there is no adequate remedy at law, and (3) that it will suffer irreparable harm if the injunction is not granted. *AM Gen. Corp.*, 311 F.3d at 803. If the party meets this burden, the court must consider "the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied," and consider the public interest. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). Plaintiffs satisfy each of these elements.

As explained in Section I of the Argument, Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that the medication ordering and distributions systems at TCI violate the Eighth Amendment.

With respect to irreparable harm, the Seventh Circuit has recognized that receiving inadequate – or even substandard – medical care is an irreparable injury sufficient to support injunctive relief. *Am. Med. Ass'n v. Weinberger*, 522 F.2d 921 (7th Cir. 1975); *see also Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997) (plaintiff would suffer irreparable harm if treatment sought but denied would be "more effective"). Putting a patient's life in danger is, by definition, an irreparable injury. The Defendants' own employees and agents, reports and experts recognize the inherent dangers in the current medication ordering system and in medication distribution by

79

correctional officers, both in the abstract and light of the history of specific incidents. In addition, as described in detail above, several incidents that endangered the health and lives of Plaintiffs on a number of occasions (and left many in severe pain) could have been avoided if the requested relief were in place.

Finally, Defendants will not suffer irreparable harm if the preliminary injunction is granted, nor will the public interest be harmed. Simply incurring expenses is not irreparable harm. *See, e.g.*, *Classic Components Supply, Inc. v. Mitsubishi Elec. Am., Inc.*, 841 F.2d 163, 164-65 (7th Cir. 1988).

Moreover, the public interest is actually promoted by granting Plaintiffs' motion, because it will save lives and avoid unnecessary suffering. Indeed, as argued above, the public safety generally will be promoted by requiring Defendants to comply with their affirmative obligation to provide necessary health care, as such compliance will remove a potentially explosive source of for unrest among prisoners.

## CONCLUSION

For the reasons set forth above, this Court should grant Plaintiffs' motion and order Defendants to prepare and implement a plan (i) to ensure that all controlled medications at TCI be distributed by trained medical personnel with credentials equal to or greater than those of LPNs; and to prepare and implement a plan (ii) to ensure that Defendants timely, accurately, and reliably process medication orders and dispense and administer prescribed medications in accordance with Wisconsin Department of Corrections Policy and Procedure 800:02 as modified by the terms of the proposed Order.

80

Dated this 23rd day of January, 2009.

Respectfully submitted,

/s Gabriel B. Eber

Gabriel B. Eber
D.C. Bar No. 483021
Elizabeth Alexander
National Prison Project of the ACLU
Foundation
915 15th Street, N.W., 7th Floor
Washington, D.C. 20005
Tel: (202) 393-4930
Fax: (202) 393-4931
Email: geber@npp-aclu.org

Laurence J. Dupuis
State Bar No. 1029261
American Civil Liberties Union of
Wisconsin Foundation
207 E. Buffalo St., # 325
Milwaukee WI 53202
Tel: (414) 272-4032
Fax: (414) 272-0182
Email: ldupuis@aclu-wi.org

Robert L. Graham
Keri L. Holleb Hotaling
Michael R. Strong
Jenner & Block LLP
330 N. Wabash Ave.
Chicago, IL 60611-7603
Telephone: (312) 222-9350
Email: mstrong@jenner.com

Attorneys for Plaintiffs