# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

KRISTINE FLYNN, LENDA FLOURNOY,
VERNESSIA PARKER and DEBBIE ANN
RAMOS, on behalf of themselves and all others
similarly situated,

                Plaintiffs,

                                        Case No. 06-C-537

       -vs-

JIM DOYLE, Governor of Wisconsin;
MATTHEW FRANK, Secretary, Wisconsin
Department of Corrections (WDOC); JAMES
GREER, Director, WDOC Bureau of Health
Services (BHS); DAVID BURNETT, M.D.,
Medical Director, BHS; KEVIN KALLAS,
M.D., Mental Health Director, BHS; DONALD
HANDS, Ph.D., Psychology Director, BHS;
BARBARA RIPANI, Dental Director, BHS;
ANA BOATWRIGHT, Warden, Taycheedah
Correctional Institution (TCI); HOLLY MEIER, R.N.,
Health Services Unit Manager, TCI; STEVEN
MERESS, M.D., Supervising Physician, TCI,

                Defendants.

---

# DECISION AND ORDER

---

      Taycheedah Correctional Institution (TCI) is a maximum and medium security facility that houses Wisconsin's female prisoners. This class action alleges that the medical, dental and mental health care provided to prisoners at TCI violates the Eighth Amendment, the Equal Protection Clause of the Fourteenth Amendment, Title II of the Americans with Disabilities Act, and § 504 of the Rehabilitation Act.

On March 14, 2007, the Court granted plaintiffs' motion for class certification. The TCI Class is defined as "all prisoners who are now or in the future will be confined at TCI." The ADA Subclass is defined as "all individuals with disabilities who are now or in the future will be confined at TCI." Plaintiffs, on behalf of the TCI Class and ADA Subclass, request declaratory and injunctive relief to rectify the ongoing violations of federal and constitutional law at TCI.

On April 24, 2009, the Court granted plaintiffs' motion for a preliminary injunction with respect to medication processing and distribution. The Court's injunction, which remains in effect, provides that all controlled medications must be distributed to TCI inmates by trained medical personnel. The Court's injunction also provides that medication orders must be processed and dispensed in a timely, accurate, and reliable manner.

Now before the Court is the defendants' motion for partial summary judgment. This motion is directed at all claims except those related to medication delivery. For the reasons that follow, defendants' motion is granted, but only to the extent that it seeks dismissal of claims related to dental care. In all other respects, defendants' motion is denied.

## BACKGROUND

### Overview of TCI

The Taycheedah Correctional Institution was originally opened in 1921 as the Wisconsin Industrial Home for Women, housing women between the ages of 18 and 30 incarcerated for "moral" crimes. Women committing major crimes were sent to the Waupun Correctional Institution ("WCI"). In 1933, the two populations were combined at TCI. In

-2-

1975, the institution officially became known as the Taycheedah Correctional Institution. TCI is the only medium/maximum security institution in the State of Wisconsin for female inmates. TCI maintains an approximate population of 700 inmates. TCI has approximately 325 staff members, 167 of which are security staff.

In December 2004, as part of the process for creating a new Wisconsin Women's Correctional System ("WWCS"), DOC moved intake, or Assessment and Evaluation ("A&E"), for all newly incarcerated female inmates from the Dodge Correctional Institution to TCI. Upon intake, inmates go through a 6-8 week assessment and evaluation process to determine custody and programming needs. On August 21, 2005, TCI officially became part of the new WWCS. The WWCS brings all DOC female adult correctional facilities, TCI and female correctional centers, under one appointing authority.

TCI has seven (7) individual housing units:

- **Addams Hall:** Opened in 1933, Addams Hall houses offenders involved in AODA Treatment. The 1st floor is occupied with staff offices, the 2nd floor is a modified residential treatment unit for 3 fulltime programs, and the 3rd floor houses inmates with an identified AODA treatment need, when open due to bed needs.

- **Harris Hall:** Opened in 1921, Harris Hall is a medium security unit for mature inmates. Harris Hall has two floors of rooms with 1 to 4 offenders per room. Inmates living in Harris Hall must be at least 40 years old and have good behavior.

- **Abrahamson Unit ("AB"):** This unit was originally opened in 1995 and housed the maximum security inmates. In 2004, this unit was named the Abrahamson Unit and the medium security inmates were moved to this unit. It is a 96-cell unit with a maximum capacity of 184 offenders. Offenders are housed two per cell with the exception of eight handicap single cells.

-3-

- **McCauley Unit ("MC"):** The McCauley Unit is a maximum security unit. It was opened in 2002 as medium security and switched to maximum security in November 2004 due to TCI's assumption of A&E. The unit has capacity of 240 inmates. The north wing of the building houses all A&E inmates. The west wing of the building houses maximum general population inmates.

- **Dorms/Barracks:** Opened in 1997, this is a medium security, open-bay unit with bunk beds lined up against the walls in 4 quads. This unit has a capacity of 146 medium-security offenders.

- **Monarch Special Management Unit ("MSMU"):** The Monarch Special Management Unit opened in January 2002, as a specialized housing unit for female offenders with behavioral or mental health needs. MSMU has a capacity of 61, and all rooms are singles cells.

- **Segregation Unit:** The Segregation Unit, which opened in 2002, is utilized as a means of providing security separation of inmates whose behavior substantially affects the safe and secure operation of the Institution.

TCI has several other buildings:

- **Gower:** Gower was opened in 1983 as the Social Services building. This building has the main Control center, security offices, visiting room, Records Department and Health Services Unit.

- **Simpson Hall:** Simpson was opened in 1966 as the Administration and Education Building. Maintenance, canteen and laundry occupy the basement level.

- **Chapel:** The chapel is used for smaller religious services and groups as a staff training area.

- **Homestead:** Built in the early 1800's, the Homestead is now used for Extended Visits. Inmates who have completed the Parenting Program may have their children visit on Saturday from 8 am - 3 pm in this home. These visits are family-oriented and are supervised by Social Workers and Teachers.

- **Prescott:** Opened in 1992, Prescott is the main dining room for inmates. It also includes a kitchen facility for food preparation and bakery and storage in the lower level.

## Access to Care: Triage

-4-

TCI written policy requires that health care staff collect and triage all Health Service Requests (HSRs) within 24 hours of submission by the prisoner. TCI written policy requires that triage nurses review each HSR and make triage decisions based upon "patient health care needs according to approved protocols and shall not be limited by facility resources." Once a patient's HSR has been triaged, TCI written policy requires that patients needing to see a provider be seen within seven days. The triage function is critical as it serves as the entry point into the health care system. Triage nurses serve as gatekeepers. Without proper triage, diagnoses may be missed and it becomes "very difficult" for the rest of the health care system to function.

Triage of HSRs at TCI does not routinely occur within 24 hours as required by written policy. TCI's nursing system places patients at risk of harm by its failure to properly triage and respond to prisoner health concerns as submitted in HSRs. The expert witnesses for both parties identify numerous examples of improper, and even cynical, nursing triage that placed patients at risk of harm, including unnecessary pain, possible exacerbation of infections, risk of additional morbidity, and possibly urgent medical conditions being ignored. Defendant Dr. David Burnett, the Medical Director at the Bureau of Health Services ("BHS"), wrote that "[defendants' expert Dr. Robert Greifinger, M.D.] found sick call slip review by nursing staff to be 'awful.' Responses written on many requests are cynical and [nurses] are finding reasons not to see [patients]. The inmates are making reasonable requests and they get responses back such as 'you just saw someone last week' when [the prisoner's health concern] is not even related to that visit."

