UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

KRISTINE FLYNN, *et al.*, on behalf
of themselves and all others
similarly situated,

        Plaintiffs,

v.                                        **Case No. 06-C-537-RTR**

JIM DOYLE, *et al.*,

        Defendants.

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, ORDER AUTHORIZING NOTICE TO THE CLASS, AND SCHEDULING A FAIRNESS HEARING**

## I.   INTRODUCTION

Pursuant to Fed. R. Civ. P. 23(e), Plaintiffs, by and through their undersigned counsel, respectfully submit this Brief in Support of their Motion for Preliminary Approval of Class Action Settlement Agreement, Order Authorizing Notice to the Class, and the Scheduling of a Fairness Hearing.

## II.  PROCEDURAL HISTORY

Plaintiffs filed their Class Action Complaint on May 1, 2006 (Dkt. # 1), alleging that Defendants violated the Eighth Amendment of the United States Constitution (as applied to the states through the Fourteenth Amendment), the Equal Protection Clause of the Fourteenth Amendment, the Americans with Disabilities Act, and section 504 of the Rehabilitation Act. Specifically, Plaintiffs alleged that inadequate medical, dental, and mental health care at the

Taycheedah Correctional Institution (TCI), Wisconsin's only maximum security women's facility, constituted deliberate indifference to serious medical needs in violation of the Eighth Amendment's prohibition of cruel and unusual punishment. Plaintiffs further alleged that the lack of an inpatient psychiatric treatment facility for women constituted an Equal Protection violation and that Defendants denied prisoners with disabilities access to the prison's services, programs, and activities based on their disability status.

On May 1, 2006, Class Representatives Kristine Flynn, Debbie Ann Ramos, Lenda Flournoy, and Vernessia Parker brought a motion to certify a class defined as "all prisoners who are now or in the future will be confined at TCI" (the "TCI Class") and a subclass defined as "all individuals with disabilities who are now or in the future will be confined at TCI" (the "ADA Subclass") (Dkt. # 2). Defendants initially moved the Court to screen the case for dismissal under 28 U.S.C. § 1915A (Dkt. # 12). After the Court declined to dismiss the case on screening (Dkt. # 18), Defendants opposed the Plaintiffs' motion for class certification (Dkt. # 26) and filed a motion to dismiss for failure to state a claim and a motion for summary judgment (Dkt. # 20). On March 17, 2007, the Court certified the TCI Class and ADA Subclass and denied Defendants' motions. *Flynn v. Doyle*, No. 06-C-537, 2008 WL 217134 (E.D. Wis. March 17, 2007) (Dkt. # 57). The Parties proceeded to conduct approximately 18 months of discovery. On January 23, 2009, Plaintiffs filed a motion for a preliminary injunction to require Defendants to provide timely, uninterrupted medications to prisoners and to employ nurses to administer those medications to prisoners instead of correctional officers (Dkt. # 123). On February 2, 2009, Defendants filed a motion for partial summary judgment (Dkt. # 130). On April 24, 2009, the Court granted Plaintiffs' motion and entered a preliminary injunction. *Flynn v. Doyle*, 630 F. Supp. 2d 987 (E.D. Wis. 2009) (Dkt. # 178). On November 24, 2009, the Court denied

Defendants' motion for partial summary judgment with respect to all claims except the dental claim, which Plaintiffs had conceded. *Flynn v. Doyle*, 672 F. Supp. 2d 858 (E.D. Wis. 2009) (Dkt. # 234). Following the entry of that Order, the Court calendared five weeks for a trial beginning on September 27, 2010 (Dkt. #236). At the Parties' request, the Court referred the matter for mediation and assigned Magistrate Judge Aaron Goodstein to serve as mediator (Dkt. # 237).

The Parties engaged in a total of seven days of mediation over three months under the auspices of Judge Goodstein, in addition to extensive email correspondence, numerous telephone calls, and an additional in-person negotiation session. By mid-June 2010, the Parties had reached an agreement settling all of Plaintiffs' substantive claims and reduced that agreement to writing. As of June 17, 2010, the agreement was fully executed. The substantive terms having been settled, the Parties entered into negotiations on attorneys' fees and costs. Plaintiffs' counsel submitted documentation of fees and costs and a proposal for a mechanism to pay Plaintiffs' counsel for work done during the term of the settlement agreement. After email correspondence and telephone negotiations, the parties reached agreement on fees on August 11, 2010. The agreement was reduced to a writing ("Addendum 1"), which was fully executed as of August 18, 2010.