## Access to Care: Sick Call Delays

Once a patient's request for non-emergency care has been triaged, TCI policy requires that patients needing to see a provider be seen within seven days. Even when followed, this policy does not comply with the applicable National Commission on Correctional Health Care standard. Dr. Greifinger concluded that the policy is unacceptably vague because the "request for care should be assessed for clinical urgency, and an acute condition should be seen much sooner than 7 days." Patients with serious or potentially serious health issues such as chest pain, heavy vaginal bleedings and blood clots, and elevated blood sugars often wait longer than seven days before seeing a provider.

## Access to Care: Nursing Assessments

Assuming that a patient's HSR is timely and appropriately triaged and an appointment is timely scheduled, the patient will generally be evaluated by a registered nurse. Nurses function as gatekeepers and are expected to assess patient symptoms and medical history and proceed according to established algorithms, or "nursing protocols." Failing to follow established nursing protocols places patients at risk of harm. Nurses at TCI fail to conduct adequate nursing assessments according to nursing protocols. Plaintiffs' nursing expert Madeline LaMarre found that the failure to perform adequate nursing assessments, coupled with delays in clinician referrals, creates "a serious obstacle for access to care."

## Access to Care: Failure to Refer Patients to Clinicians and Provide Follow-up Care

Ms. LaMarre cited "known delays in access to a clinician once a referral is made." There are multiple examples of patients failing to receive timely follow-up care as ordered

-6-

and patients needing care beyond what a single visit with a registered nurse can provide. These patients, as a result, endure long delays without necessary care. In one example, Patient B.J., an HIV patient, submitted an HSR complaining of abdominal pain, dizziness, nausea and fever with chills. Patient B.J. wrote that she cried every night, that the medications were not working, and that her abdomen was swollen. The nurse who evaluated her referred Patient B.J. to [Defendant] Dr. Meress for the "first available [appointment]." Dr. Meress, the Supervising Physician at TCI, did not see Patient B.J. until approximately two months after she submitted the HSR and approximately six weeks after the nurse referred her for the "first available" appointment with Dr. Meress.

Defendants' medical expert, Dr. Greifinger, cited another example of a patient failing to timely see a clinician: a seizure patient waited eleven days before being evaluated following a seizure. Dr. Greifinger testified that this patient should have seen a nurse practitioner or physician the same day, or no later than one or two days following the seizure. In another example, Dr. Greifinger noted a patient who had been prescribed an antibiotic for a possible MSRA infection that had been incised and drained received no wound care or follow-up.

Similarly, patient K.D. was seen by a nurse practitioner for an apparent diagnosis of pelvic inflammatory disease (PID). The nurse practitioner ordered that she receive follow-up care with the women's health provider. More than two weeks later, the patient had yet to be scheduled for follow-up and submitted an HSR complaining of worsening symptoms and vaginal discharge. An RN evaluated the patient and once again referred the patient to a nurse

practitioner. TCI staff scheduled Patient K.D. to see a nurse practitioner, but the appointment was canceled and, almost four weeks after the patient's initial assessment, no new appointment had been made. The triage nurse wrote that the patient "is now begging to see a provider. . . . We're losing our credibility with these inmates. I keep telling them that I am referring them for an appt to be seen. . . . Should I tell them differently when I write them back?"

Dr. Greifinger testified that the nursing system at TCI that governs access to care "is designed to be cumbersome and designed to have people fall through the cracks." Dr. Greifinger also testified that TCI's health care system creates risks that: (1) patients will suffer unnecessary pain; (2) patients with undiagnosed infections will pose a risk to the public's health; (3) patients with undiagnosed acute or chronic conditions will be more likely to have their symptoms worsen; and (4) opportunities for early diagnosis and prevention will be missed. Dr. Greifinger further testified that this system "poses a risk of harm." Summarizing his conclusions regarding sick call and acute care at TCI, Dr. Greifinger wrote that the cases he reviewed "describe a system that was unable to provide timely care."

**Medications**

TCI written policy considers orders for antibiotics to be "stat" orders that must be initiated immediately. TCI's medication system fails to reliably provide antibiotics to patients. TCI written policy considers orders for medications to treat intermediate to severe pain to be "stat" orders that must be initiated immediately. TCI's medication system is unable to reliably provide medications to treat patients in pain. TCI's medication ordering

-8-

system is unable to maintain an uninterrupted supply of anti-retroviral medications for patients with HIV. The deficiencies in the medication system jeopardize the health and safety of patients taking medications to treat psychiatric disorders. Systemic errors in the medication system result in patients receiving dangerously high or low doses of medications. Systemic errors in the medication system also result in patients receiving the wrong medications.

Correctional officers administer medications to prisoners in five of TCI's seven housing units. Correctional officers lack sufficient training and knowledge to understand why a medication is prescribed, or to know the side effects of that medication, proper dosing, or potential medication interactions. Correctional officers' lack of medication-related knowledge places patients at risk of harm. TCI correctional officers fail to follow standard medication administration practices. In one example, on May 20, 2008, a correctional officer gave Patient S.N. two psychotropic medications not prescribed for her: Imipramine, an antidepressant, and Xanax (alprazolam), an anti-anxiety medication with sedative effects. At the same time, Patient S.N. was also taking amitriptyline, an antidepressant; Ability, an anti-psychotic medication; Valium, an anti-anxiety agent, Remeron, an antidepressant; Celexa, an antidepressant; and Klonopin, another anti-anxiety agent. Even without the accidental administration of Xanax and imipramine, S.N. was already prescribed a potent combination of psychotropic medications with significant interactions and side effects. That evening, TCI health staff contacted an on-call physician, who ordered that the dose of Klonopin for S.N. be held for the following morning. The following day, S.N. fell down

-9-

stairs. She had trouble maintaining consciousness, had pupillary abnormalities, did not know what day it was, and began dry heaving. TCI sent her to the emergency room, where she was diagnosed with shoulder, head, and back injuries. On May 22, 2008, a nurse practitioner noted that "upon further investigation of events of yesterday, [Patient S.N.] received extra dose of Xanax and became dizzy and presumably fell down the stairs."

As codified in their contract with the state, correctional officers are immune from discipline for negligent medication errors. If licensed nurses rather than correctional officers were to distribute medications, as recommended by the experts in this case, the risk of professional discipline would lead to greater accountability and safety.

In medical practice, including at TCI, administration of all doses of medication must be promptly and properly documented in writing. The quality of medication documentation by correctional officers at TCI is poor and has been poor for years. Accurate documentation of medication administration is a critical component of any safe institutional medication management system. Medication Administration Records are a key component of a patient's medical chart and the importance of their proper completion flows from the medical axiom that without documentation, there is no way to demonstrate that care was given. Correct documentation of doses is vital to determining patient compliance with medication regimens, assessing clinical effectiveness, assessing the need to modify treatment plans, and preventing accidental overdoses and similar errors. Failing to properly document medication administration places patients at risk of harm, and possibly even death.

-10-

Prior to the Court's entry of a preliminary injunction, DOC had no plans to hire licensed practical nurses to administer medications to the prisoner population at TCI. Given the acuity level of patients at TCI, defendant Dr. Burnett testified that licensed practical nurses or personnel "trained along a similar level" should administer medications to patients at TCI.