By this Motion, Plaintiffs seek the Court's preliminary approval of the Proposed Settlement Agreement ("PSA") and an Order authorizing notice to the class and setting a date for a Fairness Hearing pursuant to Fed. R. Civ. P. 23(e).

### III. SUMMARY OF THE PROPOSED SETTLEMENT AGREEMENT

Subject to final approval by the Court, the PSA will settle all remaining substantive claims in this action: namely, claims of deliberate indifference to serious mental health needs and

3

violation of the Equal Protection Clause of the Fourteenth Amendment (together, the "Mental Health Claims"), claims of deliberate indifference to serious medical needs (the "Medical Claims"), and claims alleging violations of the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA) (together, the "Accessibility Claims"). A complete copy of the PSA is attached to the Eber Declaration as Exhibit 786.

### A. Medical-Related Settlement Provisions

1. **Auditing of Medical Care/Retention of an Independent Correctional Medical Care Consultant**

The PSA identifies 12 key areas of medical care in which Plaintiffs have alleged significant deficiencies. These areas are: (1) Non-emergency health care requests and services, (2) Nursing assessments, (3) Continuity of care, (4) Chronic disease services, (5) Emergency care, (6) Hospital and specialty/offsite care, (7) Intake screening, (8) Initial health assessments, (9) Pharmacy, (10) Medication services, (11) Infirmary care, and (12) Continuous quality improvement. *See* PSA Appendix A. The PSA requires TCI to comply with an agreed-upon standard of care (hereinafter, "TCI Medical Standards") for each of these areas.[1] To operationalize the determination of compliance, the Parties will jointly retain Dr. Marc Stern, MD, MPH, to serve as an independent correctional health consultant (hereinafter, "Consultant"). Dr. Stern is the former medical director for the Washington Department of Corrections and has extensive training and professional experience in correctional health care. With input from the Parties, Dr. Stern will develop a set of "Compliance Indicators," or measurable variables, to ascertain TCI's ability to meet certain pre-determined performance goals ("Compliance

---

[1] For example, the standard for Non-emergency health care requests and services requires that "[a]ll inmates have the opportunity daily to request health care. Their requests are documented and reviewed for immediacy of need and the intervention required. Sick call and clinicians' clinics are conducted on a timely basis in a clinical setting by qualified health care professionals. Patients referred to a provider from sick call are seen timely as clinically indicated."

4

Thresholds").[2] Dr. Stern will visit TCI for several days two or three times each year to conduct and/or oversee audits of TCI's health care system using the Compliance Indicators. In addition to reviewing patient medical charts, Dr. Stern will have full access to TCI and may speak with TCI employees and prisoners. After each visit, Dr. Stern will draft and submit to the Parties a written report discussing, *inter alia*, the results of his audits and recommendations for improved performance. Over the course of the settlement agreement period, Dr. Stern has discretion to delegate certain auditing duties to TCI staff but retains the right to verify and/or redo any audits so delegated. Should any audits indicate non-compliance with any TCI Medical Standard, the PSA requires the Parties to engage in an informal dispute-resolution process with the goal of developing a plan to bring about compliance without involving the Court. However, should this process fail to result in a satisfactory resolution, Plaintiffs may seek judicial enforcement to bring the Defendants into compliance. Auditing of each TCI Medical Care Standard will continue until TCI demonstrates compliance by meeting or exceeding all applicable Compliance Thresholds in two out of three consecutive audits, at which point that Standard will be deemed "inactive." Additional details of the duties of the Consultant and the auditing process are set forth in Sections I.A.2 & 3, I.D and I.E.1.c of the PSA. Plaintiffs' counsel will have access to TCI for the purpose of monitoring compliance with the terms of the PSA. PSA § I.D.1.