**Care for Patients with Acute Needs: Lack of Infirmary**

In the correctional context, infirmaries are used to care for patients requiring observation, supportive care after surgery or an invasive test or procedure, and monitoring of symptoms. Infirmaries may temporarily house patients too ill to stay in their cells but not needing a hospital level of care. TCI lacks an on-site infirmary facility. It also lacks the health care and security staff to provide care for patients needing infirmary-level care. TCI patients needing infirmary care are sent to Dodge Correctional Institution, approximately 26 miles from TCI. Placing TCI patients in the DCI Infirmary ("DCI-I") is difficult because the DCI-I is a male institution and allocates only a few beds for female prisoners. At times, the DCI-I kept female prisoners in locked negative pressure rooms notwithstanding that medical personnel needed access to these patients. The DCI-I is not required to honor requests from TCI providers that patients be transferred and, at times, the DCI-I denies requests to accept TCI patients. At other times, the DCI-I inappropriately discharges patients back to TCI. DCI-I officials have suggested that TCI keep "'infirmary type female patients' thereby creating more bed space for male offenders." Gender-based considerations such as the lack

of programming and resources available for women at the DCI-I may affect the decision to keep a patient at the infirmary.

Both parties' medical and nursing experts agree that a facility such as TCI should have an on-site infirmary. The nurse practitioner responsible for providing women's health care services at TCI believes that TCI needs an infirmary for women.

**Care for Patients with Acute Needs: Failures to Follow-Up from Off-site Care**

In general, patients returning from the hospital should be examined by a practitioner and/or assessed by a nurse. Physicians have a responsibility to follow-up with their patients after hospital discharge. Hospital discharge orders are considered "stat" and must be filled immediately. When patients return from off-site visits, their recommendations from consultants must be processed in a timely manner. However, this does not routinely happen at TCI.

For example, a terminally ill cancer patient returned from the hospital on a Wednesday and, as of the following Sunday, she had not been seen by a provider except for someone who took her vital signs. In another example, a patient with lupus returned from the hospital with an order for the medication prednisone, but did not receive it for three days. Because this patient had been on prednisone for an extended period of time, this abrupt cessation put her at risk of blood pressure and blood sugar problems. In two other examples, a July 2008 email from a TCI nurse discusses two incidents within a three week period when a TCI clinician failed to follow-up with seriously ill patients returning from the hospital. One patient was discharged back to TCI following a kidney transplant. The second patient was

-12-

returned to TCI after being treated for lacerating her wrists with a razor blade that she subsequently swallowed. With regard to the latter patient, the nurse wrote, "Quite frankly I'd like to say I'm surprised she wasn't seen – but I'm not. This seems to happen way too frequently."

## Leadership

Multiple witnesses, including experts for both parties, testified that TCI should have an on-site medical director. Having an on-site medical director at TCI would improve patient care, address some of the systemic problems with health care at TCI, and help remedy the lack of "direction and accountability" in the system. Although DOC has two associate medical directors with oversight responsibilities for multiple institutions, neither oversees care at TCI. There is no indication that BHS will add a third associate medical director any time soon.

The experts for both parties concluded that physicians at TCI are insufficiently involved in the care of patients. Plaintiffs' nursing expert, Madeleine LeMarre, concluded that "there are relatively few clinical evaluations by physicians even among medically complicated patients. Although nurse practitioners are quite capable of managing many primary care conditions, it is important that physicians are available for consultation, and that physicians take an active role in managing the more medically complicated patients to ensure that appropriate care is being provided." While nurse practitioners are qualified to see chronic care patients, physicians need to take the lead in caring for patients with complicated conditions. Senior TCI physician, defendant Dr. Stephen Meress, is unaware of any formal

-13-

protocols at TCI that govern when nurse practitioners should refer patients to physicians. Although HIV patients receive consultations from outside providers, their care is not coordinated by TCI physicians.

**Cumulative Impact of Defendants' Systemic Failures**

Defendants' nursing expert (Patricia Ottolini) testified that the entire medical system needs to be overhauled. Plaintiffs' medical expert (Dr. Jerry S. Walden) found "serious, sometimes life-threatening failures to provide adequate health care to TCI prisoners." Plaintiffs' nursing expert (Ms. LeMarre) testified that there are global systemic issues that have resulted in lack of adequate access to care and failure to deliver ordered care.

**Mental Health Care System**

In December 2004, TCI was forced to absorb the assessment and evaluation (A & E) function for all women entering DOC's female adult institutions – a function previously handled at Dodge Correctional Institution – without any additional resources to perform that function. From 2004 through 2006, initial interviews with psychologists frequently did not occur for two or three weeks after intake, creating a significant risk of harm. Psychology staff do not regularly request past treatment records for new prisoners with mental illnesses. Without prior treatment records, diagnoses made during the psychology intake process must depend on patient self-report. Prior treatment records improve the quality of diagnosis, and thus treatment. Failure to obtain past treatment records creates a greater risk of emotional pain resulting from ineffective treatment.

-14-

Post-traumatic stress disorder is extremely common among female prisoners. Mental health assessments conducted in correctional facilities should include a thorough trauma assessment, including specific questions regarding sexual abuse, physical abuse, neglect, and psychological abuse. TCI does not conduct a trauma assessment with such specific questions, despite the fact it could be beneficial in providing effective treatment. The only questions on the Mental Health interview form that pertain directly to traumatic experiences that could cause PTSD are "Have you ever been the victim of violence or assault?" and "Have you ever seriously injured your head?" Traumas other than personally experiencing physical violence can cause PTSD, and the questions on the form would not pick up such traumas. Conducting a thorough trauma assessment would be beneficial in providing effective treatment in some cases.

As of October 2008, psychiatrists were not assessing newly arriving prisoners on psychotropic medications for three to four weeks, significantly longer than TCI's purported policy of completing such assessments within 10 days. There have been no reviews of records to determine whether "bridge orders" to maintain new prisoners on psychotropic medications until they are seen by a psychiatrist are actually being written and followed. Bridge orders are either not written or not "transcribed" on the day of intake, resulting in delays in receiving critical medications. Plaintiffs' nursing expert, Madeline LaMarre, identified instances in which bridge orders for medications (including the psychotropic medications Seroquel, Amitriptyline, Geodon, Abilify and Celexa) were either not written or not transcribed on the day of admission.

-15-

Delays in psychiatric assessments of new prisoners create a risk that patients will suffer unnecessarily, either because their medications are discontinued without psychiatrist review (resulting in uncontrolled symptoms) or because a clinician fails to detect that drugs continued without such review are ineffective or producing side effects. In 64% of mental health records reviewed by Defendants' psychiatry expert, mental health providers treating the same patient were working from different diagnoses. In 24% of the records reviewed, defendants' expert found "substantial" diagnostic disparities. In general, agreement on a basic diagnosis is "fundamental" to determining the appropriate treatment of a mentally ill person. Diagnostic differences among treatment providers increase the risk of harm to mentally ill inmates. They may lead to inappropriate treatment, conflicting treatment or poorly informed interventions.

The pervasive problem of diagnostic disparity suggests a system that does not consistently process diagnostically relevant information into accurate diagnoses. Without accurate diagnosis, prisoners are at risk of improper treatment and severe emotional symptoms. A mental health treatment plan is essentially "a series of statements specifying a course of therapy and the roles of clinicians in carrying it out." Such treatment planning is an important component of delivering adequate mental health care to prisoners with serious mental illnesses. At TCI, treatment planning, even in the Monarch Special Management Unit, where the most seriously mentally ill prisoners at TCI reside, is left largely in the hands of the least qualified member of the treatment team and fails to ensure input from the treating psychiatrist or even from the patient.