2. **Accreditation by the National Commission on Correctional Health Care**

Before the settlement agreement can terminate, TCI must attain accreditation of its health care system by the National Commission on Correctional Health Care (NCCHC). NCCHC is a

---

[2] Continuing with the above example, the audit tool for the standard governing non-emergency health care might include a Compliance Indicator to measure whether referrals to providers are scheduled and carried out within a clinically appropriate time frame. With input from the Parties, Dr. Stern will make a determination that TCI must satisfy this Compliance Indicator a certain percentage of the time in order to attain compliance.

5

national organization that accredits prison health care systems using a set of correctional health care standards. PSA § I.A.1.

### 3. **Employment of an Associate Medical Director**

Within six months of the entry of an Order granting final approval, the PSA requires Defendants to hire a full-time, board-certified physician to serve as Associate Medical Director. The Associate Medical Director will be located at TCI and will devote approximately 70% of his or her time to the direct care of patients. The remainder of his or her time will be devoted to overseeing and supervising all clinical services at TCI. PSA § I.B.1.

### 4. **Continuation of Medication Administration by Nursing Staff**

On April 24, 2009, the Court entered a preliminary injunction requiring, *inter alia*, that Defendants employ nursing staff (with credentials greater or equal to those of LPNs) in place of correctional staff to administer medications to prisoners. *Flynn v. Doyle*, 630 F. Supp. 2d 987 (E.D. Wis. 2009) (Dkt. # 178). The PSA requires that Defendants continue to do so for the duration of the settlement agreement. PSA § I.C.

### 5. **Miscellaneous Medical-Related Provisions**

The medical-related provisions of the PSA will remain in effect and Plaintiffs' Medical Claims will remain active until all of the following occur: (1) TCI achieves NCCHC accreditation; (3) all of the TCI Medical Care Standards have become "inactive" as set forth in the PSA; (4) no un-remediated "Egregious Circumstances" exist;[3] (5) WDOC hires and continues to employ an Associate Medical Director in accordance with the terms of the PSA; and (6) TCI continues to employ nursing staff to administer medications. Once all of the above conditions have been met, the Parties will move to dismiss with prejudice Plaintiffs' Medical Claims. PSA

---

[3] "Egregious Circumstances" are defined as "systemic and gross deficiencies in staffing, facilities, equipment, or procedures such that Plaintiffs are effectively denied access to adequate medical care, or frequent examples of negligent acts that disclose a pattern of deliberately indifferent conduct by medical staff." PSA at 2.

6

§ I.E.1. Other provisions of the PSA provide that Defendants will pay the Consultant's fees and costs, PSA § I.A.3, and that both parties will have *ex parte* access to the Consultant. PSA § I.A.2.e.

   B. **Mental Health-Related Settlement Provisions**
      1. **Construction of and Initiation of Services at the Wisconsin Women's Resource Center**

In their Complaint, Plaintiffs alleged that Defendants violated the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment by failing to provide an inpatient level of psychiatric care to female prisoners. In settlement documents filed with *United States v. Doyle*, 08-C-753-RTR (E.D. Wis.), a lawsuit by the United States Department of Justice pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, Defendants stated their intention to begin operation of a 45-bed psychiatric facility for women in early 2011. However, the settlement reached with USDOJ provided for no direct enforcement of the terms of the agreement. USDOJ's sole remedy upon the defendants' noncompliance is to reinstate its complaint, after waiting three years and nine months from its filing. (Dkt. # 141-7, Memorandum of Agreement ("MOA"), ¶ VIII.(1), at p.9). USDOJ was prohibited by the MOA from alleging breach of the agreement as a basis for relief upon reinstating its complaint. As of the time that the Parties began negotiations in the instant matter, it was clear that the facility would not be ready for operation by early 2011, as initially intended. The PSA creates an enforceable deadline of June 1, 2012 for completion and initiation of services at the facility. PSA § II.D.