-16-

In TCI's general population housing units, there are many prisoners with serious mental illnesses, some of whom would benefit from Monarch-level services. With approximately 258 women at TCI with serious mental illnesses and 61 beds available in Monarch, there are nearly 200 women with serious mental illnesses in general population. More formal and detailed treatment plans are necessary for some of these general population prisoners, so that providers are not working from "different documents." TCI mental health care providers work in isolation, without regular review of one another's treatment notes. Within DOC generally and at TCI specifically, psychiatrists have one chain of command, psychologists another, and social workers and educators yet another. Psychiatrists report to Defendant Dr. Kevin Kallas, DOC's Mental Health Director, psychologists to Rose Kleman, who reports to the deputy warden, and social workers to the "Corrections Program Supervisor." These diverging lines of mental health authority cause problems because they result in non-clinical supervision of clinicians and confusion over priorities and authority. Dr. Kallas does not even have information about or authority over key resources for providing care.

TCI has too few psychologists and social workers to provide adequate mental health services. TCI offers insufficient therapy groups to meet the needs of mentally ill women at TCI. TCI offers insufficient individual psychological treatment to meet the needs of mentally ill women at TCI. The inability to provide individual treatment to prisoners who need it is pervasive: "a regular, daily thing." At most, only two hours per week of group therapy are available to even the most mentally ill prisoners at TCI – those housed in the

-17-

Monarch Special Management Unit. Nearly all one-on-one mental health contacts at TCI are responses to crises, not provision of planned treatment. Even if TCI had sufficient staff, defendants would be unable to provide additional group therapy and other needed programming without additional space. Efforts to add space remain in a preliminary "planning phase" and may not come to fruition for several years, if at all.

Psychiatrists are on-site at Taycheedah only four days per week. The lack of psychiatrist coverage is problematic, especially in MSMU and observation, where prisoners may need to be evaluated by a psychiatrist on an urgent basis. All psychiatrists at TCI are limited-term employees who work only 16-20 hours per week. The reliance on part-time psychiatrists renders the continuity of care provided to prisoners at TCI "inadequate."

No female prisoners are allowed at the Wisconsin Resource Center because the WRC is only for males. Defendants lack an inpatient treatment option equivalent to WRC for those women who need it. Although Monarch was originally intended to provide "parity in mental health services that are available to male offenders via WRC," the resources were never allocated to make Monarch anything more than a "minimally staffed special management unit" unable to provide the "intensive crisis management" an inpatient facility could provide. The use of Monarch and civil commitment to the Winnebago Mental Health Institute as substitutes for inpatient mental health beds is "a protocol that's in its entirety unsatisfactory." The absence of an inpatient mental health option for women strains current resources at TCI, forcing providers to devote resources to patients that would be better managed in a hospital setting. The lack of treatment resources – staff and physical plant – leaves seriously mentally

-18-

ill women "experiencing unnecessary mental suffering that could be ameliorated" if adequate treatment programs were available.

Prisoners who express suicidal thoughts are subjected to extremely harsh conditions in "observation" cells. The cells are cold and dark, the prisoners have their clothes and underwear taken away and are left with only a gown to wear. The only furniture is a mat on a concrete slab. TCI has the largest number of observation placements of any DOC institution. Prisoners at TCI are subjected to confinement in observation as long as three or four weeks. Prisoners confined to observation are treated as though they are serving a segregation sentence for misconduct. An unlicensed counselor, rather than a psychologist or psychiatrist, is the primary professional providing crisis care in the observation unit, and psychiatrists often do not review people placed in observation for days. Clinicians' contacts with prisoners in observation are undermined by lack of confidential communications. Mentally ill prisoners are afraid to report symptoms because they fear being confined in an observation cell. Conditions typical of segregation can exacerbate mental illness. For this reason, prisoners in observation cells should not be treated from a custody perspective as segregation inmates.

Psychologists involved in the treatment of a prisoner give input on the culpability of their patients for alleged misconduct in defendants' disciplinary process. Providing input on culpability creates a conflict of interest, or "dual agency problem." In disciplinary proceedings, psychology staff should only provide evidence that mitigates punishment or that bears on competency to participate in disciplinary proceedings, not on culpability or

-19-

responsibility. By DOC policy, any segregation sentence given to a prisoner for misconduct, regardless of the psychological condition of the prisoner, must be no less than 30 days. It is potentially harmful to mentally ill prisoners to place them in segregation for 30 days. Correctional officers, even those in the Monarch unit, belittle prisoners with mental illnesses and view treatment as "babying" them. TCI correctional officers sometimes interfere with PSU staff access to prisoners in the segregation units. A "chasm" between correctional and psychology staff has resulted in a climate in which the interests of security staff "presumptively overrule psychological and psychiatric concerns." Security's assertion of primacy is the "single structural defect" that most interferes with access to mental health care at TCI.

In 2002, an NCCHC Report identified and criticized diverging lines of mental health authority, insufficient mental health staffing, lack of quality assurance monitoring, lack of integration of medical records and communication problems. Similarly, a 2005 US DOJ Report identified and criticized "woefully inadequate" mental health resources, psychologists being "relegated to only performing initial diagnostic assessments and managing crises" without "time and resources to provide active treatment . . . such as individual or group programming," deficiencies in intake assessments, use of segregation and observation to punish mentally ill prisoners, failures to review previous notes and lack of integration of psychiatric and psychological notes, lack of quality assurance, and the lack of an accessible inpatient care option for women.

**Segregated Dining Hall**

TCI maintains a segregated dining hall. Prisoners who use wheelchairs, canes, or walkers are not allowed to eat in the dining hall in the Prescott building, where the other prisoners eat together. Instead, prisoners who have mobility-related disabilities are forced to eat their meals alone in their cells, and they miss out on interacting with other prisoners. Because the cells are small, requiring prisoners to eat in their cells forces them to eat close to the toilets, which can smell foul. Even on holidays, prisoners with disabilities are forced to eat alone in their cells, while the other prisoners eat together. Prisoners with disabilities come out of their cells, are given trays of food on the unit, and then have to return to their cells. This is extremely difficult for prisoners who use walkers because they have to struggle to hold onto the walker with one hand while balancing a tray in the other. Other prisoners hand out the trays to prisoners with mobility disabilities. The prisoners who hand out the trays are often careless, resulting in the food being dumped out or smeared around. The prisoners who hand out trays also steal food intended for prisoners with disabilities. Food often gets cold while prisoners with disabilities wait for their trays, some prisoners with disabilities go hungry because they are given less food than the prisoners who eat in the dining hall, and prisoners with disabilities are given fewer options at meals than prisoners without disabilities. Numerous prisoners with disabilities have complained about their exclusion from the dining hall and the inequalities that result.

**Treacherous Paths**

Numerous paths at TCI that prisoners use are steep, uneven, filled with cracks, and in a state of disrepair. As a result of these unsafe conditions, prisoners have been thrown out

-21-

of wheelchairs, tipped out of wheelchairs, and flung onto the grass.  In some cases, such prisoners are mocked by TCI staff.  As early as 2002, the US DOJ found the paths at TCI to be excessively steep.  Logan Hopper, plaintiffs' expert on disability access, found that "each separate building [at TCI] generally houses a specific program that is unique to that particular building."  Therefore, "at least one accessible path of travel from all locations must be provided to at least one accessible entrance at each building," or prisoners with mobility disabilities will be unable to access the activities held in the buildings.  The lack of accessible paths therefore results in a denial of access to programs and activities: "As the site is currently laid out, persons with disabilities would have extreme difficulty moving about the site, to such an extent it would be difficult, if not impossible, for many persons with disabilities to take part in the facility's programs independently, as afforded to non-disabled inmates."