      2. **Construction of and Initiation of Services at TCI Annexes**

Discovery, including depositions of Defendants' mental health staff, and the reports of Jeffrey Metzner, M.D., the consultant hired pursuant to the defendants' settlement of *United States v. Doyle*, 08-C-753 (E.D. Wis.), revealed that inadequate physical space appropriate for

7

individual and group therapy was among the more significant obstacles to providing sufficient mental health treatment to prisoners at TCI. As part of the settlement of *United States v. Doyle*, the defendants promised to construct two "annexes" that would provide the required space for such treatment services. However, the agreement did not specify a completion date for the annexes and, as with the promise to construct an inpatient facility, the promise to construct the annexes was not directly enforceable. The PSA creates an enforceable deadline of June 1, 2012 for completion and initiation of services in the annexes. PSA § II.C.

3. **Access to the USDOJ Consultant by Plaintiffs' Counsel**

Although Plaintiffs may have taken a different approach to remedying deficiencies in mental health care at TCI than USDOJ did in settling *United States v. Doyle*, 08-C-735 (E.D. Wis.), a desire to avoid interfering with the work of Dr. Metzner, the psychiatrist hired pursuant to the USDOJ settlement, and other practical considerations dictated that settlement of the mental health claims in this case work parallel to the framework of the USDOJ Memorandum of Understanding. Accordingly, the PSA permits Plaintiffs' counsel to communicate in writing with Dr. Metzner (or any successor USDOJ consultant) about any matter within the scope of the USDOJ settlement, to receive and comment on Dr. Metzner's draft progress reports, and to receive Dr. Metzner's final reports. PSA § II.A.1.a. Moreover, because of continued concerns about disciplinary practices that may have an unnecessarily harmful effect on seriously mentally ill prisoners, Plaintiffs' counsel also have additional *ex parte* access to Dr. Metzner for the purpose of discussing information pertaining to discipline of mentally ill prisoners. PSA § II.A.1.b.

4. **Additional Mental-Health Related Provisions**

Other mental health provisions specify a mechanism for dispute resolution and enforcement similar to that for the medical care terms of the PSA. PSA § II.E.1. Termination of Plaintiffs' counsel's access to the USDOJ consultant coincides with termination of the USDOJ agreement in September 2012, while the terms relating to construction and operation of the TCI annexes and the Wisconsin Women's Resource Center terminate only upon compliance. PSA §§ II.E.2. & 3.

C. **Accessibility-Related Settlement Provisions**

The PSA requires numerous changes to TCI's policies and practices with regard to program accessibility for prisoners with disabilities. New policies will provide accommodations such as sign language interpreters, reading assistants, and increased telephone access for prisoners with hearing and/or sight impairments. PSA §§ III.A, III.B. Additional changes will be made to policies governing access to the dining hall. PSA § II.F. TCI will be required to maintain paths and walkways in a state of repair sufficient to allow prisoners access to core programs and services. PSA § II.E. Prisoner requests for accommodation will be sent to the ADA coordinator for forwarding to staff with the authority to approve or deny the accommodation, PSA § II.F, and Plaintiffs' counsel may review accessibility-related prisoner grievances. PSA § II.D. In addition, Defendants will adhere to their policy governing disabilities and prisoner discipline and will conduct a review of the wait times experienced by prisoners with disabilities who are awaiting placement in accessible cells in medium-security housing units. PSA § II.H. The Parties will attempt to resolve allegations of non-compliance with these provisions through an informal dispute-resolution mechanism before seeking judicial enforcement. PSA § II.I.1 The accessibility-related provisions of the PSA will terminate when the medical and mental health-

9

related provisions terminate, at which time the Parties will seek dismissal of Plaintiffs' Accessibility Claims. PSA § II.I.2.

### D. Miscellaneous Settlement Provisions

The Court will retain jurisdiction over this action until the settlement ends and all claims have been dismissed. PSA § IV.A. The PSA will terminate without a termination hearing, and Defendants agree not to move to modify or terminate the agreement pursuant to 18 U.S.C. § 3626(b) until the settlement ends according to its terms. PSA §§ IV.C and IV.D. Additional terms are set forth in detail in Section IV of the PSA.

### E. Attorneys Fees and Costs

Addendum 1 to the PSA provides for a payment of $950,000 in full settlement of Plaintiffs' claims for fees and costs through mid-June 2010. This is substantially less than Plaintiffs' lodestar fees and expenses. Eber Decl. ¶ 7. Defendants will also pay Plaintiffs' counsel's reasonable fees and expenses incurred in obtaining final approval of the settlement and for monitoring compliance. Addendum 1, ¶¶ 2-3.