TCI has prisoners without disabilities act as mobility assistants or wheelchair "pushers" for prisoners who use wheelchairs.  Unfortunately, the pushers are no substitute for safe paths.  While pushing prisoners who use wheelchairs, many of the pushers are careless or gossip with each other rather than paying attention.  One pusher ran a prisoner in a wheelchair down a hill in the rain, almost throwing the prisoner out of her wheelchair.  The same wheelchair pusher ran the prisoner with a disability into a door.  Hopper found that "[w]hile [TCI] has a program utilizing 'wheelchair pushers' (prisoners who are assigned to push disabled, ill, or elderly inmates), the hazards and non-complying conditions still make movement around the site very difficult."  Wheelchair pushers frequently arrive late and

cause prisoners who use wheelchairs to miss out on major portions of activities (including religious services and classes in reading, writing, and math) and to be late for time-sensitive medical treatments (such as insulin injections for people with diabetes).

Catholic mass is an example of an activity that is held in only one location that can be reached only through inaccessible paths. Catholic Mass is held in the chapel, and a single ramp is the only means of entering the chapel. Hopper found that the path to the chapel violates the Americans with Disabilities Act Accessibility Guidelines (ADAAG) because the path is too steep, lacks handrails and landings, and is too narrow. These features constitute a "major barrier" and "would preclude access to the many programs and services located in [the Chapel] for many persons with disabilities." The ramp is so steep that it is difficult for prisoners who use wheelchairs to get to the chapel, and its grade even makes it difficult for the prisoners who work as wheelchair pushers to transport disabled prisoners to the chapel. That has led at least one prisoner to stop attending Catholic Mass, even though she wants to do so. Similarly, both pathways leading down to the main entrance to the Simpson building (where educational programs are held) violate ADAAG guidelines due to excessive slope, lack of handrails, and lack of landings.

The path to the Gower building, which contains the Health Services Unit, is steep and uneven, with cracks and portions that are heaved up. This path creates "potential trip and fall conditions" and violates ADAAG guidelines in several respects, including excessive slope, excessive roughness, and excessive bumps and depressions. In addition to the inaccessible path leading to the Gower building, doors in the Gower building are heavy and difficult for

-23-

wheelchair users to enter, are too narrow for wheelchairs to fit through, require excessive pressure to open, and violate ADAAG standards.

Prisoners' visits with their young children often occur in a building called Doty House, yet there is no continuous path leading to Doty House, just a series of uneven stones with spaces between them. Wheelchair users like Amy Prelwitz who visit with their children in Doty House cannot get there on their own. Hopper found that Doty House "was totally inaccessible, with no accessible path of travel, entrance or bathroom, and with narrow doorways. The existing conditions would make it virtually unusable for most prisoners (or children) with disabilities, and these persons would be excluded from the many uses available to prisoners without disabilities."

Numerous other paths are dangerous and inaccessible: (1) the path to the Barracks, which is used for dormitory-style housing, violates the ADAAG due to excessive slope and lack of handrails and landings; (2) the path leading to Addams Hall, which houses medium-security prisoners, violates ADAAG because of features including excessive slope; (3) the path to the Harris building, where elderly prisoners are housed, has three large bumps and depressions that violate ADAAG standards and cause "potential slip and fall conditions. As early as 2002, the US DOJ found that Harris Hall had numerous inaccessible features; and (4) the path to the library is filled with cracks, and at least one prisoner who uses a wheelchair stopped going to the library because she considered the ramp to the library too steep and dangerous.

-24-

Prisoners with disabilities have repeatedly complained about the unsafe condition of the paths, but the dangerous conditions are not repaired, and the same cracks and bumps remain for long periods of time. Rather than repairing paths, TCI simply paints some of the uneven portions with bright paint, but Charles Axelsen, who has served as TCI's backup ADA coordinator, admitted that painting the uneven portions does not make the paths compliant with the ADA. Paint is also insufficient because it generally cannot be seen in winter and because the prisoners who serve as wheelchair pushers are often oblivious. The unsafe condition of the paths is exacerbated by the fact that TCI fails to fix broken wheelchairs. Unstable wheelchairs both cause discomfort for prisoners and increase the risk that the wheelchairs will topple over on the steep and uneven paths.

**Prisoners with hearing disabilities**

TCI fails to provide sign language interpreters for important programs and activities. For example, prisoners at TCI who have hearing disabilities have made requests for sign language interpreters at Catholic Mass and Protestant religious services, but TCI has denied such requests, and prisoners with hearing disabilities miss much of what is said. Similarly, one prisoner had to withdraw from a typing class because of TCI's failure to provide sign language interpreters, and Hopper found that a deaf prisoner "was not appropriately provided with an interpreter at most required events and activities, to such an extent that the deaf inmate could not participate in required activities and other optional activities frequented by other inmates."

A TTY machine is a device that allows individuals with hearing disabilities to communicate on the telephone by displaying what the other party is saying and allowing the individual with a hearing disability to type what he or she wants to communicate. Sarah Johnson made requests to use a TTY machine, and she would have liked the opportunity to use a TTY machine to communicate with her children, her brother, her nieces and nephews, and her mother. Because her requests to use a TTY machine were denied, Ms. Johnson has to try to find a phone with a "volume up" button, and she and her family have to communicate by screaming back and forth into the telephone. This is how Ms. Johnson had to communicate with her mother, and her mother now has died. One of Ms. Johnson's nephews is deaf, and Ms. Johnson's lack of access to a TTY machine means she cannot communicate with him at all, not even by screaming back and forth on a phone with a "volume up" button.

Kelly Kujawa has requested that she be allowed to use a videophone, which would enable her to communicate with her family members using sign language, but her requests have been denied. Communicating with family members in sign language would help Ms. Kujawa maintain her proficiency. She is afraid of forgetting signs while in prison.

Prisoners with hearing disabilities often cannot hear orders given by correctional officers, including announcements over the intercom system to stand and be counted. These prisoners are then disciplined for not "obeying" orders. Prisoners with hearing disabilities are also disciplined for asking other prisoners to repeat orders. In short, prisoners with hearing disabilities have a choice between being disciplined for not understanding orders and

-26-

being disciplined for trying to understand the orders. Prisoners are supposed to stand at their door with their lights on to receive certain medications from the medication cart, but Ms. Johnson cannot hear the announcements saying that it is time to stand. Ms. Johnson therefore has to request medications by pressing the intercom button to speak with correctional officers, but they sometimes respond by hanging up or threatening to file conduct reports against her. Requesting medications in this manner became so difficult and intimidating that Ms. Johnson stopped taking medications from the medication cart, including psychiatric medications, heart medications, and blood pressure medications.

TCI officials have forced prisoners who communicate through sign language to wear handcuffs during off-site medical appointments, even though it is virtually impossible to communicate symptoms through sign language while handcuffed. When Kelly Kujawa was taken to St. Agnes hospital for a medical appointment, she requested that the TCI correctional officer remove her handcuffs during the appointment, but the officer refused.