## IV. LEGAL ARGUMENT

### A. The Court Should Preliminarily Approve the Proposed Settlement Agreement

Approval of a proposed settlement under Rule 23 requires two steps. First, the district court conducts a preliminary review of the settlement prior to notice being issued to the class. Second, following notification of the class, the court conducts a fairness hearing at which the opinions of class members may be heard. The court then decides whether the proposed settlement is "fair, reasonable, and adequate." *Armstrong v. Bd. of Sch. Dirs. of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas,* 134 F.3d 873 (7th Cir. 1998).

The purpose of the preliminary review of the settlement is to "determine whether the proposed settlement is "'within the range of possible approval'" and "to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Armstrong*, 616 F.2d at 314 (quoting Manual for Complex Litigation § 1.46, at 53-55 (West 1977)). *See also Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982) (same). The standards for obtaining preliminary approval are less stringent than those for obtaining final approval. *In re Ford Motor Fuel Temperature Sales Practices Litig.*, 258 F.R.D. 671, 675-76 (D. Kan. 2009). *See also In re Bromine Antitrust Litig.*¸ 203 F.R.D. 403, 416 (S.D. Ind. 2001) ("[t]he bar is low" for preliminary approval). The court reviewing the proposed settlement should not make conclusions on the merits of the claims or "second guess" the settlement's terms. *Barnes v. United States*, 89 Fed.Cl. 668, 670 (Fed. Cl. 2009). The settlement agreement should be analyzed in the light most favorable to the agreement as a whole rather than performing a provision-by-provision evaluation. *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996) (citing *Armstrong*, 616 F.2d at 315). *See also In re Tectronics Pacing Sys., Inc.*, 135 F. Supp. 2d 985, 1008 (S.D. Ohio 2001) (courts should not modify a proposed settlement agreement but approve or disapprove of the agreement as a whole). A determination of preliminary approval may be made "on the basis of information already known, supplemented as necessary by briefs, motions, or informal presentations by parties." Manual for Complex Litigation § 21.632, at 320-21 (4th ed.).

Courts look to myriad factors when considering a grant of preliminary approval, including whether the proposed settlement has any "'obvious deficiencies'" or "'improperly grant[s] preferential treatment to class representatives or segments of the class.'" *Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 264 F.R.D. 438, 447 (N.D. Ill. 2009) (quoting *In re*

11

*Stock Exch. Options Trading Antitrust Litig.,* 2005 WL 1635158, at *5 (S.D.N.Y. July 8, 2005). Other factors include "the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement," "the opinion of competent counsel," *Armstrong*, 616 F.2d at 314, and whether (1) "the parties have conducted extensive investigation and discovery and sufficient litigation of the issues to allow counsel for the parties to make informed and reasonable assessments of their respective positions;" (2) the proposed settlement will avoid the substantial costs, delay, risk, and uncertainty of additional litigation; (3) the proposed award of attorneys' fees and costs is preliminarily reasonable; and (4) the "proposed settlement appears to be the result of extensive, non-collusive, arm's-length negotiations between experienced and well-qualified counsel." *Kitson v. Bank of Edwardsville*, No. 08-507-GPM, 2009 WL 3066620, at *3 (S.D. Ill. Sept. 18, 2009). *See also Armstrong*, 616 F.2d at 314 (citing similar factors as relevant to a determination of fairness in the final approval stage).

1. *The Proposed Settlement Offers Relief Commensurate with the Strength of Plaintiffs' Likelihood of Success on the Merits*

In the case at bar, "the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement," weighs in favor of approval. *Armstrong*, 616 F.2d at 314 (citation omitted). *See also Synfuel Technologies, Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006) (quoting *In re General Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106, 1132 (7th Cir.1979)) (citing this factor as the most important one to consider in the context of final approval of a settlement). While the instant case seeks no monetary damages and thus is not amenable to balancing an "amount offered" against the merits of Plaintiffs' case, it is clear that the scope and breadth of the injunctive relief provided in the PSA is well-balanced against Plaintiffs' likelihood of success on the merits. Even though Plaintiffs believe that the

merits of their claims are strong, there is no guarantee that, should they prevail, the relief ordered by the Court would be substantially greater than the relief provided for by the PSA. In addition, given that conditions at TCI are subject to change over time, the strength of Plaintiffs' case at the time the PSA was negotiated may be substantially different by the time of trial, thus making Plaintiffs' chances of success less than certain.