**Prisoners with Vision-Related Disabilities**

Tammy Griffith, who is legally blind, wanted to be able to read the books her son reads so she could discuss the books with him. Because Ms. Griffith cannot read Braille, she asked for permission to listen to books on tape. She met with TCI's education director, who told her a tape player would be a security threat because it would enable prisoners to record conversations. When she pointed out that all she needed was a tape player without a record feature, her request was still denied. The education director also refused Ms. Griffith's request for instruction in Braille. The education director asked her, "What would a blind

lady do to get into prison?"  When Ms. Griffith asked TCI staff to arrange for someone to read to her, they told her to ask her roommate, who refused.  TCI staff then told Ms. Griffith to ask prisoners other than her roommate to read books to her, but they also refused.  Officers made comments about this such as "don't you have any friends."  TCI also refused Ms. Griffith's requests to arrange for someone to read letters from her family.  Her roommate was reluctant to help with this, and there were also private letters that she did not want her roommate to read, such as letters from her husband and privileged materials about the appeal in her criminal case.

Without any accommodations that would enable her to read, Ms. Griffith had to sit in her cell virtually all the time with nothing to do.  She went to the library when she was allowed to do so just to get out of her cell, even though she could not read the books in the library.  She brought a pen and paper into the library.  Ms. Griffith then stopped going to the library because there was nothing for her to do there, and she spent even more time in her cell without any activity.  Ms. Griffith was repeatedly called out from her cell to take a written skills test at TCI.  She could not take the test due to her disability and requested several times that someone read the test to her.  These requests were denied, and TCI ultimately gave up on trying to administer the test to her at all.  She believes the test may be used for placement in programs. Ms. Griffith's requests for a key lock to protect her personal belongings were denied, even though her disability prevents her from seeing the numbers on the combination locks issued to other prisoners.  When Ms. Griffith filed a prisoner complaint, which she believes was related to TCI's failure to treat her pain, the complaint

-28-

was rejected as illegible because her disability prevented her from writing clearly. She could not even read the portion of the rejection telling her how long she had to appeal.

**No coherent procedure for requesting accommodations**

Charles Axelsen testified that he serves as the ADA coordinator when the primary ADA coordinator position is vacant. The primary coordinator position was vacant at least from November 2006 through July 17, 2007, making Mr. Axelsen the only ADA coordinator for this period. Mr. Axelsen did not know whether any document informed prisoners of their rights under the ADA, whether any document informed prisoners of programs available for persons with disabilities, whether any document informed prisoners of the name of the ADA coordinator or backup ADA coordinator, or whether any document informed prisoners of how to file disability-related complaints. The Inmate Handbook states that prisoners can contact the ADA Coordinator directly to request accommodations – but it does not state the name, office address, and telephone number of the employee or employees designated as the ADA Coordinator.

Hopper found the Inmate Handbook's references to the ADA and the ADA Coordinator totally inadequate:

> Only the latest (July, 2007) edition of the inmates' handbook appeared to have any reference at all to the ADA, procedures for requesting reasonable accommodations, policies for filing grievances related to the ADA, and any other significant programmatic requirements. And these references were quite cursory and rudimentary at best. There appeared to be no previous effort to inform inmates of the rights under the ADA or to describe appropriate policies and procedures.

-29-

. . . While it was verbally reported by TCI that Charles Axelson was the back-up ADA coordinator at the facility (this could not be confirmed through any document provided by the facility), only one of the inmates interviewed was familiar with that name. Inmates who reported that they had attempted to contact the ADA coordinator had been given various other names, none of whom had responded to the inmates' inquiries.

Axelsen's understanding of the procedures for requesting accommodations contradicts the instructions in the Inmate Handbook stating that prisoners may contact the ADA Coordinator directly to request accommodations. Mr. Axelson believed that a prisoner's request for a particular accommodation, such as a wheelchair or an accessible cell, would be decided by the Health Services Department without consulting the ADA Coordinator or the backup ADA Coordinator. Thus, if a prisoner needed a sign language interpreter or Braille material, Mr. Axelsen claimed the request would be handled by the Health Services Unit, and when Mr. Axelsen received a request for a hearing aid, he "just kicked it back, because there's really nothing that I'm authorized to do with something like that." Mr. Axelsen also testified that it was not part of his job while serving as backup ADA coordinator to address prisoner grievances involving disabilities, except grievances related to the physical condition of TCI, and that a prisoner with a hearing disability who needed a sign language interpreter or other aid or service would have to file an inmate complaint, rather than contacting the ADA coordinator.

Defendants claim that TCI has operated under a document entitled Executive Directive 17, which discusses accommodations for disabilities, since 1991. In fact, Defendants do not follow the policy. Mr. Axelsen testified that he was not sure if he had

-30-

ever seen Executive Directive 17. Executive Directive 17 states that when a prisoner makes a request for accommodation related to a job, education, or treatment program to a supervisor, the supervisor should contact the coordinator for disability-related issues. Executive Directive 17 uses the term "504 Coordinator," which refers to Section 504 of the Rehabilitation Act, a predecessor statute which the ADA mirrors. Executive Directive 17 states that the coordinator for disability-related issues may then contact an Affirmative Action Officer. Asked about the provision referring to the functions of the 504 Coordinator, Mr. Axelsen stated, "I've never seen a request of this nature."

Executive Directive 17 states: "All inmates should be notified of their right to reasonable accommodations upon entry to the institution. This would ordinarily be handled as part of intake/orientation. Institution superintendents are responsible for ensuring that inmates already within the system are informed of this policy." Nonetheless, TCI's Assessment and Evaluation Handbook, which is a guide for prisoners for their first four to eight weeks at TCI, contains no mention of accommodations for disabilities or the ADA. One prisoner recounts that when she first arrived at TCI, "there was some orientation and general discussion of the rules of the institution. But I was not told of any procedure for requesting accommodations for a disability or told whom I should contact about disability-related issues. During over a decade of incarceration at TCI, no staff member ever gave me information like this." Another prisoner who is legally blind was not able to take notes at the orientation because staff members would not give her a marker – it took three weeks and numerous requests before she could get a marker. The same prisoner did not learn about

Charles Brown, the ADA Coordinator, until an eye doctor mentioned Mr. Brown offhand, during an appointment.

The lack of clarity about procedures for seeking accommodations resulted in Sarah Johnson not being given a hearing aid for over a year. Ms. Johnson lost her hearing aid in April of 2007. Ms. Johnson spoke to a nurse at HSU about getting a replacement, but the nurse told her it would take six to eight months because TCI did not have enough money for a hearing aid. Ms. Johnson then wrote to the head of HSU, offering to buy her own hearing aid, but the head of HSU did not respond to the letter. Because the Inmate Handbook does not say who the ADA Coordinator is, on the advice of a TCI staff member, Ms. Johnson contacted Charles Axelsen about obtaining a replacement hearing aid. Mr. Axelsen never responded to Ms. Johnson's request. Ms. Johnson then filed an inmate grievance requesting a hearing aid. The request was denied as "untimely." Despite her diligent efforts to obtain a replacement, Ms. Johnson had no hearing aid from April 2007 through the fall of 2008.

The Wisconsin Department of Corrections receives federal financial assistance and is a department, agency, or other instrumentality of a state government.