Further, the PSA grants significant, meaningful relief to the TCI Class and ADA Subclass in settlement of the Medical Claims, Mental Health Claims, and Accessibility Claims. Institutional litigation involving medical and mental health care frequently end in settlements in which, as is the case in the instant settlement, a third-party monitor or consultant measures the institution's compliance with the terms of a settlement agreement. *See, e.g., Hadix v. Caruso,* 461 F.Supp.2d 574, 580 (W.D. Mich. 2006) (discussing a medical monitor in a case with a consent decree); *Laube v. Campbell,* 333 F. Supp. 2d 1234, 1244 (M.D. Ala. 2004) (approving a settlement with an independent medical monitor); *Ruiz v. Johnson*, 154 F. Supp. 2d 975, 981 (S.D. Tex. 2001) (discussing appointment of special master to monitor consent decrees). Similarly, correctional cases involving alleged violations of the ADA and Rehabilitation Act frequently result in settlements requiring specific changes to policies, as is the case with the PSA. *See, e.g., D.M. v. Terhune*, 67 F. Supp. 2d 401, 404 (D.N.J. 1999); Stipulation of Dismissal of Actions & Order (Dkt. # 115), *Valenzuela v. County of Los Angeles,* No. 02-9092 (C.D. Cal. Mar. 16, 2007); Settlement Agreement between the United States and the Alameda County Sheriff's Office, DOJ Complaint 204-11-290, February 2, 2010, http://www.ada.gov/bonner.htm. The relief provided by the PSA is particularly reasonable given the limits on prospective injunctive relief imposed by the Prison Litigation Reform Act (PLRA), which requires that injunctive relief "…extend no further than necessary to correct the violation

13

of the Federal right of a particular plaintiff or plaintiffs…[and] that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1). In the instant case, the Parties agree that the relief set forth in the PSA fully complies with the PLRA's limitations. PSA § IV.B. Likewise, Defendants have agreed not to seek termination pursuant to 18 U.S.C. § 3626(b)(1)(A), which would otherwise permit Defendants to move to terminate post-judgment relief after as little as 2 years. In contrast, based on its terms, it is possible that the relief offered by the PSA will extend for more than two years.

2. *The Proposed Settlement Agreement Treats All Class and Subclass Members Equally*

Neither the Class Representatives nor any segment of the TCI Class or ADA Subclass receives preferential treatment. The terms of the PSA apply equally to all TCI Class and ADA Subclass members. No class member or group of class members is singled out for injunctive relief beyond what is afforded to all other class members.

3. *The Parties Have Conducted Extensive Discovery and Litigation*

More than four years elapsed from the time Plaintiffs filed their Complaint to the signing of the PSA. During these four years, the Parties exchanged more than 300,000 pages of discovery documents and conducted more than 40 depositions of expert and fact witnesses across the country. Plaintiffs fully investigated each of their claims both prior to and subsequent to the filing of their Complaint. Eber Decl. ¶ 6. During the pendency of the litigation, the Parties engaged in extensive motion practice, including a motion for class certification, a motion to dismiss, two motions for summary judgment, and a motion for preliminary injunction. The volume and breadth of the briefing submitted to the Court speak to the Parties' respective

14

abilities "to make informed and reasonable assessments of their respective positions." *See Kitson*, 2009 WL 3066620, at *3.

4. *The Proposed Settlement Will Avoid the Substantial Costs, Delay, Risk, and Uncertainty of Additional Litigation*

Although the Parties have already litigated this action for more than four years, if the parties were to continue to litigate, several more years would likely pass before a decision on the merits was reached, relief ordered and implemented, and all appeals exhausted. As currently calendared, the trial of this matter would not conclude until January 28, 2011 (Dkt. # 236). The five-week trial would impose significant costs on the Parties, and post-trial litigation would likely delay the implementation of relief to class members, should they prevail on the merits. Further, the risks associated with further litigation are substantial. Approval of the PSA will avoid these otherwise inevitable costs, delays, and risks.