**US DOJ Agreement**

In September 2008, the State of Wisconsin entered into a settlement agreement with the United States Department of Justice in *United States v. Doyle, et al.*, Case No. 08-C-753 (E.D. Wis.), a case relating to the inadequacy of mental health care at TCI. On September 15, 2008, the Court granted the parties' joint motion to place the case on its inactive docket

for four years while retaining jurisdiction or until an earlier final dismissal with prejudice is entered.

Pursuant to the memorandum of agreement ("MOA"), the parties jointly selected Dr. Jeffrey L. Metzner ("Metzner") to serve as a consultant and issue a series of status reports. In each report, the consultant will evaluate the status of compliance for each provision of the Standards and Action plan, using the following standards: (1) substantial compliance; (2) partial compliance; (3) beginning compliance; and (4) non-compliance. Each report will describe the steps taken to analyze conditions and assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the consultant's findings. Each report will also include specific recommendations for actions needed to bring the State into compliance with the Standards and Action plan. In consultation with Dr. Metzner, the State will revise or develop policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement the provisions of the MOA. The State will provide and document initial and ongoing training to all TCI staff with respect to newly implemented or revised policies and procedures. The State will develop and implement a Quality Assurance Program for TCI's provision of mental health care services for inmates with a serious mental illness. Pursuant to the MOA, the USDOJ has full and complete access to TCI, inmates, DOC staff, and all documents relating to topics addressed in the MOA. The State will maintain sufficient records to document its compliance with the MOA, and every 6 months the State will provide the

-33-

consultant and the USDOJ with status reports detailing the State's compliance with the MOA.

The Agreement will terminate 4 years from the date of execution. If the USDOJ believes that the State has not substantially complied with the terms of the MOA after a period of 3 years and 9 months, the USDOJ's sole remedy is reinstatement of the complaint.

## ANALYSIS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Ultimately, the "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## I.     Eighth Amendment – Cruel and Unusual Punishment

The Eighth Amendment's cruel and unusual punishment provision "imposes a duty upon states to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002). A prison official's "'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v.*

-34-

*Brennan*, 511 U.S. 825, 828 (1994). In order to prevail on an Eighth Amendment, inadequate medical care claim, a prisoner must show both that the risk of harm to the prisoner is objectively serious and that the defendant was deliberately indifferent to the risk of harm as a subjective matter. *Id.* at 834; *see also Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000) ("plaintiff must show both an objective risk of danger and actual knowledge of that risk on the part of the custodial staff"). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997).

Importantly, this case challenges the delivery of health care services to the inmate population at TCI on a systemic, institutional level. *See, e.g., Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983); *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430-31 (7th Cir. 1989) (distinguishing a systemic claim from one based on "isolated instances of indifference to a particular inmate's medical needs"). Plaintiffs may succeed on a "systems" claim by showing either (1) that "'there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care;'" or (2) "'repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff'" evincing an excessive risk of serious harm. *Wellman* at 272. "[S]ystemic and longstanding inadequacies create such a high risk of future injury that deliberate indifference must be inferred." *Ginest v. Bd. of County Comm'rs. of Carbon County*, 333 F. Supp. 2d 1190, 1198 (D. Wyo. 2004).

-35-

In response to the defendants' motion for summary judgment, the plaintiffs come forward with a mountain of evidence which is relevant to both prongs of the "systems" inquiry. There is a great deal of evidence demonstrating that there are "systemic and gross deficiencies" in staffing, facilities and procedures at TCI. There are also plenty of examples of negligent acts which suggest a pattern of conduct by the medical staff at TCI. Moreover, the evidence tends to establish that the defendants are and have been subjectively aware of the risks that are posed by the administration of medical and mental health care at TCI.

The defendants simply cannot overcome the presence of genuine issues of material fact with respect to the plaintiffs' Eighth Amendment claims. Essentially, the defendants argue that they follow their internal procedures, which are adequate to ensure that constitutional minimums are satisfied. The evidence in the record belies this assertion. Procedures might be followed in many instances, but the plaintiffs provided evidence demonstrating that these procedures are inadequate or frequently ignored to the detriment of the TCI inmate population. It is true that errors often occur in any system, but a system that is overwhelmingly error-prone can violate the Eighth Amendment. Ultimately, the Court finds it curious that the defendants would even bother moving for summary judgment when their own expert describes the system as one designed to let people "fall through the cracks."[1]

## II.     Equal Protection – Mental Health Care for Women

The equal protection clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const.

---

[1]  The Court grants the defendants' motion on the issue of dental care, but not to the extent that dental issues overlap with broader medical issues.

amend. XIV, 1. To state a *prima facie* claim under the Equal Protection Clause, plaintiffs must show (1) they are similarly situated to members of the unprotected class; (2) they are treated differently from members of the unprotected class; and (3) the defendants act with discriminatory intent. *See Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000); *Trautvetter v. Quick*, 916 F.2d 1140, 1149 (7th Cir. 1990). Discriminatory intent can be shown by direct or circumstantial evidence. Direct evidence is evidence which, if believed by the trier of fact, will prove discrimination without inference or presumption. *See Nichols v. So. Ill. Univ.- Edwardsville*, 510 F.3d 772, 781 (7th Cir. 2007). Circumstantial evidence is evidence which allows the trier of fact to infer intentional discrimination. *Id.* "All that is required is that the action [or lack of action] taken be motivated by the gender of the plaintiff. No hatred, no animus, and no dislike is required." *King v. Bd. of Regents of Univ. of Wis. Sys.*, 898 F.2d 533, 539 (7th Cir. 1990).

Plaintiffs argue that the State's failure to provide an inpatient mental health facility for women that is equal to the one provided for men (the Wisconsin Resource Center) violates equal protection. Defendants essentially concede that men are treated more favorably than women in this context. Defendants claim that this was not discriminatory, but rather a natural outgrowth of the historically small number of female prisoners in Wisconsin. This still doesn't explain differential treatment for similarly situated female prisoners. The defendants' ongoing knowledge of the disparity in treatment is circumstantial evidence of discriminatory animus. It raises the inference that the defendants deemed female prisoners

less important than male prisoners. Plaintiffs have established a prima facie case on their equal protection claim.

Defendants also argue that the Court must defer to its future plans to build a female inpatient health treatment facility. The Wisconsin State Legislature approved funding for an inpatient health treatment facility for female prisoners that is slated to open in early 2011. If this plan actually comes to fruition in a manner that satisfies the equal protection clause, this claim will be mooted. In the meantime, plaintiffs' equal protection claim is still viable.

## III.  ADA (Title II) and Rehabilitation Act Claims

The ADA was enacted to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA prohibits discrimination in connection with access to public services, requiring that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

The ADA and the Rehabilitation Act both apply to prisoners. *See Pennsylvania Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998). Title II of the ADA was modeled after Section 504 of the Rehabilitation Act. The elements of the two claims are nearly identical, and precedent under one statute typically applies to the other. *See Washington v. Indiana*

-38-

*High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 845 n.6 (7th Cir. 1999).[2]  For purposes of this motion, the minor differences between the ADA and the Rehabilitation Act are not relevant, so the Court will confine its analysis to the ADA.  *See, e.g., Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

The elements of a Title II claim are: (1) plaintiffs are qualified individuals with disabilities; (2) plaintiffs were either excluded from participating in, or denied the benefits of, a public entity's services, programs, or activities, or were otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of disability. *See Kiman v. New Hampshire Dep't of Corrs.*, 451 F.3d 274, 283 (1st Cir. 2006); 42 U.S.C. § 12132.  Intentional discrimination, or discrimination "by reason of disability," can be established by evidence that the defendant intentionally acted on the basis of the disability, the defendant refused to provide a reasonable modification, or that the defendant's rule disproportionately impacts disabled people.  *See Washington*, 181 F.3d at 847.  If needed, a plaintiff must demonstrate "the existence of a reasonable accommodation" that would enable her to participate in the program, service, or activity at issue.  *See, e.g., Zukle v. Regents of Univ. of Calif.*, 166 F.3d 1041, 1046 (9th Cir. 1999) (when a plaintiff alleges a failure to accommodate, part of the plaintiff's initial burden includes showing the existence of a reasonable accommodation).