5. *The Proposed Award of Attorneys' Fees and Costs is Reasonable*

Reasonable attorneys' fees and costs are available to prevailing parties for both Section 1983 and ADA claims. 42 U.S.C. § 1988; 42 U.S.C. § 12205. Under the PLRA, attorneys' fees for Section 1983 claims are subject to an hourly rate cap that is substantially below the hourly market rates charged by Plaintiffs' counsel. 42 U.S.C. § 1997e. The amount of attorneys' fees proposed by the PSA is significantly less than Plaintiffs' claimed lodestar and represents the product of negotiations with Defendants' counsel. Eber Decl. ¶ 7. . In accordance with best practices and to avoid the appearance of any conflict of interest, Plaintiffs' counsel declined to negotiate attorneys' fees and costs until *after* the agreement on substantive relief had been signed. Eber Decl. ¶ 8.

6. *The Proposed Settlement is the Product of Extensive, Arm's-Length Negotiations*

15

As discussed *supra*, the Parties negotiated the substantive terms of the PSA during seven days of mediation with Judge Goodstein, subsequent written correspondence and telephone calls, and an additional in-person negotiation session. Each provision of the PSA is the result of careful, bilateral negotiations among counsel experienced with cases of this nature. The lack of collusion is evidenced by the substantial time, costs, and effort expended by the Parties in pursuit of a final agreement. Pursuant to Fed. R. Civ. P. 23(e)(3),[4] the Plaintiffs and Defendants have no other agreements between them other than the PSA. Eber Decl. ¶ 9.

7. *The Opinion of Competent Counsel Supports Approval of the PSA.*

The Court should consider the representations of counsel experienced in the litigation of cases of the type before the Court. *Great Neck Capital Appreciation Inv. P'Ship v. Pricewaterhousecoopers, L.L.P.*, 212 F.R.D. 400, 410 (E.D. Wis. 2002). Plaintiffs' counsel includes multiple attorneys experienced in complex class action litigation and cases involving civil liberties issues. Eber Decl. ¶ 10. Plaintiffs' counsel have considered myriad factors and believe that the PSA is fair, reasonable, and adequate and will provide substantial benefits to the TCI Class and ADA Subclass. Eber Decl. ¶ 11.

**B. The Class Notice and Manner of Dissemination Are Reasonable**

Before a class action may be settled, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). When, as in the case at bar, class members will be bound by a settlement of injunctive claims, notice to the class should include, *inter alia*, the "essential" terms of the proposed settlement, including attorneys' fees, options and procedures for objecting to the settlement, the date and

---

[4] Fed. R. Civ. P. 23(e)(3) requires that "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal."

16

time of the fairness hearing, and a procedure for making inquiries to class counsel. Manual for Complex Litigation § 21.312, at 295 (4th ed.); *see also Mangone v. First USA Bank*, 206 F.R.D. 222, 232 (S.D. Ill. 2001). A copy of the proposed class notice is attached to the Eber Declaration as Exhibit 787.

Notice to the class should "facilitate[] understanding and . . . arouse[] the interest of the reader." *F.C.V. Inc. v. Sterling Nat'l Bank*, 652 F. Supp. 2d 928, 933 (N.D. Ill. 2009). In *F.C.V.*, the notice "was eight pages long, and was simple and explicit in its explanation of the recipients' options and the consequences of those options." 652 F. Supp. 2d at 932. The court went on to describe the layout as "Dr. Seuss"-like, citing the capital, bold-face type the notice employed for the headings. *Id.* at 942. This notice was held to have "sufficiently informed the recipients" of their rights and options in the settlement. *Id.* at 947. The proposed notice here contains the same elementary divisions of information that was deemed sufficient in *F.C.V.* The six-page proposed notice incorporates black boxes to separate each section, and essential information is laid out in bullet points rarely longer than five lines of text in length. Each section of the notice is clearly laid out in an "FAQ" fashion, a style that has been called "luminously clear." *F.C.V.*, 652 F. Supp. 2d at 942.