---

[2] One difference between the two statutes is that the Rehabilitation Act only applies to entities receiving federal funds.  "It is undisputed that DOC receives and uses federal funds in its state prison facilities." *Smith v. Frank*, No. 07-C-83, 2009 WL 750272, *6 n.1 (E.D. Wis. March 20, 2009).

If the plaintiff meets these *prima facie* requirements, the burden shifts to the defendants to show that the accommodation provided was either effective, or that the accommodation sought and not provided would have resulted in a fundamental alteration of the procedures or an undue financial or administrative burden. *See Tucker v. State of Tennessee*, 539 F.3d 526, 532-33 (6th Cir. 2008) (citing *Tennessee v. Lane*, 541 U.S. 509, 532 (2004)). This determination is a fact-specific, context-specific inquiry. *See Pierce v. County of Orange*, 526 F.3d 1190, 1217 (9th Cir. 2008). Courts may consider, "with deference to the expert views of facility administrators, a detention or correctional facility's legitimate interests (namely in 'maintaining security and order' and 'operating [an] institution in a manageable fashion') when determining whether a given accommodation is reasonable." *Id.* (citing *Crawford v. Indiana Dep't of Corr.*, 115 F.3d 481, 487 (7th Cir. 1997)).

The plaintiff provides evidence of a variety of potential ADA violations, including the maintenance of a segregated dining hall, a lack of program access to prisoners with mobility disabilities, and the failure to provide auxiliary aids to prisoners with hearing and vision disabilities. By way of example, programs like church services and medical appointments are rendered inaccessible by treacherous paths connecting the various buildings on TCI's campus. Instead of repairing these unsafe conditions, TCI uses other prisoners as wheelchair "pushers." One inmate declares that she "would like to attend Catholic religious services. However, there is a steep path leading up to the chapel, and it is difficult for the wheelchair

-40-

'pushers' who help me to push me up the ramp. Because I feel it wouldn't be fair for me to make them do so, I have stopped going to religious services."

Defendants argue that this prisoner is not being excluded from participation because she consciously chooses not to use the proposed accommodation. However, a reasonable inference from the facts is that the prisoner feels she cannot go to church unless she embarrasses herself by putting herself and her fellow inmates in the awkward and dangerous position of trying to push and lift her in her wheelchair. If the proposed accommodation is too difficult, awkward or dangerous for a disabled individual to utilize, the plaintiff is being denied the benefits of TCI's services because of her disability. Going one step further, if the plaintiff actually accepts the risky accommodation so she can go to church, she *still* could state an ADA claim. Title II "proscribes *discrimination* on the basis of disability without requiring exclusion *per se*." *Chisolm v. McManimon*, 275 F.3d 315, 330 (3d Cir. 2001) (emphasis in original). This is not to say that the plaintiffs are entitled to whatever form of accommodation they prefer. However, there is an issue of fact pertaining to the effectiveness of the accommodations offered at TCI. *See, e.g., Pierce*, 526 F.3d at 1219 (evidence that fellow detainees struggled to lift a wheelchair-bound detainee established an issue of fact regarding the effectiveness of "curative methods").

The defendants also argue that Title II does not "[n]ecessarily require a public entity to make each of its *existing facilities* accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a)(1). The reference to "existing facilities" means facilities and grounds constructed prior to the ADA's implementation date of January 26, 1992. A

higher standard is applied to facilities that are substantially altered after the ADA's implementation date: "each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such a manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities if the alteration was commenced after January 26, 1992." 28 C.F.R. § 35.151(b). The "accessibility" standards are governed by reference to the Uniform Federal Accessibility Standards (UFAS) or the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG). *See* 28 C.F.R. § 35.151(c).

Defendants argue that because most (if not all) of their facilities were built prior to January 26, 1992, they do not have to meet the UFAS/ADAAG accessibility standards. "Public entities are not required to modify each facility to provide access by individuals with disabilities, but must operate all programs, services and activities in a manner such that, when viewed in its entirety, each service or program is 'readily accessible to and usable by individuals with disabilities.'" *Kinney v. Yerusalim*, 812 F. Supp. 547, 548 (E.D. Pa. 1993) (quoting 28 C.F.R. § 35.150(a)). Even so, evidence regarding the alleged failure to meet the UFAS/ADAAG standards could still be relevant in the context of a "program accessibility" case. A program could be rendered inaccessible if it is held in an inaccessible facility. *See, e.g., The Americans with Disabilities Act: Title II Technical Assistance Manual* 5.2000 ("Unlike private entities under Title III, public entities are not required to remove barriers from each facility, even if removal is readily achievable. A public entity must make its

-42-

'programs' accessible. Physical changes to a building are required only when there is no other feasible way to make the program accessible").

Finally, defendants argue that the ADA subclass lacks standing to obtain injunctive relief because they failed to show that they are facing a real or immediate threat of irreparable injury. The only relief sought by the ADA subclass is prospective, injunctive relief. *See Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 606 (7th Cir. 2004) (private plaintiff may assert an ADA claim for injunctive relief against a state official in federal court) (citing *Board of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356 (2001)). Defendants' continuing failure to provide effective accommodations for its prisoners easily establishes the threat of future injury. TCI's disabled inmates are under a continuing threat of harm under the ADA if they hope to partake in TCI's programs and services going forward. The "imminent harm" standard is satisfied where "the potential harm was not 'uncertain or speculative,' but might be expected to occur before the threat could otherwise be averted. In determining standing, the courts have framed their inquiry into the 'immediate threat' as one encompassing consideration of the likelihood of an ongoing danger, as evidenced by past events." *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 322 (3d Cir. 2001) (citing *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).

The Court concludes that the plaintiffs satisfied their prima facie burden with respect to numerous potential and ongoing ADA violations. The defendants' claim that they consistently follow TCI's "policy" to provide reasonable accommodations for disabled inmates is contradicted by extensive evidence in the record. In addition, defendants fail to

-43-

provide any evidence showing that the proposed accommodations – e.g., repairing uneven pathways, removing access barriers, providing sign language interpreters for educational and religious programs – impose an undue burden or require any fundamental alterations. Accordingly, there are genuine issues of material fact, and defendants are not entitled to judgment as a matter of law.

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

1.     Defendants' motion for partial summary judgment is **DENIED-IN-PART** and **GRANTED-IN-PART**, consistent with the foregoing opinion;

2.     The Court will conduct a telephonic status conference on **December 9, 2009** at **10:30 a.m (CST)**. The purpose of this call will be to set the case for trial on the Court's calendar. All parties must dial number **1-866-360-7333** and provide the Sprint Telephone Operator with Conference ID # **42016407** to participate.

Dated at Milwaukee, Wisconsin, this __24th__ day of November, 2009.

**SO ORDERED,**

**s/ Rudolph T. Randa**_____
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

-44-