In addition to its easy-to-follow format, the content of the proposed notice comports with the suggestions set forth in the Manual for Complex Litigation § 21.312, at 295 (4th ed.). The first section of the proposed notice describes the class and subclass and the criteria for membership in each. The proposed notice then gives an overview of the lawsuit's history and current status, and describes the purpose of the notice. The next three pages are devoted to setting forth the basic terms of the settlement agreement, which are grouped by topic.[5] A

---

[5] Moreover, the complete settlement agreement will be attached to the Notice, so that class members will be able to read all of its terms, should they so desire.

17

discussion of attorney fees is included at the end of the discussion of the settlement terms. *Id.* From there, the proposed notice explains the purpose of the settlement, the procedure and deadline for objecting to the settlement, and the hearing date. The mailing address of Plaintiffs' counsel and instructions for obtaining further information are provided.

Moreover, the proposed order contemplates disseminating the notice in a "reasonable manner" that satisfies the requirements of Fed. R. Civ. P. 23(e)(1) and due process. *See Adams v. Southern Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1285-86 (11th Cir. 2007) (in determining whether class notice satisfies due process, court "look[s] solely to the language of the notices and the manner of their distribution") (internal quotations and citations omitted).

Notice of the proposed settlement will be disseminated to prisoners at Taycheedah in four ways. First, at least one copy of the proposed notice and the settlement agreement will be posted on bulletin boards in all common areas of "all housing units at Taycheedah." Proposed Order at 2. *See Cody v. Hillard,* 88 F. Supp. 2d 1049, 1056 (D.S.D. 2000) (approving notice posted in general population housing units of a prison). For prisoners in the general population housing units, the bulletin boards are a common location for important information. Second, the proposed notice and accompanying copy of the proposed settlement will be hand-delivered to each prisoner in the Segregation and Monarch units. Proposed Order at 2. *See Cody,* 88 F. Supp. 2d at 1056 (approving hand-delivery of notice to prisoners in segregation). These prisoners do not have regular access to the common areas of TCI; hand delivery will ensure receipt. Third, a copy of the proposed Notice and settlement will be hand-delivered or mailed "to each Taycheedah prisoner housed in the infirmary at Dodge Correctional Institution." Proposed Order at 2. Finally, an item will be published "in the weekly prisoner bulletin alerting prisoners that the Notice to the Class and proposed settlement agreement have been posted." Proposed Order at 2.

18

Case 2:06-cv-00537-RTR   Filed 08/23/10   Page 18 of 20   Document 263

The item in the prisoner bulletin will direct prisoners who may not have seen the notices on the bulletin boards to the posted notices for further information. Finally, a summary notice will be posted at TCI for the duration of the settlement. A copy is attached to the Eber Declaration at Exhibit 788.

The proposed methods of distribution are designed to maximize the class's exposure and access to the proposed notice. Thus, the proposed distribution of the notice to plaintiff class members satisfies the requirements of due process and Rule 23.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to (1) grant preliminary approval to the Proposed Settlement Agreement; (2) find the proposed Class Notice and manner of dissemination reasonable and direct that the Class Notice be disseminated; and (3) set a date for a Fairness Hearing in accordance with Fed. R. Civ. P. 23(e).

Dated this 23rd day of August, 2010.

        Respectfully submitted,

        s/ Gabriel B. Eber

        Gabriel B. Eber
        D.C. Bar No. 483021
        David C. Fathi*
        National Prison Project of the ACLU Foundation
        915 15th Street, N.W., 7th Floor
        Washington, D.C. 20005
        Telephone: (202) 393-4930
        Fax: (202) 393-4931
        Email: geber@npp-aclu.org

*Not admitted in DC;
practice limited to federal courts*

Laurence J. Dupuis
State Bar No. 1029261
American Civil Liberties Union of Wisconsin Foundation
207 E. Buffalo St., # 325
Milwaukee WI 53202
Tel: (414) 272-4032
Fax: (414) 272-0182
Email: ldupuis@aclu-wi.org

Genevieve Essig
Robert Graham
Keri L. Holleb-Hotaling
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: (312) 222-9350
 Email: gessig@jenner.com


Attorneys for Plaintiffs